Filing # 141952727 E-Filed 01/13/2022 03:00:38 PM

IN THE CIRCUIT COURT OF THE
EIGHTEENTH JUDICIAL CIRCUIT IN AND FOR
SEMINOLE COUNTY, FLORIDA

Case No.: __2022CA000089_____

MYAPPS CORP.,

        Plaintiff,

vs.

TELECURE TECHNOLOGIES, INC.

        Defendant.          /
_____

## COMPLAINT

Plaintiff, MYAPPS CORP. ("MyApps"), by and through its undersigned counsel, files this Complaint against Defendant, TELECURE TECHNOLOGIES, INC. ("Telecure"), and alleges as follows:

### PARTIES, JURISDICITON AND VENUE

1.    MyApps is a Florida corporation authorized to do business in Florida having its principal place of business in Seminole County, Florida.

2.    Telecure is a BC Canada corporation having its principal place of business in Seminole County, Florida.

3.    In addition to maintaining its principal place of business in Seminole County, Florida, Telecure also routinely conducts its business operations in Seminole County, Florida, leases commercial space in Seminole County, Florida, and houses many of its employees and some of its executive officers and directors in Florida.

4.    Telecure (a) conducts substantial and not isolated activities in the State of Florida through continuous and systematic general business contact, (b) operates, conducts, engages in

1

## COMPOSITE EXHIBIT "A-1"

and carries out business in the State of Florida, and (c) has committed the wrongdoing set forth herein (at least in part) in Florida.

5.     Venue and jurisdiction are proper in Seminole County, Florida.

## COMMON ALLEGATIONS

### A. The Origin and Business of MyApps

6.     MyApps was founded in or about December 2015 by Adnan Malik ("Mr. Malik") and Muhammad Kashif Akram ("Mr. Akram").

7.     In or about March 2016, Mr. Malik and Mr. Akram added Dr. Muhammed Shaukat ("Dr. Shaukat") as a shareholder in MyApps.

8.     From approximately March 2016 forward, Mr. Malik, Mr. Akram and Dr. Shaukat have been the three (3) Directors of MyApps.

9.     From approximately March 2016 through and including the completion of the arrangement transaction described below, Mr. Malik, Mr. Akram and Dr. Shaukat each held one-third (1/3) of the voting shares in MyApps.

10.     MyApps offers software-based health technology solutions and services through a subscription-based model for medical practices, clinics, and care homes primarily (but not exclusively) in the United States.

11.     Since its inception, MyApps has invested heavily in research and development activities to develop a robust and stable infrastructure and to expand upon the functionality and utility of its services and complementary hardware.

12.     In 2019, MyApps began to issue non-voting shares and SAFEs (simple agreements for future equity) in order to obtain public financing in connection with bringing its initial products to market.

2

13.     Between November 2019 and September 2020, MyApps generated more than $1 million in investments through crowdfunding and by issuing non-voting shares and SAFEs to the public.

14.     These funds were raised in order to permit MyApps to invest more in research and development of its products and services, and future products and services.

### B.  Telecure Seeks to Acquire MyApps

15.     After MyApps' first round of crowdfunding, it began receiving inquiries from various companies wanting to license or to "white label" MyApps' products.

16.     MyApps was only interested in entertaining offers that would allow MyApps to grow, would enable MyApps to invest more in research and development of new product offerings and to improve existing services, and would allow Mr. Malik, Mr. Akram and Dr. Shaukat to retain control over MyApps' business operations.

17.     In June 2020, MyApps was approached by Zia Hirji, a broker with Mackie Research Capital, and Amandeep Parmar ("A. Parmar") on behalf of Telecure.

18.     At the time, Telecure was not actively engaged in business; rather, Telecure was a shell corporation that had been established with the goal of acquiring assets and businesses in the telemedicine industry.

19.     A. Parmar, on behalf of Telecure, informed MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat that he and his brother, H. Parmar, could take MyApps public by causing Telecure to acquire MyApps.  MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat were informed that in doing so Telecure could likely raise between $8-9 million (Canadian) through an initial public offering ("IPO"), which funds could then be used to fund the growth of MyApps' business.

20.     In its then current form, due to restrictions under United States securities laws, MyApps was limited to raising a maximum of US$1 million through public offerings per calendar year.

21.     The potential for public trading resulting from a deal with Telecure was enticing to MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat because it offered significant growth potential for MyApps in alignment with its goal for increased capital to fund research and development.

22.     The Telecure proposal would allow Mr. Malik, Mr. Akram and Dr. Shaukat to retain the desired control over the MyApps business operations by (a) enabling Mr. Malik to serve as the Chief Executive Officer (CEO) of both MyApps and Telecure and Mr. Akram to serve as Chief Technology Officer (CTO) of both MyApps and Telecure, (b) providing MyApps' existing shareholders a significant minority interest in Telecure, and (c) providing the MyApps' board members (Mr. Malik, Mr. Akram and Dr. Shaukat) with a 3:2 majority on the initial board of directors of Telecure.

23.     Discussions between the principals of MyApps and Telecure continued through early December 2020, when A. Parmar and Telecure introduced Mr. Malik, Mr. Akram Dr. Shaukat, and MyApps to Joshua Rosenberg ("Mr. Rosenberg") and to Eli Dusenbury ("Mr. Dusenbury"), whom Telecure would appoint as key persons to lead the efforts to take the MyApps business public through the contemplated transaction with Telecure.

24.     Telecure informed MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat that Mr. Rosenberg would be the Chief Operating Officer (COO) and that Mr. Dusenbury would be the Chief Financial Officer (CFO) of Telecure, and that they would devote a majority of their time to Telecure if and when the proposed deal between MyApps and Telecure came to fruition.

4

25.     Telecure convinced MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat that Mr. Rosenberg and Mr. Dusenbury were qualified to and capable of taking MyApps public in large part based upon Mr. Rosenberg's and Mr. Dusenbury's experience with Chemesis International, a company that invests in technology and was traded on the OTCQB market; however, Telecure at all times assured MyApps that MyApps would (a) remain in control of the Telecure Board upon the completion of the Arrangement Transaction because Mr. Malik, Mr. Akram and Dr. Shaukat would have three (3) of five (5) seats on the Telecure board, and (b) control the day-to-day affairs of Telecure through Mr. Malik's service as Telecure's CEO and Mr. Akram's service as Telecure's CTO.

26.     After further discussions, Telecure persuaded MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat that the deal proposed by Telecure was in the best interest of MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat.

27.     Accordingly, on December 15, 2020, MyApps, Telecure and a wholly owned subsidiary of Telecure, named AcquireCo, entered into an arrangement agreement (the "Original Arrangement Agreement").

28.     A true and correct copy of the Original Arrangement Agreement is attached hereto as **Exhibit A**.

29.     After executing of the Original Arrangement Agreement, MyApps and Telecure entered into four (4) amendments thereto.

30.     A copy of the first, third and fourth amendments to the Original Arrangement Agreement are attached hereto as **Exhibit B, Exhibit C,** and **Exhibit D** respectively.  MyApps does not currently a copy of the second amendment, but a copy is within Telecure's possession and is therefore readily available to Telecure.  MyApps will file a copy of the second amendment

to the Original Arrangement Agreement upon obtaining a copy through discovery.  The Original Arrangement Agreement, together with the four (4) amendments, are hereinafter collectively referred to as the "Arrangement Agreement".

31.      Pursuant to the Arrangement Agreement, Telecure would acquire all of the shares of MyApps, and the shareholders of MyApps would receive 32 million common shares of Telecure, representing approximately 38% of Telecure's 84 million common shares that would be issued after going public (the "Arrangement Transaction").

32.      The shareholders of MyApps unanimously approved and adopted the Arrangement Transaction upon the terms and conditions set forth in the Arrangement Agreement.

33.      As was represented and promised during proposal negotiations, the Arrangement Agreement provided that Mr. Malik would be the CEO of Telecure and that Mr. Akram would be the CTO of Telecure after the closing on the Arrangement Transaction so that they would continue to control the day-to-day operations of the MyApps business being acquired by Telecure.

34.      As was also represented and promised during proposal negotiations, the Arrangement Agreement (as amended on February 9, 2021) provided that there would be five (5) directors of Telecure after the closing on the Arrangement Transaction:  Mr. Malik, Mr. Akram, Dr. Shaukaut, H. Parmar and Mr. Rosenberg.

## C. Preparing for the Arrangement Transaction

35.      In order to generate interest for the initial public offering, Mr. Rosenberg and Mr. Malik gave a series of eight (8) presentations to four (4) brokers regarding and promoting the Arrangement Transaction, the anticipated listing, and the MyApps business and its growth potential.

36.     As a result of the presentations, MyApps and Telecure were able to complete a brokered private placement raising gross proceeds of $8,831,956.

37.     Additionally, in anticipation of the completion of the Arrangement Transaction and Telecure being publicly listed for trading on the Canadian Stock Exchange, and at the urging of Telecure, MyApps began expanding its operations, including hiring additional employees to support research and development and client services.

38.     MyApps did not have sufficient funds to support the expansion, so Telecure agreed to advance $150,000 to MyApps on the mutual understanding and agreement that these advances would be written off once the Arrangement Transaction completed.

39.     MyApps also allowed Mr. Dusenbury to serve at MyApps' CFO in order to onboard the necessary financial and accounting expertise needed to facilitate the work necessary for the contemplated public listing.

40.     In so doing, Telecure, through Mr. Dusenbury, gained full access to MyApps' financials in approximately February 2021.

41.     However, neither MyApps, nor Mr. Malik, Mr. Akram, or Dr. Shaukaut, were permitted full access to Telecure's financials until after the completion of the Arrangement Transaction.

### D.  Telecure's Requested Changes to the Arrangement Transaction

42.     In or around June 2021, Telecure began pressuring MyApps to make changes to the essential terms of the Arrangement Transaction.

43.     Around that time, the British Columbia Securities Commission (the "Commission") took issue with the price at which the existing shareholders of Telecure (the "Initial Telecure Shareholders") were to obtain shares.  The Commission required the purchase price to be increased

such that the Initial Telecure Shareholders would need to triple their investment to maintain the collective shareholding they intended to hold.

44.     As a result, the Initial Telecure Shareholders objected to Mr. Malik, Mr. Akram and Dr. Shaukat obtaining effective control of the initial Telecure board by way of the Arrangement Transaction, even though this effective control was always a pillar upon which the Arrangement Agreement and MyApps' consent thereto was founded.

45.     Nevertheless, Telecure insisted on the addition of a sixth board member and threatened to withdraw from the Arrangement Transaction if MyApps did not agree.

46.     Because MyApps and Telecure had already generated significant investment interest for the business which depended on the Arrangement Transaction and IPO, and because if the Arrangement Transaction failed MyApps would have been left with significant debt to Telecure ($150,000) due to the money MyApps had spent at Telecure's insistence to expand its operations in preparation for the IPO, MyApps was under financial pressure to consider Telecure's eleventh hour mandate with appropriate contingencies to be put in place.

47.     MyApps indicated that it would agree to the addition of a sixth Telecure board member to represent the additional investment pool only under certain express conditions.

48.     The express conditions were that Telecure would agree that:  (i) the contemplated sixth board member would be independent from Telecure, and (ii) A. Parmar (as a major shareholder of Telecure), H. Parmar and the other initial directors of Telecure agree that a seventh (independent) director would be appointed immediately after the closing on the Arrangement Transaction, and (iii) the seventh independent director would be nominated by Mr. Malik, Mr. Akram and Dr. Shaukat at an annual general meeting to be held within a few months of the completion of the Arrangement Transaction and their nominee would be supported by Telecure.

8

49.     Telecure informed MyApps that it would abide by the conditions required by MyApps for the addition of a sixth Telecure director, but the parties thereafter never ultimately amended the Arrangement Agreement to provide for the addition of a sixth Telecure director (on these conditions or otherwise), nor was anything passed by the MyApps board of directors agreeing to this change to the Arrangement Agreement.

50.     The Arrangement Transaction closed and was consummated on August 11, 2021 and Telecure was listed on or about that same day.

51.     Upon the closing of the Arrangement Transaction, MyApps became the operating business of Telecure, and MyApps' business has at all times remained the sole operating business of Telecure.

52.     Immediately upon the closing of the Arrangement Transaction, Telecure appointed Faizaan Lalani ("Mr. Lalani") as a sixth director of Telecure in violation of the terms of the Arrangement Agreement and with regards to the conditions imposed by MyApps if MyApps were to have agreed to amend the Arrangement Agreement to allow for the addition of a sixth director (which did not occur).

53.     Moreover, Telecure has at all times since the closing on the Arrangement Transaction refused to appoint a seventh (independent) director.

### E.  Discovery of Telecure's True Intention

54.     MyApps has since learned that, notwithstanding Telecure's representations to MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat to the contrary, from the inception of negotiations concerning the Arrangement Transaction and through and including the closing on the Arrangement Transaction, Telecure had been surreptitiously planning to gain control over the MyApps business.

55.     By way of example, and not of limitation, on or about May 6, 2021, Mr. Dusenbury delivered an email to H. Parmar, with a copy to A. Parmar, in which Mr. Dusenbury expressed that "a pathway to getting control exists" and that "potentially we could have 3 BOD seats".

56.     It is now apparent that notwithstanding its repeated representations to MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat to the contrary throughout the discussions regarding the Arrangement Transaction (including, without limitation, those communications specific to the potential adding of a sixth and then seventh director to the Telecure board), Telecure always intended to obtain control over the business upon closing on the Arrangement Transaction and that it never intended to fulfill its commitment to MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat that they would retain control of the post-Arrangement Transaction business.

### F. Additional Facts Evidencing Telecure's True Intention

57.     On September 2021, Telecure held its first Board of Director's meeting after the closing of the Arrangement Transaction.  Mr. Lalani insisted, without proper authority, that he was the Chair of the Board and acted as such. At the conclusion of the meeting Mr. Lalani "resigned" as Chair, but also expressed a desire to act as the Chairman for all meetings that may occur between then and the next annual general meeting.

58.     In early October 2021, Mr. Lalani again unilaterally and without proper authority attempted to claim the position of Chairman.  MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat objected because Mr. Lalani was not a proper member of the Board by way of the Arrangement Agreement and it was becoming apparent that Telecure was not going to support the appointment of a seventh board member as it had previously committed to do upon the addition of a sixth board member.

59.     There had already been signs of significant fracture in the management of Telecure arising, in part, from Mr. Malik's criticism of plans for investor relations activity that were inconsistent with and contrary to Telecure's public disclosures.

60.     As such, MyApps sought to enforce the Arrangement Agreement requirement that only those five (5) persons identified therein serve on the Board of Telecure or, alternatively, if Telecure refused that no Chair be appointed while the issue of the number of directors could be resolved and that the Board work on building consensus in its decision making.

61.     Nevertheless, it became clear that H. Parmar and Mr. Lalani would continue to stall productive discussions at Board meetings until a Chair among what they believed to be the six (6) Directors was appointed.

62.     As a result, Mr. Rosenberg suggested that because of his positive connections with the majority of the individual directors he would be the better Chair candidate.

63.     While not agreeing that the sixth board member was appropriate or should be recognized, and based upon on the understanding and agreement that Mr. Rosenberg would not use his casting vote as chair to push through business and would instead use his position as Chair to build consensus among directors with the goal of having the Board pass business by consensus or with clear majority, MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat ultimately supported the appointment of Mr. Rosenberg as Chair so that the Telecure Board could move forward until such time as the issue concerning the appropriate number of Telecure directors could be resolved.

64.     Despite an agreement to the contrary, since his appointment as Chair of the Telecure Board, all (or nearly all) business of the Board that has been passed has been approved by way of a 3-3 vote, with Mr. Rosenberg using his tie-breaking vote for approval contrary to the votes of Mr. Malik, Mr. Akram and Dr. Shaukat.

65.     The effect has been that Mr. Malik, Mr. Akram and Dr. Shaukat have been effectively pushed out in their capacities as directors of Telecure, MyApps has no meaningful voice on the Telecure Board, and MyApps thus has no control whatsoever over Telecure's business (which consists entirely of MyApps' business) in breach of the Arrangement Agreement and the representations made by Telecure to induce MyApps into entering into the Arrangement Agreement.

66.     Additionally, even though Mr. Malik was Telecure's CEO in title, Telecure removed all power and authority that Mr. Malik should have to act on behalf of Telecure.

67.     In early December Mr. Malik discovered that, while the Board was engaging in discussions about whether Telecure should approve an advisory contract, Mr. Rosenberg had already signed that contract, purportedly on behalf of Telecure even though he had no such signing authority.

68.     On discovering Mr. Rosenberg's unauthorized signing of the advisory contract, and in light of numerous prior incidents involving Mr. Rosenberg, Mr. Malik, in his capacity as CEO (and as the sole and direct report of Mr. Rosenberg), terminated Mr. Rosenberg's employment as COO on a without cause basis, effective December 6, 2021.

69.     Upon his termination as COO, Mr. Rosenberg also lost his seat on the Telecure Board.

70.     However, the very next day (December 7, 2021), H. Parmar, Mr. Lalani and Mr. Rosenberg (even though Mr. Rosenberg was no longer a director and had a conflict of interest) called and held an emergency Board meeting on behalf of Telecure during which they purported to reinstate Mr. Rosenberg's employment as COO (relying on their three votes and Mr. Rosenberg's tiebreaking vote allegedly as chair).

71.     When MyApps, Mr. Malik, Mr. Akram and Dr. Shaukat raised concerns about Mr. Rosenberg's participation and vote in the matter due to (a) his proper termination as a Telecure employee, (b) his no longer being a board member, and (c) his conflict of interest in the matter at hand, H. Parmar, Mr. Lalani and Mr. Rosenberg proceeded undeterred and voted in favor the result they wanted (i.e. reinstating Mr. Rosenberg and thus regaining control over Telecure and its business operations).

72.     No decisions made at the December 7, 2021 meeting were valid (even assuming any prior decisions made by a Board that is inconsistent with the Arrangement Agreement and the representations by Telecure to MyApps regarding the Arrangement Transaction were valid), and all decisions made thereafter by the Telecure "Board" are also invalid.

73.     Also on December 7, 2021, Telecure (by way of a purported act of H. Parmar, Mr. Lalani and Mr. Rosenberg as controlling Board members) notified Mr. Malik that he was suspended from his position as CEO of Telecure.

74.     Telecure suspended Mr. Malik (a) because of his objections into improper Board action, (b) in retaliation against Mr. Malik for inquiring regarding Telecure's improper investor relation spending, refusing to authorize particular contracts or payments that were not in the best interest of Telecure or supported by real value to Telecure, and taking necessary action against Mr. Rosenberg, and, ultimately, (c) to ensure that Telecure had what it had all along sought—full and unfettered control of Telecure post-acquisition of the MyApps business.

75.     Moreover, Telecure is also scheming to take full and unfettered control of MyApps, which, even after the Arrangement Transaction, remains an independent company (though admittedly a wholly owned subsidiary of Telecure) with its own officers and directors (those directors currently consisting of Mr. Malik, Mr. Mr. Akram and Dr. Shaukat).

76.     In this regard, by at least December 2021 the Telecure "Board" began contemplating removing the entire currently sitting MyApps board, and to replace the entirety of the MyApps board with Mr. Dusenbury (who has no or limited experience in with technology businesses in the United States similar to MyApps) as to sole member of the MyApps Board.

77.     The Telecure "Board" has also taken action to cause Mr. Malik to resign as the CEO of Telecure and attempting to take action to remove Mr. Akram as CTO despite the fact that Telecure had committed to allow these individuals to serve in these capacities for a minimum of three (3) years.

78.     Further, without authority or permission to do so and in violation of the letter and spirit of the Arrangement Agreement and Telecure's representations in connection with the Arrangement Agreement, Telecure also interfered with MyApps by removing or freezing Mr. Malik's access to MyApps' bank accounts at PNC Bank.  This was potentially incredibly harmful to MyApps because matters such as payroll, rent and costs for the underlying technology supporting the operating business are all paid through the MyApps' bank accounts.

79.     Fortunately, PNC Bank has appropriately removed any freezes or holds from the MyApps accounts and reinstated Mr. Malik's assess thereto.

## COUNT I – SPECIFIC PERFORMANCE

80.     This is an action for specific performance of the Arrangement Agreement and, more specifically, the Board of Director requirements therein.

81.     MyApps realleges and incorporates by reference paragraphs 1 through 78 above as if fully set forth herein.

82.     MyApps and Telecure entered into the Arrangement Agreement.

83.     The terms of the Arrangement Agreement are certain and mutually binding, and were not the result of fraud, overreaching or the like by MyApps.

84.     Pursuant to the Arrangement Agreement, the Telecure Board of Directors upon the closing of the Arrangement Transaction was required to consist of only the following persons:  Mr. Malik, Mr. Akram, Dr. Shaukaut, H. Parmar and Mr. Rosenberg.

85.     Telecure breached the Arrangement Agreement by failing and refusing to install the Board of Directors required by the plain and unambiguous terms of the Arrangement Agreement after the closing on the Arrangement Transaction.

86.     Through MyApps and Telecure discussed an amendment to the Arrangement Agreement that would allow for a change in the make-up of the Board of Directors required therein, they did not amend the Arrangement Agreement to change the make-up of the Board of Directors required thereby.

87.     To the extent that there was an enforceable amendment to the Arrangement Agreement regarding the make-up of the Telecure Board (which MyApps does not concede), the amendment required the addition of a seventh director to be appointed by MyApps (vis-a-vis Mr. Malik, Mr. Akram, and Dr. Shaukaut) immediately upon the closing of the Arrangement Transaction.

88.     MyApps has fulfilled its obligations under the Arrangement Agreement.

89.     MyApps has no adequate remedy at law stemming from Telecure's breach of the Arrangement Agreement.  In fact, MyApps and Telecure agreed in writing within the Arrangement Agreement itself that "money damages would not be an adequate remedy at Law if any of the provision of the [Arrangement Agreement] were not performed in accordance with their specific terms or were otherwise breached" and that the parties should be entitled to "equitable relief…to

enforce compliance with the terms of the [Arrangement Agreement]...." *See* Arrangement Agreement, at §8.05.

90.     Equity and justice require that Telecure specifically perform its obligations under the Arrangement Agreement, including establishing the Board of Directors required thereby.

91.     MyApps is entitled to specific performance.

WHEREFORE, Plaintiff, MYAPPS CORP., respectfully requests that the Court (a) order Defendant, TELECURE TECHNOLOGIES, INC., to (i) specifically perform under the Arrangement Agreement by appointing and recognizing a Board of Directors that consists of only Mr. Malik, Mr. Akram, Dr. Shaukaut, H. Parmar and Mr. Rosenberg or, (ii) in the alternative, if the Court finds there to have been an agreement to amend the initial board of directors under the Arrangement Agreement, require Telecure to allow MyApps (vis-à-vis Mr. Malik, Mr. Akram, and Dr. Shaukaut) to appoint a seventh Director which shall be recognized by Telecure, (b) award costs to and in favor of MyApps, and (c) grant such other and further relief as the Court deems just and proper.

## COUNT II – INJUNCTIVE RELIEF

92.     This is an action to enjoin Telecure from continuing to allow the Board of Directors to operate and to conduct business in violation of the Arrangement Agreement.

93.     MyApps realleges and incorporates by reference paragraphs 1 through 78 above as if fully set forth herein.

94.     Pursuant to the Arrangement Agreement, the Telecure Board of Directors, upon the closing of the Arrangement Transaction, was required to consist of only the following persons: Mr. Malik, Mr. Akram, Dr. Shaukaut, H. Parmar and Mr. Rosenberg.

95.     The Arrangement Agreement and Arrangement Transaction closed upon the understanding and agreement that Mr. Malik, Mr. Akram, and Dr. Shaukaut would maintain a voting majority of the initial post-closing Board of Directors of Telecure.

96.     After closing on the Arrangement Agreement, and over objections by MyApps, Mr. Malik, Mr. Akram, and Dr. Shaukaut, Telecure has impermissibly allowed an illegitimate Board that is inconsistent with, and in breach of, the Arrangement Agreement and the understanding and intent of the parties to control Telecure.

97.     As a result, all actions taken by the illegitimate Telecure Board (at least to the extent that those actions did not pass by a majority vote of Mr. Malik, Mr. Akram, Dr. Shaukaut, H. Parmar and Mr. Rosenberg (i.e. the five authorized Board members)) are improper, null and void.

98.     Further, all future actions taken by the illegitimate Board of Directors including, without limitation, the removal of Mr. Malik, Mr. Akram, and/or Dr. Shaukaut from the Telecure Board of Directors or the MyApps Board of Directors, would also be impermissible, null and void.

99.     Despite demand, Telecure has failed and refused to recognize the appropriate Board of Directors or to otherwise act in accordance with the majority vote of the appropriate Board of Directors.

100.    Telecure is now using the directives of its illegitimate Board of Directors to cause harm to the brand, business and reputation of MyApps.

101.    In the absence of an injunction, MyApps will suffer irreparable harm.

102.    MyApps lacks an adequate remedy at law.  In fact, MyApps and Telecure agreed within the Arrangement Agreement itself that "money damages would not be an adequate remedy at Law if any of the provision of the [Arrangement Agreement] were not performed in accordance with their specific terms or were otherwise breached" and "that the Parties shall be entitled to

injunctive and other equitable relief to prevent breaches or threatened breaches of this Agreement and to enforce compliance with the terms of this Agreement...." *See* Arrangement Agreement, at §8.05.

103.    MyApps has a substantial likelihood of success on the merits, and will succeed on the merits of this claim.

104.    MyApps will continue to suffer and incur irreparable harm in the absence of the entry of an injunction.

105.    Considerations of the public interest support the entry of the requested injunctive relief.

WHEREFORE, Plaintiff, MYAPPS CORP.s, respectfully request that the Court (a) enter judgment against Defendant, TELECURE TECHNOLOGIES, INC., for temporary and permanent injunctive relief (i) requiring Telecure to recognize as its legitimate Board of Directors those five (5) (and only those five (5)) individuals identified in the Arrangement Agreement, (ii) prohibiting Telecure from accepting and/or acting on the direction of any illegitimate Board of Directors that is not made up solely of those five individuals identified in the Arrangement Agreement (unless and until such time as the shareholders of Telecure elects a different Board), and (iii) prohibiting Telecure or an illegitimate Board of Directors of Telecure from interfering with MyApps, altering the Board of Directors of MyApps, or restricting access by MyApps, Mr. Malik, Mr. Akram, and/or Dr. Shaukaut to MyApps' bank accounts or other company records; (b) enter an award of costs in favor of MyApps; and (c) grant such other and further relief as this Court deems just and proper.

## COUNT III – DECLARATORY RELIEF

106.    This is an action for declaratory relief.

107.    MyApps realleges and incorporates by reference paragraphs 1 through 78 above as if fully set forth herein.

108.    Because of Telecure's refusal to honor and recognize the Telecure Board of Directors required to be established by way of the Arrangement Agreement, the parties are in doubt as to their rights.

109.    There exists a bona fide, actual, present and practical dispute between Telecure and MyApps as to whether the Telecure Board of Directors must consist of those persons identified as Telecure's post-closing Directors within the Arrangement Agreement (until such time as the shareholders of Telecure may elect an alternate Board).

110.    In light of this bona fide dispute, the rights of the parties are dependent upon this declaration, and this declaration is necessary and proper.

111.    In the absence of such declaration, Telecure will continue to recognize an illegitimate board of directors that is inconsistent with the Arrangement Agreement and will continue to receive and act upon the direction of the illegitimate board.

112.    The declaration deals with a present, ascertained or ascertainable state of facts and a present controversy with respect to the facts, which entitle the parties to a declaration.

113.    Each of the parties having antagonistic or adverse interests with respect to this declaration are before the Court by way of this action.

114.    This action is not filed by Plaintiff out of curiosity or for the mere giving of legal advice by this Court.

115.    This Court should order a speedy hearing on this action and advance it on the Court's calendar.

WHEREFORE, Plaintiff, MYAPPS CORP., respectfully requests (a) a speedy hearing, (b) entry of a Judgment for declaratory relief in MyApps' favor and against Defendant, TELECURE TECHNOLOGIES, INC., which declares that (i) the Board of Directors of Telecure consists solely of those five individuals identified as post-closing Telecure Board members within the Arrangement Agreement until such time as the shareholders of Telecure vote otherwise, and (ii) all actions taken by Telecure or its illegitimate Board of Directors that was not approved by a majority of the five individuals identified as post-closing Telecure Board members within the Arrangement Agreement are null and void, (c) an award of costs in favor of MyApps, and (d) an award of such other and further relief as this Court deems just and proper.

### COUNT IV – FRAUD IN THE INDUCEMENT
#### (In the Alternative)

116.    This is an action against Telecure for fraudulently inducing MyApps to enter into the Arrangement Agreement and close on the Arrangement Transaction.

117.    MyApps realleges and incorporates by reference paragraphs 1 through 78 above as if fully set forth herein.

118.    In order to induce MyApps to enter into the Arrangement Agreement and to thereafter close on the Arrangement Agreement, Telecure made false statements concerning material facts to MyApps.

119.    At all times during all communications by and between MyApps and Telecure regarding a potential business arrangement, MyApps (by way of Mr. Malik, Mr. Akram, and Dr. Shaukaut) always informed Telecure (initially by way of A. Parmar and Zia Hirji, and later also by way of H. Parmar, Mr. Dusenbury and Mr. Rosenberg) that they would not agree to any deal or transaction that would result in MyApps (vis-à-vis Mr. Malik, Mr. Akram, and Dr. Shaukaut) maintaining control of the board of directors of the resulting company or companies after closing.

120.    In attempting to sell MyApps on an acquisition by Telecure, and throughout the negotiation of the Arrangement Agreement (including the original version and all amendments thereto), Telecure (through A. Parmar, H. Parmar, Mr. Dusenbury and Mr. Rosenberg) assured MyApps (by way of Mr. Malik, Mr. Akram, and Dr. Shaukaut) that MyApps (vis-à-vis Mr. Malik, Mr. Akram, and Dr. Shaukaut) would control the majority of the Board of Telecure and would remain in sole control of the Board of MyApps if and when a transaction between the companies was agreed upon and ultimately closed.

121.    Even near closing, when Telecure approached MyApps about the potential for adding a sixth director to the Telecure board upon closing of the Arrangement Agreement, Telecure reassured MyApps that control the majority of the Board of Telecure by informing MyApps that if MyApps would agree to the addition of a sixth Telecure Director, MyApps (vis-à-vis Mr. Malik, Mr. Akram, and Dr. Shaukaut) would be immediately entitled elect a seventh member of the Telecure board upon the closing of the Arrangement Transaction (however, MyApps and Telecure never formally agreed to the addition of a sixth Telecure director).

122.    Each of Telecure's statements to MyApps regarding MyApps' ability to control the Telecure Board upon closing of the Arrangement Transaction was a deliberate and false statement of material fact.

123.    Further, as a material inducement to convince MyApps to enter into the Arrangement Agreement, Telecure at all times represented that it would invest significant funds into further research and development of MyApps' products and services.  In fact, Telecure specifically represented that it would invest a minimum of $1.5 million into research and development targeted at upgrading the CallingDr. Platform, launching Care by CallingDr, growing MyApps' medical device offerings and expanding the FindingDr Platform in 2020.

124.    Telecure's representations regarding its investment into research and development were deliberately false statements of material fact.

125.    Telecure's false statements of material fact were the premise upon which MyApps negotiated with Telecure when arriving at the Arrangement Agreement.

126.    But for the misrepresentations by Telecure regarding MyApps' post transaction control of the Telecure Board, MyApps would not have entered into the Arrangement Agreement or closed on the Arrangement Transaction.

127.    Telecure knew these material statements were false when Telecure made them to MyApps, or Telecure made these statements knowing Telecure was without knowledge of their truth or falsity or had no intention of honoring the statements post-closing.

128.    Telecure made the material misstatements with the intent that MyApps would rely and act on the false statements and thereby enter into the Arrangement Agreement and thereafter close upon the Arrangement Transaction.

129.    Telecure did rely justifiably rely on the false statements to its detriment.

130.    If the Arrangement Agreement, which was procured as a result of Telecure's fraud, were allowed to stand, MyApps would suffer and incur damage.

WHEREFORE, Plaintiff, MYAPPS CORP., respectfully requests that this Court enter a judgment that (a) declares the Arrangement Agreement void and rescinds the Arrangement Agreement and Arrangement Transaction or, if MyApps chooses to ratify the Arrangement Agreement, to enter an award of damages against Defendant, TELECURE TECHNOLOGIES, INC., if damages can be determined, (b) award costs to and in favor of MyApps, and (c) grants such other and further relief as the Court deems just and proper.

## COUNT V – BREACH OF CONTRACT
### (In the Alternative)

131.    This is an action for breach of the Arrangement Agreement.

132.    MyApps realleges and incorporates by reference paragraphs 1 through 78 above as if fully set forth herein.

133.    MyApps and Telecure are parties to the Arrangement Agreement and are bound by the terms thereof.

134.    Telecure breached the Arrangement Agreement by failing and refusing to install the agreed upon Board of Directors after closing.

135.    As a result of Telecure's breach of the Arrangement Agreement, MyApps has suffered and incurred harm.

136.    Telecure's failure to comply with the Board of Director requirement within the Arrangement Agreement constitutes an unjustifiable refusal to perform by Telecure.

137.    MyApps and Telecure can and should be restored to their original position.

138.    Telecure refuses to restore the parties to their original position notwithstanding its breach of the Arrangement Agreement and MyApps' demands for restoration.

WHEREFORE, Plaintiff, MYAPPS CORP., respectfully requests that this Court enter a judgment that (a) rescinds the Arrangement Agreement or, if MyApps chooses to ratify the Arrangement Agreement, to enter an award of damages against Defendant, TELECURE TECHNOLOGIES, INC., if damages can be determined, (b) awards costs to and in favor of MyApps, and (c) grants such other and further relief as the Court deems just and proper.

## COUNT VI – BREACH OF ORAL CONTRACT
### (In the Alternative)

139.    This is an action for breach of an oral contract.

140.    MyApps realleges and incorporates by reference paragraphs 1 through 78 above as if fully set forth herein.

141.    MyApps did not agree to amend or otherwise revise the requirement within the Arrangement Agreement that the five (5) Directors of Telecure post-closing on the Arrangement Transaction consist of Mr. Malik, Mr. Akram, Dr. Shaukaut, H. Parmar and Mr. Rosenberg; however, if Telecure argues and the Court determines that MyApps did so, this agreement came by virtue of an oral contract conditioned upon the addition of a seventh board member to be selected by MyApps.

142.    Telecure has breached this oral contract by recognizing a six (6) person Telecure Board post-closing and by failing and refusing to allow MyApps to add a seventh person to the Board.

143.    Even worse, Telecure is purports to have removed one or more of the three (3) agreed upon Telecure Board members selected by MyApps.

144.    As a result of Telecure's breach of the oral contract, MyApps has suffered and incurred harm.

145.    Telecure's failure to comply with the Board of Director requirement within the oral contract constitutes an unjustifiable refusal to perform by Telecure.

146.    MyApps and Telecure can and should be restored to their original position prior to the oral contract such that the Telecure Board reverts to the Board as set forth in the Arrangement Agreement before the existence of the oral contract.

147.    Telecure refuses to restore the parties to their pre-oral contract position notwithstanding its breach of the oral contract and MyApps' restoration demand.

WHEREFORE, Plaintiff, MYAPPS CORP., respectfully requests that this Court enter a judgment that (a) rescinds the oral contract authorizing a sixth Director on the Telecure Board, (b) awards costs to and in favor of MyApps and against Defendant, TELECURE TECHNOLOGIES, INC., and (c) grants such other and further relief as the Court deems just and proper.

## COUNT VII – BREACH OF IMPLIED-IN-FACT CONTRACT
## (In the Alternative)

148.     This is an action for breach of an implied-in-fact contract.

149.     MyApps realleges and incorporates by reference paragraphs 1 through 78 above as if fully set forth herein.

150.     MyApps did not agree to amend or otherwise revise the requirement within the Arrangement Agreement that the five Directors of Telecure post-closing on the Arrangement Transaction consist of Mr. Malik, Mr. Akram, Dr. Shaukaut, H. Parmar and Mr. Rosenberg; however, if Telecure argues and the Court determines that MyApps did so, the agreement was conditioned upon the addition of a seventh Telecure board member to be selected by MyApps and both parties assented to this condition.

151.     Telecure knew and understood that MyApps would not close on the Arrangement Agreement if MyApps did not control the Telecure Board post-closing.

152.     The fact that Telecure closed on the Arrangement Agreement with this clear understanding of MyApps' closing condition constitutes Telecure's assent to MyApps adding a seventh Telecure director post-closing.

153.     Telecure has breached this implied-in-fact contract by recognizing a six (6) person Board and refusing to allow MyApps to add a seventh person to the Telecure Board.

154.     Even worse, Telecure is purports to have removed one or more of the three (3) agreed upon Telecure Board members selected by MyApps.

25

155.    As a result of Telecure's breach of the implied-in-fact contract, MyApps has suffered and incurred harm.

156.    Telecure's failure to comply with the Board of Director requirement within the implied-in-fact contract constitutes an unjustifiable refusal to perform by Telecure.

157.    MyApps and Telecure can and should be restored to their original position prior to the implied in fact contract such that their agreement reverts to the Board as set forth in the Arrangement Agreement as it existed before the implied-in-fact contract.

158.    Telecure refuses to restore the parties to their pre-implied-in-fact contract position notwithstanding its breach of the applied-in-fact contract and MyApps' restoration demands.

WHEREFORE, Plaintiff, MYAPPS CORP., respectfully requests that this Court enter a judgment that (a) rescinds the implied-in-fact contract authorizing a sixth Director on the Telecure Board, (b) awards costs to and in favor of MyApps and against Defendant, TELECURE TECHNOLOGIES, INC., and (c) grants such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

MyApps hereby demands a trial by jury on all claims and issues so triable.

/s/ Ronald D. Edwards, Jr.

**Ronald D. Edwards, Jr.**
Florida Bar No. 0053233
**Lowndes, Drosdick, Doster, Kantor & Reed, P.A.**
215 North Eola Drive
Post Office Box 2809
Orlando, Florida 32802
Telephone: (407) 843-4600
Fax No: (407) 843-4444
ronald.edwards@lowndes-law.com
lit.control@lowndes-law.com
tracy.kennison@lowndes-law.com
Attorneys for Plaintiff

0099994\157879\11676208v3

26

# EXHIBIT A

Execution Version

# TELECURE TECHNOLOGIES INC.

and

## 1278859 B.C. LTD.

and

## MYAPPS CORP.

---

## ARRANGEMENT AGREEMENT

---

**December 15, 2020**

# TABLE OF CONTENTS

ARTICLE 1 INTERPRETATION.................................................................................2
    Section 1.01    Definitions. ..............................................................................2
    Section 1.02    Interpretation Not Affected by Headings....................................12
    Section 1.03    Currency....................................................................................12
    Section 1.04    Number and Gender....................................................................13
    Section 1.05    Date for Any Action. .................................................................13
    Section 1.06    Knowledge.................................................................................13
    Section 1.07    Schedules...................................................................................13
    Section 1.08    Accounting Terms......................................................................13
    Section 1.09    Other Definitional and Interpretive Provisions..........................13
ARTICLE 2 THE ARRANGEMENT .......................................................................14
    Section 2.01    The Arrangement. .....................................................................14
    Section 2.02    Obligations of Telecure and Acquireco. ...................................15
    Section 2.03    Interim Order. ...........................................................................15
    Section 2.04    Court Proceedings......................................................................16
    Section 2.05    Obligations of the Company. ....................................................16
    Section 2.06    Filing Statement........................................................................17
    Section 2.07    Final Order................................................................................18
    Section 2.08    Plan of Arrangement and Effective Time. .................................18
    Section 2.09    Payment of Consideration..........................................................19
    Section 2.10    Closing......................................................................................19
    Section 2.11    Withholding Taxes.....................................................................19
    Section 2.12    U.S. Securities Law Matters. ....................................................19
    Section 2.13    Adjustment of Consideration Shares. ........................................21
    Section 2.14    Conduct of Acquireco................................................................21
ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE COMPANY....................21
    Section 3.01    Representations and Warranties of the Company........................21
    Section 3.02    Survival of Representations and Warranties...............................22
ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF TELECURE AND
ACQUIRECO ..........................................................................................................22
    Section 4.01    Representations and Warranties of Telecure and Acquireco....................22
    Section 4.02    Survival of Representations and Warranties...............................22
ARTICLE 5 COVENANTS ......................................................................................22
    Section 5.01    Conduct of Business of the Company.........................................22
    Section 5.02    Conduct of Business of Telecure and Acquireco........................24
    Section 5.03    Covenants Relating to the Arrangement.....................................26
    Section 5.04    Covenants Related to Regulatory Approvals...............................29
    Section 5.05    Access to Information.................................................................30
    Section 5.06    Indemnification..........................................................................32
    Section 5.07    Non-Solicitation........................................................................32
    Section 5.08    Success Fee. ..............................................................................37

ARTICLE 6 CONDITIONS ................................................................................................37

    Section 6.01   Mutual Conditions. ........................................................................37
    Section 6.02   Additional Conditions to the Obligations of Telecure and Acquireco. .....39
    Section 6.03   Additional Conditions to the Obligations of the Company. ......................40
    Section 6.04   Notice and Cure Provisions. ........................................................42
    Section 6.05   Merger of Conditions. ................................................................42

ARTICLE 7 TERMINATION ............................................................................................42

    Section 7.01   Termination by Mutual Consent. ................................................42
    Section 7.02   Termination by Either Party. .....................................................43
    Section 7.03   Termination by Telecure. ..........................................................43
    Section 7.04   Termination by the Company. ....................................................43
    Section 7.05   Expense Payments. ...................................................................44
    Section 7.06   Notice and Effect of Termination. ..............................................45

ARTICLE 8 GENERAL PROVISIONS ............................................................................45

    Section 8.01   Amendments. ...........................................................................45
    Section 8.02   Expenses. ................................................................................46
    Section 8.03   Notices. ..................................................................................46
    Section 8.04   Time of the Essence. .................................................................47
    Section 8.05   Injunctive Relief. .....................................................................47
    Section 8.06   Further Assurances. ..................................................................47
    Section 8.07   Third-Party Beneficiaries. .........................................................47
    Section 8.08   Waiver. ...................................................................................48
    Section 8.09   Entire Agreement. ....................................................................48
    Section 8.10   Successors and Assigns. ............................................................48
    Section 8.11   Severability. ............................................................................48
    Section 8.12   Governing Law; Submission to Jurisdiction; Choice of Language. ..........48
    Section 8.13   Rules of Construction. ..............................................................49
    Section 8.14   No Liability. ............................................................................49
    Section 8.15   Counterparts. ...........................................................................49

Schedule A Plan of Arrangement ..................................................................................... A-1

Schedule B Telecure Resolution ...................................................................................... B-1

Schedule C Representations and Warranties of the Company ................................................ C-1

Schedule D Representations and Warranties of Telecure and Acquireco ................................. D-1

# ARRANGEMENT AGREEMENT

This Arrangement Agreement (this "**Agreement**"), dated as of December 15, 2020 is entered into between Telecure Technologies Inc., a corporation incorporated under the laws of the Province of British Columbia ("**Telecure**"), 1278859 B.C. Ltd. ("**Acquireco**"), a corporation incorporated under the laws of the Province of British Columbia, and a wholly owned subsidiary of Telecure, and MyApps Corp., a corporation incorporated under the laws of Florida (the "**Company**").

## RECITALS

**WHEREAS**, Telecure proposes to acquire all of the outstanding common Share of the Company, by way of a plan of arrangement on the terms and subject to the conditions set forth in this Agreement;

**AND WHEREAS**, the Company Board (as hereinafter defined), upon the terms and subject to the conditions set forth herein, (i) has approved and adopted this Agreement, the Arrangement, the Merger and the other transactions contemplated hereby, (ii) will, in accordance with the terms hereof, recommend this Agreement, the Arrangement, the Merger and the other transactions contemplated hereby, for approval and adoption by the Company Shareholders, and (iii) will send the Company Notice (as hereinafter defined) to the Company Shareholders (as hereinafter defined), in each case, in accordance with the Florida Act as well as all other applicable laws;

**AND WHEREAS**, Telecure has entered into Support Agreements (as hereinafter defined) with the officers, directors and certain Company Shareholders (as hereinafter defined) pursuant to which, among other things, such persons have agreed, subject to the terms and conditions thereof, to vote the Company Shares (as hereinafter defined) held by them in favour of the approval and adoption of the Agreement, the Arrangement, the Merger and the other transactions contemplated hereby;

**AND WHEREAS**, the execution and delivery of this Agreement has been approved by the Company Board and the Telecure Board, respectively;

**AND WHEREAS**, upon the terms and subject to the conditions set out in this Agreement and in accordance with the Florida Act, Acquireco  and the Company will complete the Merger (as hereinafter defined) and will continue as the Surviving Company, which shall be a wholly-owned Subsidiary of Telecure;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

- 2 -

# ARTICLE 1
# INTERPRETATION

## Section 1.01   Definitions.

As used in this Agreement, the following terms have the following meanings:

"**Acquireco**" has the meaning as set forth in the preamble.

"**Acquireco Share**" means a common share in the capital of Acquireco.

"**Acquisition Proposal**" means, other than the transactions contemplated by this Agreement, any offer, proposal or inquiry (written or oral) from any Person or group of Persons "acting jointly or in concert" (within the meaning of National Instrument 62-04 – *Take-Over Bids and Issuer Bids*) other than Telecure (or any affiliate of Telecure) relating to: (i) any direct or indirect sale, disposition, alliance or joint venture (or any lease, long-term supply agreement or other arrangement having the same economic effect as a sale), in a single transaction or a series of related transactions, of assets (including shares of Subsidiaries of the Company) representing 20% or more of the consolidated assets or contributing 20% or more of the consolidated revenue of the Company and its Subsidiaries or of 20% or more of the voting, equity or other securities of the Company (or rights or interests therein or thereto); (ii) any direct or indirect takeover bid, tender offer, exchange offer, treasury issuance or other transaction that, if consummated, would result in a Person or group of Persons beneficially owning 20% or more of any class of voting, equity or other securities or any other equity interests (including securities convertible into or exercisable or exchangeable for securities or equity interests) of the Company; (iii) any plan of arrangement, merger, amalgamation, consolidation, share exchange, business combination, reorganization, recapitalization, liquidation, dissolution, winding up or exclusive license involving the Company or any of its Subsidiaries; or (iv) any other similar transaction or series of transactions involving the Company or any of its Subsidiaries;

"**affiliate**" has the meaning specified in National Instrument 45-106 – *Prospectus Exemptions*.

"**Agreement**" means this Arrangement Agreement, together with the schedules attached hereto, the Company Disclosure Letter and the Telecure Disclosure Letter, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Appraisal Rights**" means the rights of appraisal provided to Company Shareholders under the Florida Act.

"**Arrangement**" means an arrangement pursuant to provisions of Division 5 of Part 9 of the BCBCA on the terms and conditions set forth in the Plan of Arrangement, subject to any amendment or supplement thereto made in accordance therewith, herewith or made at the direction of the Court either in the Interim Order or the Final Order with the consent of the Company and Telecure, each acting reasonably.

- 3 -

"**Articles of Merger**" has the meaning set forth in Section 2.01(c) of this Agreement.

"**associate**" has the meaning specified in the *Securities Act* (British Columbia).

"**Authorization**" means, with respect to any Person, any order, permit, approval, consent, waiver, licence or similar authorization of any Governmental Entity having jurisdiction over the Person.

"**BCBCA**" means the *Business Corporations Act* (British Columbia).

"**Business Day**" means any day, other than a Saturday, a Sunday or a statutory holiday, in either the city of Vancouver, British Columbia or Lake Mary, Florida.

"**Change in Recommendation**" shall have the meaning set forth in Section 7.03(b) of this Agreement.

"**Class A Company Share**" means the issued and outstanding shares of Class "A" Common Stock in the capital of the Company.

"**Class B Company Share**" means the issued and outstanding shares of Class "B" Common Stock in the capital of the Company.

"**Company**" has the meaning set forth in the preamble and includes any successor to the Company.

"**Company Board**" means the board of directors of the Company as constituted from time to time.

"**Company Consent**" means the written consent of (a) Company Shareholders representing at least a majority of the Class A Company Shares, and (b) Company Shareholders representing at least a majority of the Class B Company Shares, in each case approving and adopting the Agreement, the Arrangement, the Merger and the other transactions contemplated herein, in accordance with the Florida Act and the Company's governing documents.

"**Company Disclosure Letter**" means the disclosure letter dated the date of this Agreement and delivered by the Company to Telecure with this Agreement.

"**Company Employees**" means the officers and employees of the Company.

"**Company Expense Payment**" means an amount equal to US$400,000.

"**Company Expense Payment Event**" shall have the meaning set forth in 7.05(a).

"**Company Lease**" means any real or immovable property leased, subleased, licensed or otherwise used or occupied by the Company.

"**Company Lease Agreement**" means the lease agreement between Emerson International, Inc. and MyApps Corp. dated October 16, 2020.

- 4 -

"**Company Notice**" means the electronic notice under the Florida Act to be sent to all Company Shareholders who have not executed a Company Consent summarizing the transactions contemplated by this Agreement and advising them of their statutory rights of appraisal in respect of the Arrangement pursuant to Section 607.0704(3) of the Florida Act.

"**Company Share**" means the issued and outstanding Class A Company Shares and Class B Company Shares.

"**Company Shareholders**" means the registered and/or beneficial owners of the Company Shares, as the context requires.

"**Computer Systems**" has the meaning given such term in Schedule C.

"**Concurrent Financing**" means the private placement of units (each, a "**Unit**") at a price of $0.35 per Unit for gross proceeds of at least $4,000,000, where each Unit consists of one special warrant, each ultimately exchangeable for one-fifth (1/5) of a Telecure Share, and one subscription receipt, each ultimately exchangeable for four-fifths (4/5) of a Telecure Share.

"**Confidential Information**" shall have the meaning set forth in Section 5.05 of this Agreement.

"**Consenting Shareholder**" has the meaning set forth in Section 2.01(f) of this Agreement.

"**Consideration**" means the consideration to be received by Company Shareholders pursuant to the Plan of Arrangement as consideration for their Company Shares, consisting of the Consideration Shares, subject to adjustment in the manner and in the circumstances contemplated in Section 2.13 of this Agreement, on the basis set out in the Plan of Arrangement.

"**Consideration Shares**" means the Telecure Shares to be issued as Consideration pursuant to the Arrangement, being, in respect of each Company Share, such number of Telecure Shares as is equal to the quotient of 32,000,000 divided by the number of the issued and outstanding Company Shares immediately prior to the Effective Time.

"**Contract**" means any legally binding agreement, commitment, engagement, contract, licence, lease, obligation, undertaking or joint venture to which, as applicable, the Company, Telecure or any of their respective Subsidiaries is a party or by which it or any of their respective Subsidiaries is bound or affected or to which any of their respective properties or assets is subject.

"**Court**" means the Supreme Court of British Columbia.

"**Data Room**" means the electronic data room populated by the Company and made available to Telecure in connection with its due diligence of the Company at the URL: "https://www.dropbox.com/home/DD-TELECURE-MYAPPS", as such data room was constituted as of the date hereof.

- 5 -

"**Dissenting Shareholder**" means a Company Shareholder who has validly exercised its Appraisal Rights and has not withdrawn or been deemed to have withdrawn such exercise of Appraisal Rights, but only in respect of the Company Shares in respect of which Appraisal Rights are validly exercised by such Company Shareholder.

"**Effective Date**" means the date upon which the Arrangement becomes effective pursuant to the Plan of Arrangement.

"**Effective Time**" has the meaning given to such term in the Plan of Arrangement.

"**Employee Plan**" means all health, welfare, supplemental unemployment benefit, fringe benefit, bonus, profit sharing, savings, insurance, incentive, incentive compensation, deferred compensation, death benefits, termination, retention, change in control, severance, security purchase, security compensation, disability, pension, or supplemental retirement plans and other employee, independent contractor, consultant or director compensation or benefit plans, policies, trusts, funds, agreements or arrangements for the benefit of current or former directors of the Company or any of its Subsidiaries, Company Employees, former Company Employees or any other Person, whether written or unwritten, which are maintained by or binding upon the Company or any of its Subsidiaries or in respect of which the Company or any of its Subsidiaries has any actual or potential liability, but does not include (a) individual offer letters or Contracts with any Company Employees or former Company Employees (including any amendments thereto) and (b) any statutory plans administered by a Governmental Entity, including,  but not limited to, plans administered pursuant to applicable federal, state or provincial health, worker's compensation or employment insurance legislation.

"**Exchange**" means the Canadian Securities Exchange.

"**Filing Statement**" means any prospectus, information circular, listing statement and/or other comprehensive disclosure document required to be prepared and presented in accordance with applicable Securities Laws, and the policies of the Exchange and any other regulatory authorities having jurisdiction over all or part of the transactions contemplated by this Agreement.

"**Final Order**" means the order of the Court, in form and substance satisfactory to each Party, acting reasonably, approving the Arrangement, as such order may be amended by the Court (with the consent of each of the Parties, acting reasonably) at any time prior to the Effective Date or, if appealed, then unless such appeal is withdrawn or denied, as affirmed or as amended (provided that such amendment is satisfactory to each of the Parties, acting reasonably) on appeal.

"**Florida Act**" means the Florida Business Corporation Act, as amended, and the rules and regulations promulgated thereunder.

"**Governmental Entity**" means: (a) any international, multi-national, national, federal, provincial, territorial, state, regional, municipal, local or other government, governmental or public department, central bank, court, tribunal, arbitral body, commission, board, bureau, commissioner, minister, cabinet, governor in council, ministry, agency or

- 6 -

instrumentality, domestic or foreign; (b) any subdivision or authority of any of the foregoing; (c) any quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing; or (d) any stock exchange.

"**IFRS**" means International Financial Reporting Standards and applicable accounting requirements set by the International Accounting Standards Board.

"**Indemnified Parties**" has the meaning given to such term in Section 5.06.

"**Indemnified Party**" has the meaning given to such term in Section 5.06.

"**Intellectual Property**" means domestic and foreign (a) patents, applications for patents and reissues, divisionals, continuations, renewals, re-examinations, extensions and continuations-in-part of patents or patent applications; (b) proprietary and non-public business information, including inventions (whether patentable or not), invention disclosures, improvements, discoveries, trade secrets, confidential information, know-how, methods, models, formulae, algorithms, processes, designs, technology, technical data, schematics, formulae and customer lists and documentation relating to any of the foregoing; (c) copyrights, copyright registrations and applications for copyright registration; (d) integrated circuit topographies, integrated circuit topography registrations and applications, mask works, mask work registrations and applications for mask work registrations; (e) designs, design registrations, design registration applications, industrial designs, industrial design registrations and industrial design applications; (f) trade names, business names, corporate names, domain names, website names and world wide web addresses, common law trademarks, trademark registrations, trademark applications, trade dress and logos, and the goodwill associated with any of the foregoing; (g) software; and (h) any other intellectual property and industrial property.

"**Intellectual Property Rights**" has the meaning given such term in Schedule C.

"**Interim Order**" means the interim order of the Court, after being informed of the intention to rely upon the exemption from registration under the U.S. Securities Act provided by Section 3(a)(10) in connection with the Arrangement, to be issued following the application therefor submitted to the Court as contemplated herein, in form and substance acceptable to the Company and Telecure, each acting reasonably.

"**Law**" means, with respect to any Person, any and all applicable law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, Order, injunction, judgment, decree, ruling or similar requirement, whether domestic or foreign, enacted, adopted, promulgated or applied by a Governmental Entity that is binding upon or applicable to such Person or its business, undertaking, property or securities, and to the extent that they have the force of law, policies, guidelines, notices and protocols of any Governmental Entity, as amended, unless expressly specified otherwise.

"**Lien**" means any pledge, claim, lien, charge, option, hypothec, mortgage, security interest, restriction, adverse right, prior assignment, lease, sublease, royalty, levy, right to possession or any other encumbrance, easement, license, right of first refusal, covenant,

- 7 -

voting trust or agreement, transfer restriction under any shareholder or similar agreement, right or restriction of any kind or nature whatsoever, whether contingent or absolute, direct or indirect, or any agreement, option, right or privilege (whether by Law, contract or otherwise) capable of becoming any of the foregoing.

"**Listing**" has the meaning prescribed thereto in Section 6.01(h).

"**Matching Period**" shall have the meaning set forth in Section 5.07(f)(v) of this Agreement.

"**Material Adverse Effect**" means any change, event, occurrence, effect, state of facts or circumstance that, individually or in the aggregate with other such changes, events, occurrences, effects, states of facts or circumstances, is or could reasonably be expected to be material and adverse to the current or future business, operations, results of operations, assets, properties, capitalization, condition (financial or otherwise) or liabilities (contingent or otherwise) of the Company or Telecure, as applicable, and their Subsidiaries, taken as a whole, except any such change, event, occurrence, effect, state of facts or circumstance resulting from: (a) any change in general economic, business, regulatory, political, financial, capital, securities or credit market conditions in Canada or the United States; (b) any outbreak or escalation of war or act of terrorism; (c) any natural disaster; (d) any adoption, proposal, implementation or change in Law or any interpretation of Law by any Governmental Entity; (e) any change in accounting standards applicable to any Party, including, but not limited to, IFRS (or any authoritative interpretation or enforcement thereof); (f) any action taken (or omitted to be taken) by the Company, Telecure or any of their Subsidiaries, which is required or permitted to be taken (or omitted to be taken) pursuant to this Agreement or that is consented to by the Company or Telecure, as applicable, in writing; (g) the announcement of this Agreement or consummation of the Arrangement or the transactions contemplated hereby; or (h) the failure of the Company or Telecure, as applicable, to meet any internal or published projections, forecasts, guidance or estimate of revenues, earnings or cash flows (it being understood that the causes underlying such failure may be taken into account in determining whether a Material Adverse Effect has occurred); provided, however, (I) if any change, event, occurrence, effect, state of facts or circumstance in clauses (a) through and including (e) above has a disproportionate effect on, as applicable, the Company, Telecure or their Subsidiaries, taken as a whole, relative to other comparable companies and entities operating in the industries in which, as applicable, the Company, Telecure or any of their Subsidiaries operate, such effect may be taken into account in determining whether a Material Adverse Effect has occurred, and (II) references in certain Sections of this Agreement to dollar amounts are not intended to be, and shall not be deemed to be, illustrative for purposes of determining whether a "Material Adverse Effect" has occurred.

"**Material Contract**" means any Contract: (a) that if terminated or modified or if it ceased to be in effect, would reasonably be expected to have a Material Adverse Effect; (b) relating directly or indirectly to the guarantee of any liabilities or obligations or to indebtedness for borrowed money in excess of $50,000 in the aggregate; (c) under which indebtedness in excess of $50,000 is or may become outstanding, other than a Contract between two or more wholly-owned Subsidiaries of the Company or Telecure, as applicable or between

the Company or Telecure and one or more of their wholly owned Subsidiaries; (d) under which the Company, Telecure or any of their Subsidiaries is obligated to make or expects to receive payments in excess of $50,000 in a one year period; (e) that creates an exclusive dealing arrangement or right of first offer or refusal which material restricts the business of, as the case may be, the Company, Telecure or any of their Subsidiaries; (f) providing for the purchase, sale or exchange of, or option to purchase, sell or exchange, any property or asset outside of the ordinary course of business where the purchase or sale price or agreed value or fair market value of such property or asset exceeds $50,000; (g) that limits or restricts in any material respect (I) the ability of the Company, Telecure or any Subsidiaries to engage in any line of business or carry on business in any geographic area, or (II) the scope of Persons to whom the Company, Telecure or any of their Subsidiaries may sell products; or (h) providing for the establishment, investment in, organization or formation of any joint venture, partnership or other revenue sharing arrangements in which the interest of the Company, Telecure or any of their Subsidiaries has a fair market value which exceeds $50,000.

"**Merger**" means the plan of merger under Section 607.1103 of the Florida Act involving Acquireco, the Company, and Telecure pursuant to which, among other things, Acquireco shall be merged with and into the Company, the separate existence of Acquireco shall cease and the Company shall continue as the Surviving Company.

"**Misrepresentation**" means (a) an untrue statement of a material fact, or (b) an omission to state a material fact that is (i) required to be stated, or (ii) necessary to prevent a statement that is made from being false or misleading in the circumstances in which it was made.

"**Money Laundering Laws**" has the meaning ascribed thereto in Schedule C.

"**NI 51-102**" means National Instrument 51-102 – *Continuous Disclosure Obligations* of the Canadian Securities Administrators.

"**OHSA**" has the meaning ascribed thereto in Schedule C.

"**Order**" means all judicial, arbitral, administrative, ministerial, departmental or regulatory judgments, injunctions, orders, decisions, rulings, determinations, awards, decrees or similar actions taken by, or applied by, any Governmental Entity (in each case, whether temporary, preliminary or permanent).

"**ordinary course of business**" or any similar reference means, with respect to an action taken or to be taken by any Person, that such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day business and operations of such Person and, in any case, is not unreasonable or unusual in the circumstances when considered in the context of the provisions of this Agreement.

"**Outside Date**" means March 26, 2021 or such later date as may be agreed to in writing by the Parties.

"**Owned Intellectual Property Rights**" has the meaning given such term in Schedule C.

- 9 -

"**Parties**" means Telecure, Acquireco and the Company, and "Party" means any one of them.

"**Performance Warrants**" means the 11,000,000 performance warrants entitling the holder thereof to acquire Telecure Shares in certain circumstances, all in accordance with the terms of the certificates representing the performance warrants.

"**Permitted Liens**" means, as of any particular time and in respect of any Person, each of the following Liens: (a) the reservations, limitations, provisos and conditions expressed in the original grant from the Crown and recorded against title and any statutory exceptions to title; (b) inchoate or statutory Liens of contractors, subcontractors, mechanics, workers, suppliers, materialmen, carriers and others in respect of the construction, maintenance, repair or operation of real or personal property; (c) easements, servitudes, restrictions, restrictive covenants, party wall agreements, rights of way, licences, permits and other similar rights in real property (including rights of way and servitudes for highways and other roads, railways, sewers, drains, gas and oil pipelines, gas and water mains, electric light, power, telephone, telegraph or cable television conduits, poles, wires and cables) that do not, individually or in the aggregate, materially and adversely impair the current use and operation thereof (assuming its continued use in the manner in which it is currently used); (d) encroachments that do not materially impair or affect the current use or value of any real property and minor defects or irregularities in title to any real property; (e) Liens for Taxes which are not yet due or delinquent or that are being properly contested in good faith by appropriate Proceedings and in respect of which an applicable reserve has been made; (f) Liens imposed by Law and incurred in the ordinary course of business for obligations not yet due or delinquent; (g) Liens in respect of pledges or deposits under workers' compensation, social security or similar Laws, other than with respect to amounts which are due and delinquent, unless such amounts are being contested in good faith by appropriate Proceedings; (h) zoning and building by-laws and ordinances and airport zoning regulations made by public authorities and other restrictions affecting or controlling the use or development of any real property; (i) agreements affecting real property with any municipal, provincial or federal governments or authorities and any public utilities (including subdivision agreements, development agreements and site control agreements) that do not, individually or in the aggregate, materially and adversely impair the current use and operation thereof (assuming its continued use in the manner in which it is currently used); (j) any notices of leases registered on title and licences of occupation; (k) purchase money liens and liens securing rental payments under capital lease arrangements; and (l) such other imperfections or irregularities of title or Lien that, in each case, do not materially adversely affect the use of the properties or assets subject thereto or otherwise materially adversely impair business operations of such properties.

"**Person**" includes any individual, partnership, association, body corporate, organization, trust, estate, trustee, executor, administrator, legal representative or government (including any Governmental Entity), syndicate or other entity, whether or not having legal status.

"**Personal Information**" means any data or information in any media that is used or reasonably capable of being used alone or in conjunction with other information to identify

- 10 -

an individual and any other data or information that constitutes personal data or personal information under any Law to which the Company or any of its Subsidiaries is subject.

"**Plan of Arrangement**" means the plan of arrangement of Acquireco under the BCBCA substantially in the form and content of Schedule A attached hereto and any amendment or variation thereto made in accordance with the Plan of Arrangement or this Agreement or made at the direction of the Court in the Final Order with the prior written consent of the Parties, each acting reasonably.

"**Privacy Laws**" means the Laws governing the collection, use, disclosure, and protection of Personal Information.

"**Proceeding**" means any suit, claim, action, charge, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, audit, examination or known investigation commenced, brought, conducted or heard by or before any Governmental Entity.

"**Prospectus**" has the meaning prescribed thereto in Section 6.01(h).

"**Regulatory Approvals**" means any material consent, waiver, permit, exemption, review, Order, decision or approval of, or any registration and filing with, any Governmental Entity, or the expiry of any waiting period imposed by Law or a Governmental Entity, in each case in connection with this Agreement, the Arrangement or the Merger.

"**Representatives**" has the meaning ascribed thereto in Section 5.07.

"**SAFEs**" means all of the issued and outstanding simple agreements for future equity of the Company.

"**Sanctions**" has the meaning ascribed thereto in Schedule C.

"**Securities Laws**" means the *Securities Act* (British Columbia) and the rules, regulations, instruments and published policies thereunder, and the rules of the Exchange applicable to companies listed thereon.

"**Software**" has the meaning given such term in Schedule C.

"**Subsidiary**" means a company or corporation that is controlled directly or indirectly by another company or company and includes a Subsidiary of that Subsidiary.

"**Superior Proposal**" means any unsolicited bona fide written Acquisition Proposal from a Person who is an arm's length third party made after the date of this Agreement: (i) to acquire not less than all of the outstanding Company Shares (other than any Company Shares owned by the Person making such Acquisition Proposal or its affiliates) or all or substantially all of the assets of the Company and its Subsidiaries on a consolidated basis solely for cash consideration; (ii) that complies with Securities Laws and did not result from a breach of Section 5.07 of this Agreement or any agreement between the Person making such Acquisition Proposal and the Company; (iii) that is reasonably capable of

being completed without undue delay, taking into account, all financial, legal, regulatory and other aspects of such proposal and the Person making such proposal; (iv) that is not subject to any financing condition and in respect of which it has been demonstrated to the satisfaction of the Company Board, acting in good faith (after receipt of advice from its financial advisors and its outside legal counsel), that adequate arrangements have been made in respect of any required financing to complete such Acquisition Proposal at the time and on the basis set out therein; (v) that is not subject to any due diligence and/or access condition; and (vi) in respect of which the Company Board determines, in its good faith judgment, after receiving the advice of its outside legal counsel and financial advisors and after taking into account all the terms and conditions of the Acquisition Proposal, including all legal, financial, regulatory and other aspects of such Acquisition Proposal and the party making such Acquisition Proposal, (A) such Acquisition Proposal would, if consummated in accordance with its terms, but without assuming away the risk of noncompletion, result in a transaction which is more favourable, from a financial point of view, to the Company Shareholders than the transactions contemplated by this Agreement (including any amendments to the terms and conditions of this Agreement proposed by Telecure pursuant to Section 5.07(g) of this Agreement) and (B) that recommending such Acquisition Proposal to the Company Shareholders and entering into a definitive agreement with respect to such Acquisition Proposal would not be inconsistent with its fiduciary duties.

"**Superior Proposal Notice**" shall have the meaning set forth in Section 5.07(f)(iii) of this Agreement.

"**Support Agreements**" means the voting and support agreements dated effective the date hereof and made between the Company and the officers, directors and certain Company Shareholder(s).

"**Surviving Company**" means the corporate entity formed as a result of the Merger.

"**Tax Act**" means the *Income Tax Act* (Canada).

"**Tax Returns**" means any and all returns, reports, declarations, elections, notices, forms, designations, filings and statements (including estimated tax returns and reports, withholding tax returns and reports and information returns and reports) filed or required to be filed in respect of Taxes.

"**Taxes**" means: (a) any and all taxes, duties, fees, excises, premiums, assessments, imposts, levies and other charges or assessments of any kind whatsoever imposed by any Governmental Entity, whether computed on a separate, consolidated, unitary, combined or other basis, including those levied on, or measured by, or described with respect to, income, gross receipts, profits, gains, windfalls, capital, capital stock, production, recapture, transfer, land transfer, licence, gift, occupation, wealth, environment, net worth, indebtedness, surplus, sales, goods and services, harmonized sales, use, value-added, excise, special assessment, stamp, withholding, business, franchising, real or personal, health, employee health, payroll, workers' compensation, employment or unemployment, severance, social services, social security, education, utility, surtaxes, customs, import or

- 12 -

export and including all licence and registration fees and all employment insurance, health insurance and government pension plan premiums or contributions; (b) all interest, penalties, fines, additions to tax or other additional amounts imposed by any Governmental Entity on or in respect of amounts described in clause (a) above or this clause (b); (c) any liability for the payment of any amounts of the type described in clauses (a) or (b) as a result of being a member of an affiliated, consolidated, combined or unitary group for any period; and (d) any liability for the payment of any amounts described in clauses (a) or (b) as a result of any express or implied obligation to indemnify any other Person or as a result of being a transferee or successor in interest to any party.

"**Telecure**" has the meaning set forth in the preamble.

"**Telecure Board**" means the board of directors of Telecure as constituted from time to time.

"**Telecure Disclosure Letter**" means the disclosure letter dated the date of this Agreement and delivered by Telecure to the Company with this Agreement.

"**Telecure Resolution**" means the consent resolution of Telecure, as the sole shareholder of Acquireco, approving the Plan of Arrangement, substantially in the form set forth in Schedule B.

"**Telecure Shares**" means the Class A voting common shares in the capital of Telecure, as constituted on the date hereof.

"**Third-Party Beneficiaries**" has the meaning set forth in Section 8.07.

"**Third-Party Intellectual Property**" has the meaning given such term in Schedule C.

"**U.S. Exchange Act**" means the United States *Securities Exchange Act* of 1934, as amended, and the rules and regulations promulgated thereunder.

"**U.S. PCAOB GAAS**" means auditing standards of the Public Company Accounting Oversight Board (United States of America), as amended from time to time.

"**U.S. Securities Act**" means the United States *Securities Act* of 1933, as the same has been, and hereafter from time to time may be, amended.

**Section 1.02    Interpretation Not Affected by Headings.**

The provision of a Table of Contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 1.03    Currency.**

All references to dollars or to $ are references to Canadian dollars unless otherwise specified.

- 13 -

**Section 1.04   Number and Gender.**

In this Agreement, unless the contrary intention appears, words importing the singular include the plural and vice versa and words importing gender shall include all genders.

**Section 1.05   Date for Any Action.**

If the date on which any action is required to be taken hereunder by a Party is not a Business Day in the place where the action is required to be taken, such action shall be required to be taken on the next succeeding day which is a Business Day in such place.

**Section 1.06   Knowledge.**

In this Agreement, the phrase "to the knowledge of the Company" or "to the knowledge of Telecure" means, unless otherwise indicated, in the case of the Company, the actual knowledge of Adnan Malik, CEO and Muhammad Kashif Akram, CTO, and in the case of Telecure the actual knowledge of Eli Dusenbury, Director and Harwinder Parmar, Director, President and Secretary, in both cases after reasonable enquiry, and to the extent that such reasonable enquiry was not conducted, includes the knowledge that a reasonable Person would have had if such reasonable enquiry had been conducted.

**Section 1.07   Schedules.**

The following schedules attached to this Agreement form an integral part of this Agreement for all purposes of it:

| | | |
|---|---|---|
| Schedule A | - | Form of Plan of Arrangement |
| Schedule B | - | Telecure Resolution |
| Schedule C | - | Representations and Warranties of the Company |
| Schedule D | - | Representations and Warranties of Telecure and Acquireco |

**Section 1.08   Accounting Terms.**

Unless otherwise stated, all accounting terms used in this Agreement shall have the meanings attributable thereto under IFRS and all determinations of an accounting nature required to be made shall be made in a manner consistent with the aforementioned accounting standards and principles, as applicable.

**Section 1.09   Other Definitional and Interpretive Provisions.**

(a)   References in this Agreement to the words "include", "includes" or "including" shall be deemed to be followed by the words "without limitation" whether or not they are in fact followed by those words or words of like import.

(b)   Any capitalized terms used in any exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.

(c)   References to any agreement or Contract are to that agreement or Contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

- 14 -

(d)    Any reference in this Agreement to a Person includes the heirs, administrators, executors, legal personal representatives, predecessors, successors and permitted assigns of that Person.

(e)    References to a particular statute or Law shall be to such statute or Law and the rules, regulations and published policies made thereunder, as now in effect and as they may be promulgated thereunder or amended from time to time.

## ARTICLE 2
## THE ARRANGEMENT

### Section 2.01   The Arrangement.

The Company, Telecure and Acquireco agree that the Arrangement shall be implemented in accordance with the terms and subject to the conditions contained in this Agreement and the Plan of Arrangement, and in connection therewith, the Parties agree that:

(a)    upon the terms and subject to the conditions set forth in this Agreement and in accordance with the Florida Act and the BCBCA, at the Effective Time, Acquireco shall be merged with and into the Company, the separate existence of Acquireco shall cease and the Company shall continue as the Surviving Company in the Merger; the Merger shall have the effects set forth in this Agreement and in the applicable provisions of the Florida Act. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all property of Acquireco and the Company shall vest in the Surviving Company, all liabilities and duties of Acquireco and the Company shall become liabilities and duties of the Surviving Company, and the Surviving Company shall be a wholly-owned Subsidiary of Telecure;

(b)    subject to the provisions of the Arrangement Agreement, articles of merger in substantially the form attached hereto as Exhibit A (the "Articles of Merger") shall be duly executed by the Surviving Company and, on the Effective Date, the Articles of Merger shall be filed by the Surviving Company with the Florida Department of State pursuant to all applicable provisions of the Florida Act;

(c)    the consideration for the Merger shall be comprised of, in respect of each Company Share, the Consideration Shares;

(d)    each Company Share held by Dissenting Shareholders in respect of which Appraisal Rights have been validly exercised shall, in accordance with the applicable provisions of the Florida Act, be cancelled and converted into the right to be paid fair value for such Company Shares as set out in Section 3.01 of the Plan of Arrangement in accordance with the applicable provisions of the Florida Act;

(e)    each outstanding Company Share other than the Company Shares that are held by Dissenting Shareholders who have validly exercised their Appraisal Rights in accordance with the Florida Act and who are ultimately entitled to be paid the fair value for such Company Shares by the Company (the "Consenting Shareholders"), shall, without any further action by or on behalf of a holder of Company Shares and in accordance with the applicable provisions of the Florida Act, be cancelled and

converted into the right to receive the Consideration Shares less amounts withheld and remitted in accordance with Section 4.02 of the Plan of Arrangement. In accordance with the applicable provisions of the Florida Act, the holders of such Company Shares shall cease to be the holders thereof and to have any rights as holders of such Company Shares other than the rights to be paid the Consideration per Company Share in accordance with the Plan of Arrangement.

(f)     Telecure shall issue to each Consenting Shareholder the Consideration Shares for for each Company Share, in accordance with the Plan of Arrangement.

**Section 2.02    Obligations of Telecure and Acquireco.**

Subject to the terms and conditions of this Agreement, in order to facilitate the Arrangement, Telecure and Acquireco shall take all action necessary in accordance with all applicable Laws to:

(a)     make and diligently pursue an application to the Court for the Interim Order in respect of the Arrangement in a manner acceptable to the Company, acting reasonably;

(b)     subject to obtaining the approvals as contemplated in the Interim Order and as may be directed by the Court in the Interim Order, take all steps necessary or desirable to submit the Arrangement to the Court and appear at Court to seek the Final Order as soon as reasonably practicable and, in any event, on or before March 1, 2021; and

(c)     file any documents as required pursuant to Section 292 of the BCBCA, and such other documents as may be required to give effect to the Arrangement pursuant to Division 5 of Part 9 of the BCBCA.

**Section 2.03    Interim Order.**

(a)     As soon as reasonably practicable after the date of this Agreement, but in any event on or before December 31, 2020, Acquireco shall apply in a manner reasonably acceptable to the Company pursuant to Section 292 of the BCBCA and, in cooperation with the Company, prepare, file and diligently pursue an application for the Interim Order which shall provide, among other things:

(i)     that, in all respects, the terms, restrictions and conditions of the constating documents of MyApps and the Florida Act shall apply in respect of the Merger;

(ii)    for the notice requirements with respect to the presentation of the application to the Court for the Final Order; and

(iii)   for such other matters as Telecure or Acquireco may reasonably require, subject to the consent of the Company, acting reasonably.

(b)     In seeking the Interim Order, Acquireco shall advise the Court that it is the intention of the Parties to rely upon the exemption from registration provided by Section 3(a)(10) of the U.S. Securities Act with respect to the issuance of all Consideration Shares to be issued pursuant to the Arrangement, based and conditioned on the

- 16 -

Court's approval of the Arrangement and its determination that the Arrangement is fair and reasonable to Company Shareholders whose rights are affected by the Arrangement to whom Consideration Shares will be issued pursuant to the Arrangement, following a hearing and after consideration of the substantive and procedural terms and conditions thereof.

**Section 2.04   Court Proceedings.**

Subject to the terms of this Agreement, the Company shall cooperate with and assist Telecure and Acquireco in seeking the Interim Order and the Final Order, including by providing to Telecure on a timely basis any information reasonably required to be supplied by the Company in connection therewith as requested by Telecure. Telecure shall provide legal counsel to the Company with a reasonable opportunity to review and comment upon drafts of all material to be filed with the Court in connection with the Arrangement and shall give reasonable consideration to all such comments. Subject to applicable Law, Acquireco will not file any material with the Court in connection with the Arrangement or serve any such material, and will not agree to modify or amend materials so filed or served, except as contemplated by this Section 2.04 or with the Company's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed; provided that, nothing herein shall require the Company to agree or consent to any decrease in the Consideration or other modification or amendment to such filed or served materials that expands or increases Telecure's and Acquireco's rights set forth in any such filed or served materials or under this Agreement or the Arrangement. Telecure and Acquireco shall, subject to applicable Law, oppose any proposal from any Person that the Final Order contain any provision inconsistent with this Agreement, and if required by the terms of the Final Order or by Law to return to Court with respect to the Final Order do so only after notice to, and in consultation and cooperation with the Company. Acquireco shall also provide to the Company's legal counsel on a timely basis copies of any notice of appearance or other Court documents served on Telecure or Acquireco in respect of the application for the Interim Order or the Final Order or any appeal therefrom and of any notice, whether written or oral, received by Telecure or Acquireco indicating any intention to oppose the granting of the Interim Order or the Final Order or to appeal the Interim Order or the Final Order. Telecure and Acquireco shall ensure that all materials filed with the Court in connection with the Arrangement are consistent in all material respects with the terms of this Agreement and the Plan of Arrangement. In addition, Telecure and Acquireco will not object to legal counsel to the Company making such submissions on the hearing of the motion for the Interim Order and the application for the Final Order as such counsel considers appropriate; provided that, Telecure and Acquireco are advised of the nature of any submissions prior to the hearing and such submissions are consistent with this Agreement and the Plan of Arrangement. For greater certainty, nothing in this Section 2.04 shall limit the Company's ability to take any and all steps, including the filing of all manner of documents with any Governmental Entity, to enforce its rights hereunder, including in connection with any dispute involving the Company, on the one hand, and Telecure and Acquireco, together, on the other hand.

**Section 2.05   Obligations of the Company.**

Subject to the terms and conditions of this Agreement, in order to facilitate the Arrangement and the Merger, the Company shall take all action necessary in accordance with all applicable Laws, including, without limitation, the Florida Act, to:

- 17 -

(a)    secure unanimous approval of the Company Board in respect of the Arrangement, this Agreement, the Plan of Arrangement and the Merger;

(b)    within three (3) Business Days of executing this Agreement, deliver to Telecure evidence of the adoption and approval of the Company Consent by (i) Company Shareholders representing at least a majority of the Class A Company Shares and (ii) Company Shareholders representing at least a majority of the Class B Company Shares;

(c)    within ten (10) days after the Company Consent has been delivered to the Company, the Company will send the Company Notice to the Company Shareholders who have not executed a Company Consent in accordance with the Florida Act as well as all other applicable laws;

(d)    as soon as reasonably practicable and, in any event, within five (5) Business Days after the date of the Final Order, arrange for the execution by the Surviving Company of the Articles of Merger and, on the Effective Date, cause the Articles of Merger to be filed by the Surviving Company with the Florida Department of State pursuant to all applicable provisions of the Florida Act; and

(e)    follow and complete the procedures and processes set out in the Florida Act in respect of the exercise of Appraisal Rights by Dissenting Shareholders.

**Section 2.06    Filing Statement.**

(a)    As promptly as reasonably practicable following execution of this Agreement, Telecure shall prepare and complete, in consultation with the Company as contemplated by this Section 2.06, the Filing Statement together with any other documents required by Securities Laws and Telecure shall cause the Filing Statement and such other documents required by Securities Laws to be filed with the Exchange and applicable securities regulatory authorities in accordance with Securities Laws.

(b)    Telecure shall ensure that the Filing Statement complies in all material respects with applicable Securities Laws and does not contain any Misrepresentation regarding Telecure or Acquireco.

(c)    The Company shall fully cooperate with Telecure in the preparation of the Filing Statement. The Company shall provide to Telecure all necessary information concerning the Company as required by Securities Laws, for inclusion in the Filing Statement as requested by Telecure. The Company shall also use commercially reasonable efforts to obtain any necessary consents from any of its auditors and any other advisors to the use of any financial, technical or other expert information required to be included in the Filing Statement and to the identification in the Filing Statement of each such advisor. The Company shall ensure that any such information will not include any Misrepresentation concerning the Company.

(d)    The Company and its legal counsel shall be given a reasonable opportunity to review and comment on drafts of the Filing Statement and other related documents and reasonable consideration shall be given to any comments made by the

- 18 -

Company and its legal counsel; provided that, all information relating solely to the Company included in the Filing Statement shall be in form and substance satisfactory to the Company, acting reasonably.

(e)     The Company, on one hand, and Telecure and Acquireco, together, on the other hand, shall promptly notify each other upon becoming aware that the Filing Statement contains a Misrepresentation or otherwise requires an amendment or supplement and shall cooperate in the preparation of any amendment or supplement to the Filing Statement as required or appropriate and Telecure shall cause the Filing Statement and such other documents required by Securities Laws to be filed with applicable securities regulatory authorities in accordance with Securities Laws.

**Section 2.07   Final Order.**

If the Interim Order is obtained and following the signing of the Company Consent: (i) Acquireco shall, with the cooperation of the Company, take all steps necessary or desirable to submit the Arrangement to the Court and diligently pursue an application for the Final Order pursuant to the BCBCA, as soon as practicable, but in any event not later than five Business Days after the date of the Company Consent; and (ii) the Company shall take all steps necessary to complete the Merger pursuant to and in accordance with the Florida Act.

**Section 2.08   Plan of Arrangement and Effective Time.**

(a)     Unless another time or date is agreed to in writing by the Parties, on the third Business Day following satisfaction or, where not prohibited, the waiver of the conditions (excluding conditions that, by their terms, cannot be satisfied until the Effective Date, but subject to the satisfaction or, where not prohibited, the waiver of those conditions as of the Effective Date) set forth in Article VI, each of the Parties shall execute and deliver such closing documents and instruments and such other documents as may be required to give effect to such portions of the Arrangement to be effected on the Effective Date and Acquireco shall proceed to file any documents as required pursuant to Section 292 of the BCBCA, and such other documents as may be required to give effect to the Arrangement (to the extent effective on the Effective Date) pursuant to Division 5 of Part 9 of the BCBCA and the Company shall proceed to file any documents as required to give effect to the Merger pursuant to and in accordance with the Florida Act (including, without limitation, the filing of the Articles of Merger with the Florida Department of State pursuant to all applicable provisions of the Florida Act). Without limiting the foregoing, Acquireco shall, following receipt of the Final Order and satisfaction, or, where not prohibited, the waiver, of the conditions (excluding conditions that, by their terms, cannot be satisfied until the Effective Date, but subject to the satisfaction, or, where not prohibited, the waiver, of those conditions as of the Effective Date) set forth in Article VI but prior to the filing by Acquireco of the documents referred to above, deliver or cause to be delivered by Telecure, sufficient Consideration Shares to satisfy the Consideration issuable to the Company Shareholders pursuant to the Plan of Arrangement.

- 19 -

(b)   The Arrangement shall become effective at the Effective Time on the Effective Date, whereupon, the transactions comprising the Arrangement and the Merger shall be deemed to occur in the order and on the dates set out in the Plan of Arrangement without any further act or formality.

(c)   From and after the Effective Time, the Plan of Arrangement shall have all of the effects provided by applicable Law, including the BCBCA.

**Section 2.09   Payment of Consideration.**

Telecure shall, prior to the filing by Acquireco of any documents as required pursuant to Section 292 of the BCBCA, and such other documents as may be required to give effect to the Arrangement pursuant to Division 5 of Part 9 of the BCBCA and the Merger pursuant to the Florida Act, and in accordance with Section 2.07, irrevocably instruct its transfer agent to issue the Consideration Shares, in order to pay and deliver the aggregate Consideration payable to the Company Shareholders as provided in the Plan of Arrangement.

**Section 2.10   Closing.**

The closing of the Arrangement will take place at the offices of Cassels Brock & Blackwell LLP, located at 2200 – 885 West Georgia Street, Vancouver, British Columbia, or at such other location as may be agreed upon by the Parties, at 10:00 a.m. (Vancouver time) on the Effective Date.

**Section 2.11   Withholding Taxes.**

The Company, Telecure and Acquireco, as applicable, shall be entitled to deduct or withhold from any consideration payable or otherwise deliverable to any Person, pursuant to the Arrangement and from all dividends, other distributions or other amount otherwise payable to any former Company Shareholders, such Taxes or other amounts as the Company, Telecure or Acquireco are required, entitled or permitted to deduct or withhold with respect to such payment under the Tax Act, or any other provisions of any applicable Laws, in each case, as amended. To the extent that Taxes or other amounts are so deducted or withheld, such deducted or withheld Taxes or other amounts shall be treated for all purposes under this Agreement as having been paid to the Person in respect of which such deduction or withholding was made, provided that such deducted or withheld Taxes or other amounts are actually remitted to the appropriate taxing authority.

**Section 2.12   U.S. Securities Law Matters.**

The Parties agree that the Arrangement will be carried out with the intention that all Consideration Shares will be issued by Telecure in reliance on the exemption from the registration requirements of the U.S. Securities Act provided by Section 3(a)(10) thereunder. In order to ensure the availability of the exemption under Section 3(a)(10) of the U.S. Securities Act and to facilitate Telecure's compliance with other United States securities Laws, the Parties agree that the Arrangement will be carried out on the following basis:

(a)   pursuant to Section 2.03(b), prior to the issuance of the Interim Order, the Court will be advised as to the intention of the Parties to rely on the exemption provided by Section 3(a)(10) of the U.S. Securities Act with respect to the issuance of all Consideration Shares pursuant to the Arrangement, based on the Court's approval of the Arrangement;

- 20 -

(b) prior to the issuance of the Interim Order, the Company will file with the Court a copy of the proposed text of the Company Consent together with any other documents required by Law in connection with the obtaining of the approval of the Arrangement and the Merger by the Company Shareholders;

(c) the Court will be required to satisfy itself as to the substantive and procedural fairness of the Arrangement to the Company Shareholders to whom Consideration Shares will be issued pursuant to the Arrangement;

(d) the Company will ensure that each Company Shareholder and any other Person entitled to receive Consideration Shares pursuant to the Arrangement will be given adequate and appropriate notice advising them of their right to attend the hearing of the Court to give approval to the Arrangement and providing them with sufficient information necessary for them to exercise that right and will ensure that there will not be any improper impediments to the appearance by such Persons at the hearing;

(e) all Persons entitled to receive Consideration Shares pursuant to the Arrangement will be advised that Consideration Shares issued pursuant to the Arrangement have not been registered under the U.S. Securities Act and will be issued by Telecure in reliance on the exemption provided by Section 3(a)(10) of the U.S. Securities Act, and shall be without trading restrictions under the U.S. Securities Act (other than those that would apply under the U.S. Securities Act to Persons who are, have been within 90 days of the Effective Time, or, at the Effective Time, become affiliates (as defined by Rule 144 of the U.S. Securities Act) of Telecure);

(f) the Final Order approving the terms and conditions of the Arrangement that is obtained from the Court will expressly state that the Arrangement is approved by the Court as fair and reasonable to all Persons entitled to receive Consideration Shares pursuant to the Arrangement;

(g) the Interim Order will specify that each Person entitled to receive Consideration Shares pursuant to the Arrangement will have the right to appear before the Court at the hearing of the Court to give approval of the Arrangement so long as they enter an appearance within a reasonable time;

(h) the Court will be expressly authorized by law to hold the hearing and will hold such hearing before approving the fairness of the terms and conditions of the Arrangement and issuing the Final Order; and

(i) Acquireco shall request that the Final Order shall include a statement to substantially the following effect:

"This Order will serve as a basis of a claim to an exemption, pursuant to Section 3(a)(10) of the United States Securities Act of 1933, as amended, from the registration requirements otherwise imposed by that act, regarding the distribution of securities of Telecure pursuant to the Plan of Arrangement."

**Section 2.13   Adjustment of Consideration Shares.**

If on or after the date hereof, except as otherwise contemplated herein, either Party: (a) splits, consolidates or reclassifies any of its common shares or common stock, as applicable; (b) undertakes any other capital reorganization; or (c) declares, sets aside or pays any dividend or other distribution to its shareholders of record as of a time prior to the Effective Date, the Parties hereto shall make such adjustments to the Arrangement, including the number or fraction of Consideration Shares deliverable per Company Share under the Arrangement, as they determine acting in good faith to be necessary to restore the original intention of the Parties in the circumstances.

**Section 2.14   Conduct of Acquireco.**

(a)    Telecure hereby agrees to cause Acquireco to comply with its obligations under this Agreement.

(b)    The Company shall be entitled to rely upon any communication or writings given by or to, or executed by, Telecure. All notices to be sent to Acquireco pursuant to this Agreement or any other agreement contemplated hereby may be addressed to Telecure and any notice so sent shall be deemed notice to Acquireco. Acquireco hereby consents and agrees that Telecure is authorized to accept and deliver notice on behalf of Acquireco pursuant hereto and pursuant to all other agreements contemplated hereby and to deliver waivers and consents on behalf of Acquireco pursuant hereto.

(c)    Telecure is hereby appointed and constitutes the true and lawful attorney-in-fact of Acquireco, with full power in its name and on its behalf to act according to the terms of this Agreement and all other agreements contemplated hereby in the absolute discretion of Telecure, and to do all things and to perform all acts, including amending this Agreement, waiving rights, discharging liabilities and obligations, and executing and delivering all agreements, certificates, receipts, instructions and other instruments contemplated by or deemed advisable in connection with this Agreement. This power of attorney and all authority hereby conferred is granted in consideration of the mutual covenants and agreements made herein, and shall be irrevocable and shall not be terminated by any act of Acquireco or by operation of Law.

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

**Section 3.01   Representations and Warranties of the Company.**

Except as set forth in the Company Disclosure Letter (it being expressly understood and agreed that the disclosure of any fact or item in any section of the Company Disclosure Letter shall only be deemed to be an exception to (or, as applicable, disclosure for the purposes of) the representations and warranties of the Company that are contained in the corresponding section of this Agreement and any other representation or warranty of the Company in this Agreement to which the relevance of such fact or item is reasonably apparent on its face), the Company represents and warrants to Telecure and Acquireco as set forth in Schedule C and acknowledges

- 22 -

and agrees that Telecure and Acquireco are relying upon such representations and warranties in connection with the entering into of this Agreement.

**Section 3.02   Survival of Representations and Warranties.**

The representations and warranties of the Company contained in this Agreement shall not survive the completion of the Arrangement and shall expire and be terminated on the earlier of the Effective Time and the date on which this Agreement is terminated in accordance with its terms.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF TELECURE AND ACQUIRECO**

**Section 4.01   Representations and Warranties of Telecure and Acquireco.**

Except as set forth in the Telecure Disclosure Letter (it being expressly understood and agreed that the disclosure of any fact or item in any section of the Telecure Disclosure Letter shall only be deemed to be an exception to (or, as applicable, disclosure for the purposes of) the representations and warranties of Telecure and Acquireco that are contained in the corresponding section of this Agreement and any other representation or warranty of Telecure and Acquireco in this Agreement to which the relevance of such fact or item is reasonably apparent on its face), each of Telecure and Acquireco represents and warrants to the Company as set forth in Schedule D and acknowledges and agrees that the Company is relying upon such representations and warranties in connection with the entering into of this Agreement.

**Section 4.02   Survival of Representations and Warranties.**

The representations and warranties of Telecure and Acquireco contained in this Agreement shall not survive the completion of the Arrangement and shall expire and be terminated on the earlier of the Effective Time and the date on which this Agreement is terminated in accordance with its terms.

**ARTICLE 5**
**COVENANTS**

**Section 5.01   Conduct of Business of the Company.**

The Company covenants and agrees that during the period from the date of this Agreement until the earlier of the Effective Time and the date on which this Agreement is terminated in accordance with its terms, unless otherwise: (i) agreed to in writing by Telecure (such agreement not to be unreasonably withheld, conditioned or delayed); (ii) required or expressly permitted or specifically contemplated by this Agreement; (iii) required by applicable Law; or (iv) as expressly contemplated by the Company Disclosure Letter:

    (a)    the business of the Company and its Subsidiaries shall be conducted only in, and the Company and its Subsidiaries shall not take any action except in, the ordinary course of business, and the Company shall use all commercially reasonable efforts to maintain and preserve its and their business organization, assets, properties, employees, goodwill and business relationships with customers, suppliers, partners and other Persons with which the Company or any of its Subsidiaries has material business relationships;

- 23 -

(b) without limiting the generality of Section 5.01(a), the Company shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

(i) amend its articles or other constating documents or, in the case of any subsidiary which is not a corporation, its similar organizational documents;

(ii) split, combine or reclassify any shares or other securities of the Company or of any Subsidiary or declare, set aside or pay any dividends or make any other distributions;

(iii) amend the terms of any outstanding securities;

(iv) other than pursuant to exercise of Appraisal Rights under the Florida Act, redeem, repurchase or otherwise acquire or offer to redeem, repurchase or otherwise acquire any outstanding shares or other securities of the Company or any of its Subsidiaries;

(v) issue, grant, deliver, sell, pledge or otherwise encumber, or authorize the issuance, grant, delivery, sale, pledge or other encumbrance of, any shares or other securities, or any options, warrants or similar rights exercisable or exchangeable for or convertible into shares or other securities, of the Company or any of its Subsidiaries;

(vi) reorganize, amalgamate or merge the Company or any Subsidiary;

(vii) adopt a plan of liquidation or resolutions providing for the liquidation or dissolution of the Company or any Subsidiary;

(viii) make any material Tax election, information schedule, return or designation, settle or compromise any material Tax claim, assessment, reassessment or liability, file any materially amended Tax Return, file any notice of appeal or otherwise initiate any action with respect to Taxes, enter into any material agreement with a Governmental Entity with respect to Taxes, surrender any right to claim a material Tax abatement, reduction, deduction, exemption, credit or refund, consent to the extension, or waiver of a limitation period applicable to any material Tax matter or materially amend or change any of its methods of reporting income, deductions or accounting for income Tax purposes except as may be required by applicable Law;

(ix) make any material change in the Company's accounting principles, except as required by concurrent changes in IFRS or U.S. PCAOB GAAS or pursuant to written instructions, comments or orders of an applicable securities regulatory authority;

(x) grant to any employee any increase in compensation in in excess of 5% of their current annual compensation, except in the ordinary course of business consistent with past practice;

- 24 -

(xi)    increase any severance, change of control or termination pay to (or amend any existing Contract in this regard from that in effect on the date hereof) with any officer or director of the Company or any of its Subsidiaries or increase the benefits payable under any existing severance or termination pay policies with any officer or director of the Company or any of its Subsidiaries;

(xii)    waive, release, surrender, abandon, grant or transfer any material right or amend, modify or change, or agree to amend, modify or change, any existing material Authorization, right to use, lease or contract other than in the ordinary course, as required by applicable Law, or where same would not individually or in the aggregate have a Material Adverse Effect;

(xiii)    enter into or amend any employment, deferred compensation or similar Contract (or amend any such existing Contract) with any officer or director of the Company or any of its Subsidiaries;

(xiv)    amend or modify in any material respect or terminate or waive any material right under any Material Contract or enter into any Contract or agreement that would be a Material Contract if in effect on the date hereof;

(xv)    amend, modify, terminate, cancel or let lapse any material insurance (or re-insurance) policy of the Company or any Subsidiary in effect on the date of this Agreement, unless simultaneously with such termination, cancellation or lapse, replacement policies underwritten by insurance and re-insurance companies of nationally recognized standing providing coverage equal to or greater than the coverage under the terminated, cancelled or lapsed policies for substantially similar premiums are in full force and effect;

(xvi)    enter into or amend any Contract with any broker, finder or investment banker; or

(xvii)    authorize, agree, resolve or otherwise commit to do any of the foregoing.

**Section 5.02    Conduct of Business of Telecure and Acquireco.**

Each of Telecure and Acquireco covenants and agrees that during the period from the date of this Agreement until the earlier of the Effective Time and the date on which this Agreement is terminated in accordance with its terms, neither Telecure nor Acquireco shall, directly or indirectly, unless otherwise: (i) agreed to in writing by the Company (such agreement not to be unreasonably withheld, conditioned or delayed); (ii) required or expressly permitted or specifically contemplated by this Agreement; (iii) required by applicable Law; or (iv) as expressly contemplated by the Telecure Disclosure Letter:

(a)    the business of Telecure and its Subsidiaries shall be conducted only in, and Telecure and its Subsidiaries shall not take any action except in, the ordinary course of business, and Telecure shall use all commercially reasonable efforts to maintain and preserve its and their business organization, assets, properties, employees, goodwill and business relationships with customers, suppliers, partners and other

- 25 -

Persons with which Telecure or any of its Subsidiaries has material business relationships;

(b) without limiting the generality of Section 5.02(a), Telecure shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

    (i) amend its notice of articles, articles or other constating documents or, in the case of any Subsidiary which is not a corporation, its similar organizational documents;

    (ii) split, combine or reclassify any shares or other securities of Telecure or of any Subsidiary or declare, set aside or pay any dividends or make any other distributions;

    (iii) amend the terms of any outstanding securities;

    (iv) redeem, repurchase or otherwise acquire or offer to redeem, repurchase or otherwise acquire any outstanding shares or other securities of Telecure or any of its Subsidiaries;

    (v) issue, grant, deliver, sell, pledge or otherwise encumber, or authorize the issuance, grant, delivery, sale, pledge or other encumbrance of, any shares or other securities, or any options, warrants or similar rights exercisable or exchangeable for or convertible into shares or other securities, of Telecure or of any Subsidiary, except (A) the Performance Warrants, (B) securities issuable pursuant to the terms of the Concurrent Financing or the Arrangement, and (C) as disclosed in the Telecure Disclosure Letter;

    (vi) reorganize, amalgamate or merge Telecure or any Subsidiary, except pursuant to the terms of the Arrangement and the Merger;

    (vii) adopt a plan of liquidation or resolutions providing for the liquidation or dissolution of Telecure or any Subsidiary;

    (viii) make any material Tax election, information schedule, return or designation, settle or compromise any material Tax claim, assessment, reassessment or liability, file any materially amended Tax Return, file any notice of appeal or otherwise initiate any action with respect to Taxes, enter into any material agreement with a Governmental Entity with respect to Taxes, surrender any right to claim a material Tax abatement, reduction, deduction, exemption, credit or refund, consent to the extension, or waiver of a limitation period applicable to any material Tax matter or materially amend or change any of its methods of reporting income, deductions or accounting for income Tax purposes except as may be required by applicable Law;

    (ix) make any material change in Telecure's accounting principles, except as required by concurrent changes in IFRS or pursuant to written instructions, comments or orders of an applicable securities regulatory authority;

- 26 -

(x)    grant to any employee any increase in compensation in any form, except in the ordinary course of business consistent with past practice;

(xi)    increase any severance, change of control or termination pay to (or amend any existing Contract in this regard from that in effect on the date hereof) with any officer or director of Telecure or any of its Subsidiaries or increase the benefits payable under any existing severance or termination pay policies with any officer or director of Telecure or any of its Subsidiaries;

(xii)    waive, release, surrender, abandon, let lapse, grant or transfer any material right or amend, modify or change, or agree to amend, modify or change, any existing material Authorization, right to use, lease or Contract other than in the ordinary course, as required by applicable Law, or where same would not individually or in the aggregate have a Material Adverse Effect;

(xiii)    enter into or amend any employment, deferred compensation or similar Contract (or amend any such existing Contract) with any officer or director of Telecure or any of its Subsidiaries;

(xiv)    amend or modify in any material respect or terminate or waive any material right under any Material Contract or enter into any contract or agreement that would be a Material Contract if in effect on the date hereof;

(xv)    amend, modify, terminate, cancel or let lapse any material insurance (or re-insurance) policy of Telecure or any Subsidiary in effect on the date of this Agreement, unless simultaneously with such termination, cancellation or lapse, replacement policies underwritten by insurance and re-insurance companies of nationally recognized standing providing coverage equal to or greater than the coverage under the terminated, cancelled or lapsed policies for substantially similar premiums are in full force and effect; or

(xvi)    authorize, agree, resolve or otherwise commit to do any of the foregoing.

**Section 5.03**    **Covenants Relating to the Arrangement.**

(a)    Each of the Company, Telecure and Acquireco shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do or cause to be done all things required or advisable under applicable Laws to consummate and make effective, as soon as reasonably practicable, the transactions contemplated by this Agreement, including:

(i)    using commercially reasonable efforts to satisfy, or cause the satisfaction of, all conditions precedent in this Agreement and take all steps set forth in this Agreement, the Interim Order and Final Order applicable to it and comply promptly with all requirements imposed by applicable Law with respect to this Agreement, the Arrangement or the Merger;

(ii)    using commercially reasonable efforts to obtain, as soon as practicable following the execution of this Agreement, and maintain all third-party or other consents, waivers, permits, exemptions, Orders, approvals,

- 27 -

agreements, amendments or confirmations that are: (a) necessary to be obtained under the Material Contracts in connection with the Arrangement or this Agreement; or (b) required in order to maintain the Material Contracts in full force and effect following the completion of the Arrangement, in each case, on terms that are reasonably satisfactory to the Parties;

(iii) using commercially reasonable efforts to oppose, lift or rescind any injunction, restraining or other Order, decree, judgment or ruling seeking to restrain, enjoin or otherwise prohibit or delay or otherwise adversely affect the consummation of the Arrangement and defend, or cause to be defended, any proceedings to which it is a party or brought against it or its directors or officers challenging the Arrangement or this Agreement;

(iv) not taking any action, or refrain from taking any commercially reasonable action, or permitting any action to be taken or not taken, which would reasonably be expected to prevent, materially hinder, delay or otherwise impede the consummation of the Arrangement or the transactions contemplated by this Agreement or which would render, or which may reasonably be expected to render, untrue or inaccurate (without giving effect to, applying or taking into consideration any materiality or Material Adverse Effect qualification already contained within such representation or warranty) in any material respect a Party's representations and warranties set forth in this Agreement;

(v) use commercially reasonable efforts to cause the Company Consent to be completed;

(vi) causing the Telecure Resolution to be adopted; and

(vii) causing the Articles of Merger to be filed with Florida Department of State pursuant to all applicable provisions of the Florida Act.

(b) The Company shall promptly notify Telecure in writing of:

(i) any Material Adverse Effect in respect of the Company;

(ii) any notice or other written communication from any Person: (a) alleging that the consent (or waiver, permit, exemption, Order, approval, agreement, amendment or confirmation) of such Person (or another Person) is or may be required in connection with the Arrangement or this Agreement; or (b) to the effect that such Person is terminating or otherwise materially adversely modifying its relationship with the Company or any of its Subsidiaries as a result of the Arrangement or this Agreement; or

(iii) any material filings, actions, suits, claims, investigations or proceedings commenced or, to its knowledge, threatened against, relating to or involving the Company or any of its Subsidiaries that relate to the Arrangement or this Agreement.

- 28 -

(c)     Telecure shall promptly notify the Company in writing of:

    (i)     any Material Adverse Effect in respect of either Telecure or Acquireco;

    (ii)    any notice or other written communication from any Person alleging that the consent (or waiver, permit, exemption, Order, approval, agreement, amendment or confirmation) of such Person (or another Person) is or may be required in connection with the Arrangement or this Agreement; or

    (iii)   any material filings, actions, suits, claims, investigations or proceedings commenced or, to its knowledge, threatened against, relating to or involving Telecure or any of its Subsidiaries that relate to the Arrangement or this Agreement.

(d)     Telecure and Acquireco shall furnish promptly to the Company a copy of each notice, report, schedule or other document or communication delivered, filed or received by them in connection with this Agreement, the Arrangement, the Interim Order, the Final Order, any filings made under any applicable Laws and any dealings or communications with any Governmental Entity in connection with, or in any way affecting, the transactions contemplated by this Agreement.

(e)     The Company shall furnish promptly to Telecure and Acquireco a copy of each notice, report, schedule or other document or communication delivered, filed or received by it in connection with this Agreement, the Arrangement, the Merger, and filings made under any applicable Laws and any dealings or communications with any Governmental Entity (including, without limitation, the Articles of Merger and the filing thereof with the Florida Department of State pursuant to all applicable provisions of the Florida Act) in connection with, or in any way affecting, the transactions contemplated by this Agreement.

(f)     Subject to the terms of this Agreement, the Company shall use all commercially reasonable efforts to satisfy, or cause to be satisfied, all conditions precedent to its obligations to the extent that the same is within its control and to take, or cause to be taken, all other action and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to complete the transactions contemplated by this Agreement, including using its commercially reasonable efforts to:

    (i)     obtain all other consents, approvals and Authorizations as are required to be obtained by the Company under any applicable Law or from any Governmental Entity that would, if not obtained, materially impede the completion of the transactions contemplated by this Agreement or have a Material Adverse Effect on the Company;

    (ii)    effect all necessary registrations, filings and submissions of information requested by Governmental Entities required to be effected by it in connection with the transactions contemplated by this Agreement (including, without limitation, the Articles of Merger and the filing thereof

- 29 -

with the Florida Department of State pursuant to all applicable provisions of the Florida Act); and

(iii)     fulfill all conditions and satisfy all provisions of this Agreement and the Plan of Arrangement required to be fulfilled or satisfied by the Company.

(g)     Telecure shall use all commercially reasonable efforts, and shall cause Acquireco to use all commercially reasonable efforts to, satisfy, or cause to be satisfied, all of the conditions precedent to their obligations to the extent the same is within its control and to take, or cause to be taken, all other actions and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to complete the transactions contemplated by this Agreement, including using commercially reasonable efforts to:

(i)     obtain all consents, approvals, and Authorizations as are required to be obtained by it or Acquireco under any applicable Law or from any Governmental Entity that would, if not obtained, materially impede the completion of the transactions contemplated hereby or have a Material Adverse Effect on Telecure or Acquireco;

(ii)     effect all necessary registrations, filings and submissions of information requested by Governmental Entities required to be effected by it in connection with the transactions contemplated by this Agreement and participate, and appear in any proceedings of, any Party before any Governmental Entity in connection with the transactions contemplated by this Agreement; and

(iii)     fulfill all conditions and satisfy all provisions of this Agreement and the Plan of Arrangement required to be fulfilled or satisfied by it.

(h)     The Company, on one hand, and Telecure and Acquireco, together, on the other hand shall make, or cooperate as necessary in the making of, all necessary filings and applications under all applicable Laws required in connection with the transactions contemplated hereby and take all reasonable action necessary to be in compliance with such Laws, including any filings, reports, documents or applications as may be required to be filed by any of the Parties.

**Section 5.04   Covenants Related to Regulatory Approvals.**

Each Party, as applicable to that Party, covenants and agrees with respect to obtaining all Regulatory Approvals that, subject to the terms and conditions of this Agreement, until the earlier of the Effective Time and the date on which this Agreement is terminated in accordance with its terms:

(a)     each Party shall use commercially reasonable efforts to obtain all Regulatory Approvals and cooperate with the other Party in connection with all Regulatory Approvals sought by the other Party and shall use commercially reasonable efforts to effect all necessary registrations, filings and submissions of information required by Government Entities relating to the Arrangement or this Agreement;

- 30 -

(b)    each Party shall use commercially reasonable efforts to respond promptly to any request or notice from any Governmental Entity requiring that Party to supply additional information that is relevant to the review of the transactions contemplated by this Agreement in respect of obtaining or concluding the Regulatory Approvals sought by either Party and each Party shall cooperate with the other Party and shall furnish to the other Party such information and assistance as a Party may reasonably request in connection with preparing any submission or responding to such notice from a Governmental Entity;

(c)    each Party shall permit the other Party an opportunity to review in advance any proposed substantive applications, notices, filings, submissions, undertakings, correspondence and communications (including responses to requests for information and inquiries from any Governmental Entity) in respect of obtaining or concluding the Regulatory Approvals and shall provide the other Party with a reasonable opportunity to comment thereon and agree to consider those comments in good faith and each Party shall provide the other Party with any substantive applications, notices, filings, submissions, undertakings or other substantive correspondence provided to a Governmental Entity or any substantive communications received from a Governmental Entity, in respect of obtaining or concluding the Regulatory Approvals; and

(d)    the Company, on one hand, and Telecure and Acquireco, together, on the other hand, shall keep each other reasonably informed on a timely basis of the status of discussions relating to obtaining or concluding the Regulatory Approvals sought by each such Party and, for greater certainty, no Party shall participate in any substantive meeting (whether in person, by telephone or otherwise) with a Governmental Entity in respect of obtaining or concluding the required Regulatory Approvals unless it advises the other Party in advance and gives such other Party an opportunity to attend.

**Section 5.05    Access to Information.**

From the date hereof until the earlier of the Effective Time and the date on which this Agreement is terminated in accordance with its terms, subject to applicable Law and the terms of any existing Contracts, the Company, on one hand, and Telecure and Acquireco, together, on the other hand, shall give each other and their respective representatives reasonable access to the books and records and Material Contracts of such Party and their Subsidiaries and to its management personnel during normal business hours and in such a manner as to not unreasonably interfere with the conduct of the business of each respective Party and their Subsidiaries and furnish to the other such financial and operating data and other information as the other may reasonably request. Each Party acknowledges that all information provided to it under this Section 5.05 or otherwise pursuant to this Agreement or acquired in connection with the transactions contemplated under this Agreement (**"Confidential Information"**) is confidential, must be kept confidential and must not be disclosed to any Person at any time or in any manner except:

(a)    to any Party or to any of the affiliates of a Party that have a bona fide need to be informed provided that such affiliates are advised by the disclosing Party of the confidential nature of such Confidential Information and agree to be subject to

- 31 -

confidentiality obligations no less onerous than those contained in this Agreement. Any breaches of the obligations of confidentiality contained in this Agreement by such an affiliate shall be treated as a breach of such obligations by the Party making the disclosure to the affiliate;

(b)   with the prior written consent of the other Party, such consent not to be unreasonably withheld;

(c)   to a bank, lender, investor or other financial institution considering the provision of or, which has provided financial accommodation to, a Party or an affiliate of a Party or to a trustee, representative or agent or such a bank, lender, investor or financial institution, in each case who has entered into a confidentiality agreement with the disclosing Party that contains provisions substantially similar to and no less stringent than those contained in this Section and provided that such bank, lender, investor or other financial institution is advised by the disclosing Party of the confidential nature of such Confidential Information;

(d)   by a Party to a Representative, provided that such Representatives have first been made aware that the Confidential Information is confidential and have agreed to maintain the confidentiality of the Confidential Information. Any breaches of the obligations of confidentiality contained in this Agreement by a Representative shall be treated as a breach of such obligations by the Party making the disclosure to the Representative; and

(e)   to the extent required by applicable Law or by a lawful requirement of any Governmental Entity having jurisdiction over the Parties or their affiliates provided that any Party that intends to make such required disclosure will (to the extent permitted by applicable Law) provide the other Party with the full written text of the proposed required disclosure at least two Business Days before its first disclosure or publication, unless pursuant to applicable Law such required disclosure must be made within a shorter period, in which case the Party intending to make such required disclosure will provide the full written text of the proposed required disclosure to the other Party for as long a period as is practicable in advance of its first disclosure or publication.   The Party making such required disclosure will consider in good faith all reasonable amendments to the required disclosure as may be proposed by the other Party and will, to the extent practicable in the circumstances, use its reasonable endeavours to obtain assurances from the Governmental Entity that any such required disclosure will be treated confidentially.   The Party making a required disclosure will be solely and entirely responsible for the contents of such required disclosure and will include in the required disclosure a statement as to that Party's sole and entire responsibility.

This Section 5.05 will remain in full force and effect in accordance with its terms notwithstanding any other provisions of this Agreement or any termination of this Agreement.

**Section 5.06   Indemnification.**

Telecure and the Company agree that all rights to indemnification existing in favour of the present and former directors and officers of Telecure and the Company (each such present and former director or officer being herein referred to as an "**Indemnified Party**" and such Persons collectively being referred to as the "**Indemnified Parties**") which are in effect as of the date hereof and as of the Effective Time, will survive and will continue in full force and effect and without modification, and Telecure and the Company and any successor to Telecure and the Company shall continue to honour such rights of indemnification and indemnify the Indemnified Parties pursuant thereto, with respect to actions or omissions of the Indemnified Parties occurring prior to the Effective Time, for six years following the Effective Date. The provisions of this Section 5.06 are intended for the benefit of, and shall be enforceable by, each insured or Indemnified Party, his or her heirs, and his or her legal representatives and, for such purpose, Telecure hereby confirms that it is acting as agent on their behalf. Furthermore, this Section 5.06 shall survive the termination of this Agreement as a result of the occurrence of the Effective Time for a period of six years.

**Section 5.07   Non-Solicitation.**

(a)     On and after the date of this Agreement, except as otherwise provided in this Agreement, the Company and its Subsidiaries shall not, directly or indirectly, through any officer, director, employee, advisor, representative, agent (collectively, "Representatives") or otherwise, and shall not permit any such Person to:

        (i)     make, solicit, assist, initiate, encourage or otherwise facilitate any inquiries, proposals or offers relating to any Acquisition Proposal for the Company, or furnish to any Person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to do or seek to do any of the foregoing;

        (ii)     enter into or otherwise engage in any discussions or negotiations regarding, or provide any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to make or complete any Acquisition Proposal for the Company, provided, however, that, for greater certainty, the Company may advise any Person making an unsolicited Acquisition Proposal for the Company that such Acquisition Proposal does not constitute a Superior Proposal when the Company Board has so determined;

        (iii)     withdraw, modify or qualify, or propose publicly to withdraw, modify or qualify, in any manner adverse to Telecure, the recommendation of the Company Board or any committee thereof of the Arrangement;

        (iv)     accept, approve, recommend or remain neutral with respect to, or propose to accept, approve, recommend or remain neutral with respect to, any Acquisition Proposal for the Company (it being understood that taking no position or a neutral position with respect to an Acquisition Proposal (A) for a period of five (5) Business Days following the announcement of such

Acquisition Proposal or (B) in respect of which no public announcement has been made and a confidentiality agreement has been executed in accordance with Section 5.07(e), shall not be considered a violation of this Section 5.07(a)(iv) provided the Company Board has rejected such Acquisition Proposal and affirmed its recommendation of the Arrangement before the end of such five (5) Business Day period, and it being further understood that taking no position or a neutral position with respect to an Acquisition Proposal for a period of more than five (5) Business Days shall be considered to be a violation of this Section 5.07(a)(iv)); or

(v)     accept, approve, endorse, recommend, execute or enter into, or publicly propose to accept, approve, endorse, recommend, execute or enter into, any letter of intent, agreement in principle, agreement, arrangement or undertaking related to any Acquisition Proposal for the Company,

provided, however, that nothing contained in this Section 5.07(a) or any other provision of this Agreement shall prevent the Company from, and the Company shall be permitted to engage in discussions or negotiations with, or respond to enquiries from any Person that has made an unsolicited written Acquisition Proposal for the Company that the Company Board has determined constitutes or could reasonably be expected to result in a Superior Proposal, or provide information and access to properties, facilities, books or records of the Company pursuant to Section 5.07(e) to any Person where the requirements of that Section are met.

(b)     The Company shall, and shall cause its Subsidiaries and its Representatives to, immediately cease and terminate, and cause to be terminated, any solicitation, encouragement, discussion, negotiation, or other activity commenced prior to the date of this Agreement with any Person (other than Telecure and its affiliates) with respect to any inquiry, proposal or offer that constitutes, or would reasonably be expected to constitute or lead to, an Acquisition Proposal and, in connection therewith, the Company will, as promptly as possible following execution of this Agreement:

(i)     discontinue access to and disclosure of all information, including any data room and any confidential information, properties, facilities, books and records of the Company or any of its Subsidiaries that such Person may have access to; and

(ii)    request, and use reasonably commercial efforts to require, (A) the return or destruction of all copies of any confidential information regarding the Company or any of its Subsidiaries provided to any Person who could reasonably be expected to make an Acquisition Proposal (other than Telecure and its affiliates), or (B) the destruction of all material including or incorporating or otherwise reflecting such confidential information regarding the Company or any of its Subsidiaries using its commercially reasonable efforts to ensure that such requests are fully complied with in accordance with the terms of such rights or entitlements.

- 34 -

(c)    The Company represents and warrants that it has not waived any confidentiality, standstill or similar agreement or restriction applicable to another Person to which the Company or any of its Subsidiaries is a party, and further covenants and agrees that (i) the Company shall use commercially reasonable efforts to enforce each confidentiality, standstill, non-disclosure, non-solicitation, use, business purpose or similar agreement, restriction or covenant to which the Company or any of its Subsidiaries is a party, and (ii) neither the Company nor any of its Subsidiaries nor any of its Representatives have or will, without the prior written consent of Telecure (which may be withheld or delayed in Telecure's sole and absolute discretion), release any Person from, or waive, amend, suspend or otherwise modify such Person's obligations respecting Telecure or any of its Subsidiaries, under any confidentiality, standstill, non-disclosure, non-solicitation, use, business purpose or similar agreement, restriction or covenant to which the Company or any of its Subsidiaries is a party (it being acknowledged by Telecure that the automatic termination or release of any such agreement, restriction or covenant as a result of entering into this Agreement shall not be a violation of this Section 5.07 (c)).

(d)    If, on or after the date of this Agreement, the Company or any of its Subsidiaries or any of their respective Representatives, receives any inquiry, proposal or offer that constitutes or would reasonably be expected to constitute or lead to an Acquisition Proposal, or any request for copies of, access to, or disclosure of, confidential information relating to the Company or any of its Subsidiaries, including but not limited to information, access, or disclosure relating to the properties, facilities, books or records of the Company or any of its Subsidiaries in connection with, or that would reasonably be expected to lead to, an Acquisition Proposal, the Company shall promptly (and in any event within 24 hours) notify Telecure, at first orally, and then as promptly as practicable (and in any event within 24 hours) in writing, of such Acquisition Proposal, inquiry, proposal, offer or request, including a description of its material terms and conditions, the identity of all Persons making the Acquisition Proposal, inquiry, proposal, offer or request, and shall provide Telecure with copies of all written documents received in respect of, from or on behalf of any such Person and such other details of such Acquisition Proposal, inquiry, proposal, offer or request as Telecure may reasonably request. The Company shall keep Telecure informed on a reasonably current basis of the status of material developments and (to the extent permitted by Section 5.07(e)) negotiations with respect to any Acquisition Proposal, inquiry, proposal, offer or request, including any material changes, modifications or other material amendments to any such Acquisition Proposal, inquiry, proposal, offer or request and shall provide to Telecure copies of all material or substantive correspondence if in writing or electronic form, and if not in writing or electronic form, a description of the material terms of such correspondence sent or communicated to the Company by or on behalf of any Person making any such Acquisition Proposal, inquiry, proposal, offer or request.

(e)    Notwithstanding Section 5.07(a) or any other agreement between the Parties, if at any time prior to the Effective Date, the Company receives an unsolicited written Acquisition Proposal, the Company may (x) engage in or participate in discussions

or negotiations with such Person regarding such Acquisition Proposal, and (y) provide copies of, access to or disclosure of information, properties, facilities, books or records of the Company or its Subsidiaries, for a period of not more than five (5) Business Days, if and only if:

(i)    the Company Board first determines in good faith, after consultation with its financial advisors and its outside legal counsel, that such Acquisition Proposal constitutes a Superior Proposal (provided that, for the purposes of this Section 5.07(e)(i) only, such Acquisition Proposal may be subject to an access condition for a period of not more than five (5) Business Days and such Person's satisfactory review of such information) and, after consulting with its outside legal counsel, engaging in such discussions or negotiations would not be inconsistent with its fiduciary duties;

(ii)    such Person was not restricted from making such Acquisition Proposal pursuant to an existing confidentiality, standstill, non-disclosure, use, business purpose or similar restriction with the Company or any of its Subsidiaries;

(iii)    such Acquisition Proposal did not result from a breach by the Company of its obligations under this Section 5.07;

(iv)    before providing any such copies, access or disclosure, the Company enters into a confidentiality and standstill agreement with such Person and any such copies, access or disclosure provided to such Person shall have already been (or substantially simultaneously be) provided to Telecure; and

(v)    the Company provides Telecure with:

(A)    one (1) Business Day's prior written notice stating the Company's intention to participate in such discussions or negotiations and to provide such copies, access or disclosure and the Company Board has determined that taking such action is not inconsistent with its fiduciary duties; and

(B)    before providing any such copies, access or disclosure, the Company provides Telecure with a true, complete and final executed copy of the confidentiality and standstill agreement referred to in Section 5.07(e)(iv).

(f)    If the Company receives an Acquisition Proposal that constitutes a Superior Proposal prior to the Effective Date, the Company Board may, or may cause the Company to, subject to compliance with Article VII, make a Change in Recommendation and/or accept, recommend or approve or enter into a definitive agreement with respect to such Superior Proposal, if and only if: :

(i)    the Person making the Superior Proposal was not restricted from making such Superior Proposal pursuant to an existing confidentiality, standstill, nondisclosure, use, business purpose or similar restriction;

- 36 -

(ii)    such Acquisition Proposal did not result from a breach by the Company of its obligations under this Section 5.07;

(iii)    the Company has delivered to Telecure a written notice of the determination of the Company Board that such Acquisition Proposal constitutes a Superior Proposal and of the intention of the Company Board to make a Change in Recommendation and/or accept, recommend, approve or enter into a definitive agreement with respect to such Superior Proposal, as applicable (the "Superior Proposal Notice");

(iv)    the Company has provided Telecure with a copy of the proposed definitive agreement for the Superior Proposal and all material ancillary documents, including financing documents supplied to the Company in connection therewith;

(v)    at least five (5) Business Days (the "Matching Period") have elapsed from the date that is the later of the date on which Telecure received the Superior Proposal Notice and the date on which Telecure received all of the materials set forth in Section 5.07(f)(iv);

(vi)    during any Matching Period, Telecure has had the opportunity (but not the obligation), in accordance with Section 5.07(g), to offer to amend this Agreement and the Arrangement in order for such Acquisition Proposal to cease to be a Superior Proposal;

(vii)    after the Matching Period, the Company Board has determined in good faith, after consultation with its outside legal counsel and financial advisors, that such Acquisition Proposal continues to constitute a Superior Proposal (if applicable, compared to the terms of the Arrangement as proposed to be amended by Telecure under Section 5.07(g)), and has determined in good faith, after consultation with its outside legal counsel, that for the Company Board to make a Change in Recommendation and/or authorize the Company to accept, recommend or approve or enter into a definitive agreement with respect to such Superior Proposal would not be inconsistent with their fiduciary duties; and

(viii)    prior to or concurrent with making a Change in Recommendation and/or entering into of such definitive agreement, the Company terminates this Agreement pursuant to Section 7.04(b) and pays the Company Expense Payment pursuant to Section 7.05.

(g)    During the Matching Period, or such longer period as the Company may approve (in its sole discretion) in writing for such purpose: (i) the Company Board shall review any offer made by Telecure to amend the terms of this Agreement and the Arrangement in good faith in order to determine whether such proposal would, upon acceptance, result in the Acquisition Proposal previously constituting a Superior Proposal ceasing to be a Superior Proposal; and (ii) the Company shall, and shall cause its financial and legal advisors to, negotiate in good faith with Telecure to make such amendments to the terms of this Agreement and the

- 37 -

Arrangement as would enable Telecure to proceed with the transactions contemplated by this Agreement on such amended terms. If the Company Board determines that such Acquisition Proposal would cease to be a Superior Proposal, the Company shall promptly so advise Telecure and the Company and Telecure shall amend this Agreement to reflect such offer made by Telecure, and shall take and cause to be taken all such actions as are necessary to give effect to the foregoing.

(h)   Each successive amendment or modification to any Acquisition Proposal that results in an increase in, or modification of, the consideration (or value of such consideration) to be received by the Company Shareholders or other material terms or conditions thereof shall constitute a new Acquisition Proposal for the purposes of this Section 5.07, and Telecure shall be afforded a new five (5) Business Day Matching Period from the later of the date on which Telecure received a Superior Proposal Notice and the date on which Telecure received all of the materials set forth in Section 5.07(f)(iv) with respect to the new Superior Proposal from the Company.

(i)   The Company Board shall promptly reaffirm its recommendation of the Arrangement by press release after the Company Board determines that an Acquisition Proposal which has been publicly announced is not a Superior Proposal or the Company Board determines that a proposed amendment to the terms of this Agreement as contemplated under Section 5.07(g) would result in an Acquisition Proposal no longer being a Superior Proposal. The Company shall provide Telecure and its outside legal counsel with a reasonable opportunity to review the form and content of any such press release and shall consider in good faith all reasonable amendments to such press release as requested by Telecure and its counsel.

(j)   Any violation of the restrictions set forth in this Section 5.07 by the Company, its Subsidiaries or their respective Representatives will be deemed to be a breach of this Section 5.07 by the Company.

**Section 5.08   Success Fee.**

Following the Effective Date, four equal monthly payments of $25,000 will be made to each of: (i) Adnan Malik; (ii) Muhammad Kashif Akram; and (iii) Muhammad Shaukat, with the first of such payments occurring immediately following the Effective Date.

### ARTICLE 6
### CONDITIONS

**Section 6.01   Mutual Conditions.**

The Parties are not required to complete the Arrangement unless each of the following conditions is satisfied on or prior to the Effective Time, which conditions may only be waived, in whole or in part, by the mutual written consent of the Company and Telecure:

(a)   the Interim Order shall have been granted on terms consistent with this Agreement and the Interim Order shall not have been set aside or modified in a manner

- 38 -

unacceptable to either the Company or Telecure, acting reasonably, on appeal or otherwise;

(b)    the Company Consent shall have been received by the Company, in accordance with the Interim Order and the Florida Act;

(c)    the Final Order shall have been granted on terms consistent with this Agreement and the Final Order shall not have been set aside or modified in a manner unacceptable to either the Company or Telecure, acting reasonably, on appeal or otherwise;

(d)    there shall not be in force any Law, or final, binding, non-appealable ruling, Order or decree, and there shall not have been any action taken under any Law or by any Governmental Entity or other regulatory authority, that is final, binding or non-appealable that makes it illegal or otherwise directly or indirectly restrains, enjoins or prohibits the consummation of the Arrangement and the Merger in accordance with the terms hereof;

(e)    (i) all consents, waivers, permits, exemptions, Orders and approvals of, and any registrations and filings with, any Governmental Entity and the expiry of any waiting periods, in connection with, or required to permit, the completion of the Arrangement and the Merger; and (ii) all third Person and other consents, waivers, permits, exemptions, Orders, approvals, agreements and amendments and modifications to agreements, indentures or arrangements, in each case, the failure of which to obtain or the non-expiry of which would, or could reasonably be expected to have, a Material Adverse Effect on any of the Parties or materially impede the completion of the Arrangement or the Merger, shall have been obtained or received;

(f)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent), in any case which is in effect and which prevents, prohibits or makes the consummation of the Arrangement or the Merger illegal or otherwise prohibits or enjoins the Company, or Telecure or Acquireco from consummating the Arrangement or any of the other transactions contemplated in this Agreement, including, without limitation, the Merger;

(g)    the completion of the Concurrent Financing;

(h)    Telecure shall have: (i) filed a long form prospectus (the "Prospectus") with the Canadian securities regulators in connection with a listing of the Telecure Shares (the "Listing") on the Exchange, and obtained a final receipt for the Prospectus from Canadian securities regulators in each applicable jurisdiction; and (ii) received of all required approvals in connection with the Prospectus and the Listing, including, without limitation, the conditional approval of the Exchange for the Listing, with Listing subject to fulfilling the customary listing requirements of the Exchange;

- 39 -

(i)      the Consideration Shares to be issued pursuant to the Arrangement shall be exempt from the registration requirements of the U.S. Securities Act pursuant to Section 3(a)(10) thereof;

(j)      the Telecure Board shall consist of: (i) Adnan Malik; (ii) Muhammad Kashif Akram; (iii) Dr. Muhammad Shaukat; (iv) Tim Laidler; and (v) Josh Rosenberg;

(k)      the Chief Executive Officer of Telecure shall be Adnan Malik, the Chief Technology Officer of Telecure shall be Muhammad Kashif Akram, and the Chief Financial Officer of Telecure shall be Eli Dusenbury; and

(l)      executive employment agreements, in a form mutually agreeable to the parties thereto, will be entered into between Telecure and each of Adnan Malik and Muhammad Kashif Akram.

**Section 6.02    Additional Conditions to the Obligations of Telecure and Acquireco.**

Telecure and Acquireco are not required to complete the Arrangement or the Merger unless each of the following conditions is satisfied, which conditions are for the exclusive benefit of Telecure and Acquireco and may only be waived, in whole or in part, by Telecure in its sole discretion on its own behalf and on behalf of Acquireco:

(a)      the representations and warranties made by the Company in this Agreement shall be true and correct as of the Effective Time (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of such date), except to the extent that the failure or failures of such representations and warranties to be so true and correct, individually or in the aggregate, would not have a Material Adverse Effect (and, for this purpose, any reference to "material", "Material Adverse Effect" or other concepts of materiality in such representations and warranties shall be ignored) and the Company shall have provided to Telecure a certificate of two senior officers of the Company certifying the foregoing and dated the Effective Date;

(b)      the Company shall have fulfilled or complied in all material respects with each of the covenants of the Company contained in this Agreement to be fulfilled or complied with by it on or prior to the Effective Time, and the Company shall have provided to Telecure a certificate of two senior officers of the Company certifying the foregoing and dated the Effective Date;

(c)      the Company shall have obtained the written consent of Emerson International, Inc. in respect of the assignment of the Company Lease Agreement to Telecure prior to the Effective Date;

(d)      US$340,208.24 in SAFEs of the Company shall: (i) be amended in such a manner so as to provide that such SAFEs shall be converted into Company Shares; and (ii) such SAFEs shall be converted into Company Shares, such that upon the conversion of the SAFEs, there shall be no securities of the Company outstanding, or other instruments or obligations of the Company or any of its Subsidiaries that carry (or which is convertible into, or exchangeable for, securities having) the right to acquire securities of the Company, other than the Company Shares;

- 40 -

(e)     the Company shall have delivered to Telecure certificates of good standing (or equivalent) for the Company;

(f)     Company Shareholders will not have exercised Appraisal Rights, or have instituted proceedings to exercise Appraisal Rights, in connection with the Arrangement (other than Company Shareholders representing not more than 5% of the Company Shares then outstanding);

(g)     there is no action or proceeding (whether, for greater certainty, by a Governmental Entity or any other Person) pending or threatened in any jurisdiction to:

    (i)     cease trade, enjoin or prohibit or impose any limitations, damages or conditions on, Telecure or Acquireco's ability to acquire, hold or exercise full rights of ownership over, any Company Shares, including the right to vote the Company Shares;

    (ii)     impose terms or conditions on the completion of the Arrangement or on the director or indirect ownership or operation by Telecure of the business or assets of Telecure, the Company and their respective Subsidiaries, affiliates and related entities; or

    (iii)     prevent or materially delay the consummation of the Arrangement;

(h)     each of the directors and officers of the Company shall have entered into a Support Agreement (in form and substance satisfactory to Telecure) on the date of this Agreement, none of such Support Agreements shall have been terminated and none of such directors and officers shall have breached, in any material respect, any of the representations, warranties and covenants thereof;

(i)     between the date hereof and the Effective Time, there will not have occurred a Material Adverse Effect or any event, occurrence, circumstance or development that would reasonably be expected to have a Material Adverse Effect; and

(j)     certain Company Shareholders shall have entered into share escrow or pooling agreements in respect of the Consideration Shares to which they are entitled to receive under the terms of the Arrangement, as may be required by the Exchange.

**Section 6.03   Additional Conditions to the Obligations of the Company.**

The Company is not required to complete the Arrangement unless each of the following conditions is satisfied, which conditions are for the exclusive benefit of the Company and may only be waived, in whole or in part, by the Company in its sole discretion:

(a)     the representations and warranties made by Telecure and Acquireco in this Agreement shall be true and correct as of the Effective Time (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of such date), except to the extent that the failure or failures of such representations and warranties to be so true and correct, individually or in the aggregate, would not have a Material Adverse Effect (and, for this purpose, any reference to "material", "Material Adverse Effect" or other concepts of materiality

- 41 -

in such representations and warranties shall be ignored) and Telecure shall have provided to the Company, on behalf of itself and Acquireco, a certificate of two senior officers of Telecure certifying the foregoing dated the Effective Date;

(b)     Telecure and Acquireco shall have fulfilled or complied in all material respects with each of the covenants of Telecure and Acquireco contained in this Agreement to be fulfilled or complied with by them on or prior to the Effective Time, and Telecure shall have provided to the Company, on behalf of itself and Acquireco, a certificate of two senior officers of Telecure certifying the foregoing dated the Effective Date.

(c)     there is no action or proceeding (whether, for greater certainty, by a Governmental Entity or any other Person) pending or threatened in any jurisdiction to:

(i)     cease trade, enjoin or prohibit or impose any limitations, damages or conditions on, Telecure or Acquireco's ability to acquire, hold or exercise full rights of ownership over, any Company Shares, including the right to vote the Company Shares;

(ii)    impose terms or conditions on the completion of the Arrangement or on the director or indirect ownership or operation by Telecure of the business or assets of Telecure, the Company and their respective Subsidiaries, affiliates and related entities; or

(iii)   prevent or materially delay the consummation of the Arrangement.

(d)     Telecure shall be the sole registered and beneficial owner of all of the outstanding securities of Acquireco with good and valid title thereto, free and clear of all encumbrances, including pre-emptive rights, rights of first refusal or "put" or "call" rights created by statute, Acquireco's constating documents or otherwise;

(e)     no Person shall have any written or oral agreement, option, warrant, understanding or commitment or any right or privilege (whether by Law, Contract or otherwise) capable of becoming such for the purchase or acquisition of any securities of Acquireco;

(f)     Telecure shall have complied with its obligations under Section 2.08;

(g)     the Telecure Resolution shall have been approved and adopted by Telecure in accordance with applicable laws, and as applicable, the Interim Order;

(h)     legal counsel to Telecure and Acquireco shall have confirmed that all required Regulatory Approvals (including from the Canadian tax authorities) have been received by Telecure and Acquireco;

(i)     the distribution of Consideration Shares shall be exempt from the prospectus and registration requirements of Securities Laws either by virtue of exemptive relief from the securities regulatory authorities of each of the provinces of Canada or by virtue of exemptions under Securities Laws and shall not be subject to resale restrictions under Securities Laws (other than as applicable to control persons or pursuant to Section 2.6 of National Instrument 45-102 – Resale of Securities);

- 42 -

(j)     between the date hereof and the Effective Time, there will not have occurred a Material Adverse Effect or any event, occurrence, circumstance or development that would reasonably be expected to have a Material Adverse Effect; and

(k)     Company Shareholders will not have exercised Appraisal Rights, or have instituted proceedings to exercise Appraisal Rights, in connection with the Arrangement (other than Company Shareholders representing not more than 5% of the Company Shares then outstanding);

**Section 6.04   Notice and Cure Provisions.**

Each Party shall promptly notify the other Party of the occurrence, or failure to occur, of any event or state of facts which occurrence or failure would, or would be likely to:

(a)     cause any of the representations or warranties of such Party contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date of this Agreement to the Effective Time; or

(b)     result in the failure, in any material respect, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by such Party under this Agreement.

Telecure may not elect to exercise its right to terminate this Agreement pursuant to Section 7.03(a) and the Company may not elect to exercise its right to terminate this Agreement pursuant to Section 7.04(a), unless the Party intending to rely thereon has delivered a written notice to the other Party specifying in reasonable detail all breaches of covenants, inaccuracies of representations and warranties or other matters which the Party delivering such notice is asserting as the basis for the non-fulfillment of the applicable condition or the availability of a termination right, as the case may be. If any such notice is delivered with respect to a matter that is capable of being cured, provided that a Party is proceeding diligently to cure such matter, no Party may terminate this Agreement until the earlier of: (i) the Outside Date; and (ii) the date that is 10 Business Days from the date of receipt of such notice, if such matter has not been cured by such date.

**Section 6.05   Merger of Conditions.**

Subject to applicable Law, the conditions set out in Section 6.01, Section 6.02 and Section 6.03 shall be conclusively deemed to have been satisfied, waived or released upon the Effective Date.

**ARTICLE 7**
**TERMINATION**

**Section 7.01   Termination by Mutual Consent.**

This Agreement may be terminated prior to the Effective Time by the mutual written agreement of the Company and Telecure.

- 43 -

**Section 7.02   Termination by Either Party.**

This Agreement may be terminated by either the Company or Telecure at any time prior to the Effective Time if:

(a)   the Company Consent is not received by the Company, as required by the Interim Order;

(b)   after the date of this Agreement, any Law is enacted, made, enforced or amended, as applicable, that makes the consummation of the Arrangement illegal or otherwise permanently prohibits or enjoins the Company or Telecure or Acquireco from consummating the Arrangement and such Law has, if appealable, become final and non-appealable; or

(c)   the Effective Time does not occur on or prior to the Outside Date; provided that, the right to terminate this Agreement pursuant to this Section 7.02(c) shall not be available to the Company, on one hand, or Telecure and Acquireco, together, on the other hand, where their respective failure to fulfil any obligation or breach of any representation and warranty under this Agreement has been a principal cause of, or resulted in, the failure of the Effective Time to occur by such date.

**Section 7.03   Termination by Telecure.**

This Agreement may be terminated by Telecure at any time prior to the Effective Time if:

(a)   a breach of any representation or warranty or failure to perform any covenant or agreement on the part of the Company under this Agreement occurs that would cause any condition in Section 6.03(a) or Section 6.02(b) not to be satisfied and such breach or failure is incapable of being cured or is not cured in accordance with the terms of Section 6.04; provided that, any wilful breach shall be deemed to be incapable of being cured and Telecure is not then in breach of this Agreement so as to cause any of the conditions in Section 6.03(a) or Section 6.03(b) not to be satisfied;

(b)   (i) prior to the Effective Time, the Company Board or a committee thereof shall have approved or recommended any Acquisition Proposal; or (ii) prior to the Effective Time, the Company shall have breached Section 5.07 in any material respect (any action in (i) or (ii), a "Change in Recommendation"); or

(c)   there has occurred a Material Adverse Effect in respect of the Company which is incapable of being cured on or before the Outside Date.

**Section 7.04   Termination by the Company.**

This Agreement may be terminated by the Company at any time prior to the Effective Time if:

(a)   a breach of any representation or warranty or failure to perform any covenant or agreement on the part of Telecure or Acquireco under this Agreement occurs that would cause any condition in Section 6.03(a) or Section 6.03(b) not to be satisfied and such breach or failure is incapable of being cured or is not cured in accordance with the terms of Section 6.04; provided that, any wilful breach shall be deemed to

- 44 -

be incapable of being cured and the Company is not then in breach of this Agreement so as to cause any of the conditions in Section 6.03(a) or Section 6.03(b) not to be satisfied;

(b)     prior to the Effective Date, it wishes to enter into a binding written agreement with respect to a Superior Proposal (other than a confidentiality agreement permitted by Section 5.07(e)), subject to compliance with Section 5.07 in all respects and provided, however, that no termination under this Section 7.04(b) shall be effective unless and until the Company shall have paid to Telecure the amount required to be paid pursuant to Section 7.05; or

(c)     there has occurred a Material Adverse Effect in respect of Telecure and Acquireco which is incapable of being cured on or before the Outside Date.

**Section 7.05     Expense Payments.**

(a)     Except as otherwise provided herein, all fees, costs and expenses incurred in connection with this Agreement and the Plan of Arrangement shall be paid by the Party incurring such fees, costs or expenses.

For the purposes of this Agreement, "**Company Expense Payment Event**" means the termination of this Agreement by the Company pursuant to Section 7.04(b).

(b)     If a Company Expense Payment Event occurs, the Company shall pay the Company Expense Payment to Telecure.

(c)     Any Company Expense Payment payable by the Company pursuant to this Agreement shall be paid free and clear of and without deduction or withholding for, or on account of, any present or future Taxes, unless such deduction or withholding is, or the Company reasonably believes such deduction or withholding is, required by Law. If the Company is, or reasonably believes it is, required by applicable Laws to deduct or withhold any Taxes from the payment of the Company Expense Payment, (i) the Company shall make such required deductions or withholdings, (ii) the Company shall remit the full amount deducted or withheld to the appropriate Governmental Entity in accordance with applicable Laws, and (iii) the amount so withheld and remitted shall be treated for purposes of this Section 7.05(c) as having been paid to Telecure.

(d)     Each of the Parties acknowledges that the agreements contained in this Section 7.05 are an integral part of the transactions contemplated in this Agreement and that, without those agreements, the Parties would not enter into this Agreement. Each Party acknowledges that all of the payment amounts set out in this Section 7.05 are payments of liquidated damages which are a genuine pre-estimate of the damages, which the Party entitled to such damages will suffer or incur as a result of the event giving rise to such payment and the resultant termination of this Agreement and are not penalties. Each of the Company and Telecure irrevocably waives any right it may have to raise as a defence that any such liquidated damages are excessive or punitive. For greater certainty, each Party agrees that, upon any termination of this Agreement under circumstances where Telecure is entitled to a Company Expense

- 45 -

Payment and such Company Expense Payment is paid in full, Telecure shall be precluded from any other remedy against the Company at Law or in equity or otherwise (including, without limitation, an order for specific performance), and shall not seek to obtain any recovery, judgment, or damages of any kind, including consequential, indirect, or punitive damages, against the Company or any of its Subsidiaries or any of their respective directors, officers, employees, partners, managers, members, shareholders or affiliates or their respective Representatives in connection with this Agreement or the transactions contemplated hereby, provided, however, that payment by the Company of a Company Expense Payment shall not be in lieu of any damages or any other payment or remedy available (including, without limitation, an order for specific performance) in the event of any wilful or intentional breach by the Company of any of its obligations under this Agreement.

**Section 7.06   Notice and Effect of Termination.**

The Party desiring to terminate this Agreement pursuant to this Article VII (other than pursuant to Section 7.01) shall deliver written notice of such termination to the other Parties specifying in reasonable detail the basis for such Party's exercise of its termination right. If this Agreement is terminated pursuant to this Article VII, it will become void and of no further effect, with no liability on the part of either Party to this Agreement (or any shareholder, director, officer, employee, agent, consultant or representative of such Party) except with respect to the obligations set forth in this Section 7.06, Section 5.05, Section 5.06, Section 5.07 and Article VIII (and any related definitions contained in any such Sections or Article) which shall remain in full force and effect and; provided further that, no Party shall be relieved of any liability for any intentional or wilful breach by it of this Agreement.

**ARTICLE 8
GENERAL PROVISIONS**

**Section 8.01   Amendments.**

This Agreement and the Plan of Arrangement may, at any time and from time to time before or after the date on which approval by the Company Shareholders is received but not later than the Effective Time, be amended by mutual written agreement of the Parties, without further notice to or authorization on the part of the Company Shareholders and any such amendment may, subject to the Interim Order and the Final Order and applicable Laws, without limitation:

(a)   change the time for performance of any of the obligations or acts of the Parties;

(b)   modify any representation or warranty contained in this Agreement or in any document delivered pursuant to this Agreement;

(c)   modify any of the covenants contained in this Agreement and waive or modify performance of any of the obligations of the Parties; or

(d)   modify any mutual conditions contained in this Agreement.

- 46 -

**Section 8.02    Expenses.**

Except as otherwise expressly provided in this Agreement, the Parties agree that all out-of-pocket expenses of the Parties relating to this Agreement or the transactions contemplated under this Agreement, including legal fees, accounting fees, financial advisory fees, regulatory filing fees, stock exchange fees, all disbursements of advisors and printing and mailing costs, shall be paid by the Party incurring such expenses.

**Section 8.03    Notices.**

All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made as of the date delivered or sent if delivered personally or sent by email, or as of the following Business Day if sent by prepaid overnight courier, to the Parties at the following addresses (or at such other addresses as shall be specified by either Party by notice to the other given in accordance with these provisions):

in the case of a notice to the Company, addressed to it at:

MyApps Corp.
801 International Parkway, Suite 500
Lake Mary, Florida 32746, United States

Attention:      Adnan Malik
Email:          azmalik@gmail.com

with a copy (not constituting notice) to:

Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
215 N Eola Drive
Orlando, Florida 32801, United States

Attention:      James M. O'Brien
Email:          james.obrien@lowndes-law.com

and to:

Segev LLP
6th Floor, 905 W Pender St.
Vancouver, BC  V6C 1L6, Canada

Attention :     Evie Sheppard
Email »         e.sheppard@segev.ca

and, in the case of a notice to Telecure, addressed to it at:

Telecure Technologies Inc.
885 West Georgia Street, Suite 2200
Vancouver, British Columbia V6C 3E8, Canada

- 47 -

Attention:      Harwinder Parmar, President
Email:          harwinder.parmar@gmail.com

with a copy (not constituting notice) to:

Cassels Brock & Blackwell LLP
2200 – 885 West Georgia Street
Vancouver, British Columbia V6C 3E8

Attention:      Deepak Gill
Email:          dgill@cassels.com

**Section 8.04    Time of the Essence.**

Time is of the essence in this Agreement.

**Section 8.05    Injunctive Relief.**

The Parties acknowledge and agree that irreparable harm would occur for which money damages would not be an adequate remedy at Law if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to injunctive and other equitable relief to prevent breaches or threatened breaches of this Agreement and to enforce compliance with the terms of this Agreement, without any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief.

**Section 8.06    Further Assurances.**

Each Party hereto shall, from time to time and at all times hereafter, at the request of the other Party hereto, but without further consideration, do all such further acts, and execute and deliver all such further documents and instruments as may be reasonably required in order to fully perform and carry out the terms and intent hereof.

**Section 8.07    Third-Party Beneficiaries.**

Except as provided in Section 5.06 which, without limiting its terms, is intended for the benefit of the present and former directors and officers of Telecure, the Company and their respective Subsidiaries, as and to the extent applicable in accordance with its terms (collectively, the "**Third-Party Beneficiaries**"), the Parties intend that this Agreement will not benefit or create any right or cause of action in favour of any Person, other than the Parties and that no Person, other than the Parties, shall be entitled to rely on the provisions of this Agreement in any action, suit, Proceeding, hearing or other forum. The Parties acknowledge to each of the Third-Party Beneficiaries their direct rights against the applicable Party under Section 5.06 which are intended for the irrevocable benefit of, and shall be enforceable by, each Third-Party Beneficiary, his or her heirs, executors, administrators and legal representatives, and for such purpose, Telecure shall hold the rights and benefits of Section 5.06 in trust for and on behalf of the Third-Party Beneficiaries and Telecure hereby accepts such trust and agrees to hold the benefit of and enforce performance of such covenants on behalf of the Third-Party Beneficiaries.

- 48 -

**Section 8.08   Waiver.**

No waiver of any of the provisions of this Agreement will constitute a waiver of any other provision (whether or not similar). No waiver will be binding unless executed in writing by the Party to be bound by the waiver. A Party's failure or delay in exercising any right under this Agreement will not operate as a waiver of that right. A single or partial exercise of any right will not preclude a Party from any other or further exercise of that right or the exercise of any other right.

**Section 8.09   Entire Agreement.**

This Agreement, together with the Company Disclosure Letter and Telecure Disclosure Letter, constitute the entire agreement between the Parties with respect to the transactions contemplated by this Agreement and supersedes all prior agreements, understandings and negotiations, whether oral or written, of the Parties. There are no representations, warranties, covenants, conditions or agreements, express or implied, collateral, statutory or otherwise, between the Parties in connection with the subject matter of this Agreement, except as specifically set forth in this Agreement.

**Section 8.10   Successors and Assigns.**

This Agreement shall be binding upon and enure to the benefit of the Company, Telecure and Acquireco and their successors and permitted assigns. Neither Party may assign its rights or obligations hereunder without the prior written consent of the other Party. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 8.11   Severability.**

If any term or provision of this Agreement is determined to be illegal, invalid or incapable of being enforced by any court of competent jurisdiction, that term or provision will be severed from this Agreement and the remaining terms and provisions shall remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to affect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

**Section 8.12   Governing Law; Submission to Jurisdiction; Choice of Language.**

(a)     This Agreement shall be governed by and construed in accordance with the Laws of the Province of British Columbia and the federal Laws of Canada applicable therein.

(b)     Each Party irrevocably attorns and submits to the non-exclusive jurisdiction of the courts of the Province of British Columbia in respect of all matters arising under and in relation to this Agreement or the Arrangement and waives, to the fullest extent possible, the defence of an inconvenient forum or any similar defence to the maintenance of proceedings in such courts.

- 49 -

(c)     The Parties confirm that it is their express wish that this Agreement, as well as any other documents relating to this Agreement, including notices, schedules and Authorizations, have been and shall be drawn up in the English language only.

**Section 8.13    Rules of Construction.**

The Parties to this Agreement waive the application of any applicable Law or rule of construction providing that ambiguities in any agreement or other document shall be construed against the party drafting such agreement or other document.

**Section 8.14    No Liability.**

No director or officer of Telecure shall have any personal liability whatsoever to the Company under this Agreement or any other document delivered in connection with the transactions contemplated hereby on behalf of Telecure. No director or officer of the Company shall have any personal liability whatsoever to Telecure under this Agreement or any other document delivered in connection with the transactions contemplated hereby on behalf of the Company.

**Section 8.15    Counterparts.**

This Agreement may be executed by facsimile or other electronic signature and in counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument.

**[signature page follows]**

- 50 -

IN WITNESS WHEREOF, the Parties have executed this Arrangement Agreement as of the date first written above.

**MYAPPS CORP.**

By: _____

       Name:     Adnan Malik
       Title:      Chief Executive Officer

**TELECURE TECHNOLOGIES INC.**

By: _____

       Name:     Harwinder Parmar
       Title:      President

**1278859 B.C. Ltd.**

By: _____

       Name:     Eli Dusenbury
       Title:      Director

- 50 -

IN WITNESS WHEREOF, the Parties have executed this Arrangement Agreement as of the date first written above.

**MYAPPS CORP.**

By: _____

Name:   Adnan Malik
Title:   Chief Executive Officer

**TELECURE TECHNOLOGIES INC.**

By: *Harry Parmar*_____

Name:   Harwinder Parmar
Title:   President

**1278859 B.C. Ltd.**

By: *Eli*_____

Name:   Eli Dusenbury
Title:   Director

*Signature Page to the Arrangement Agreement*

**Schedule A**
**Plan of Arrangement**

(See attached)

# PLAN OF ARRANGEMENT

## UNDER DIVISION 5 OF PART 9 OF THE BUSINESS CORPORATIONS ACT (BRITISH COLUMBIA)

## ARTICLE I
## INTERPRETATION

### Section 1.01   Definitions

Words and phrases used herein that are defined in the Arrangement Agreement and not defined herein shall have the same meaning herein as in the Arrangement Agreement, unless the context otherwise requires. Words and phrases used herein that are defined in the BCBCA and not defined herein or in the Arrangement Agreement shall have the same meaning herein as in the BCBCA, unless the context otherwise requires, and the following terms have the following meanings:

"**Acquireco**" means 1278859 B.C. Ltd., a corporation incorporated under the laws of the Province of British Columbia;

"**Arrangement Agreement**" means the Arrangement Agreement dated December 15, 2020 among the Company, Telecure and Acquireco (including the schedules thereto) as it may be amended, modified or supplemented from time to time in accordance with its terms;

"**Class A Company Share**" means the issued and outstanding shares of Class "A" Common Stock in the capital of the Company;

"**Class B Company Share**" means the issued and outstanding shares of Class "B" Common Stock in the capital of the Company;

"**Company**" means MyApps Corp., a corporation incorporated under the laws of Florida;

"**Company Consent**" means the written consent of (a) Company Shareholders representing at least a majority of the Class A Company Shares, and (b) Company Shareholders representing at least a majority of the Class B Company Shares, in each case approving and adopting the Agreement, the Arrangement, the Merger and the other transactions contemplated herein, in accordance with the Florida Act and the Company's governing documents;

"**Company Shares**" means the issued and outstanding Class A Company Shares and Class B Company Shares;

"**Company Shareholders**" means the registered and/or beneficial owners of the Company Shares, as the context requires;

"**Consenting Shareholder**" has the meaning set forth in Section 2.03(f);

"**Consideration**" means the consideration to be received by Company Shareholders pursuant to this Plan of Arrangement as consideration for their Company Shares, consisting of the

- 2 -

Consideration Shares, subject to adjustment in the manner and in the circumstances contemplated in Section 2.13 of the Arrangement Agreement, on the basis set out in this Plan of Arrangement;

"**Consideration Shares**" means the Telecure Shares to be issued as Consideration pursuant to the Arrangement, being, in respect of each Company Share, such number of Telecure Shares as is equal to the quotient of 32,000,000 divided by the number of the issued and outstanding Company Shares immediately prior to the Effective Time;

"**Dissenting Shareholder**" means a Company Shareholder who has validly exercised its Appraisal Rights and has not withdrawn or been deemed to have withdrawn such exercise of Appraisal Rights, but only in respect of the Company Shares in respect of which Appraisal Rights are validly exercised by such Company Shareholder;

"**Effective Date**" means the date upon which the Arrangement becomes effective pursuant to this Plan of Arrangement;

"**Effective Time**" means 12:01 a.m. (Vancouver Time) on the Effective Date or such other time as the Parties agree to in writing before the Effective Date;

"**Florida Act**" means the Florida Business Corporation Act, as amended, and the rules and regulations promulgated thereunder;

"**Merger**" means the plan of merger under Section 607.1103 of the Florida Act involving Acquireco, the Company, and Telecure pursuant to which, among other things, Acquireco shall be merged with and into the Company, the separate existence of Acquireco shall cease and the Company shall continue as the Surviving Company;

"**Plan of Arrangement**", "**hereof**", "**herein**", "**hereto**" and like references mean and refer to this plan of arrangement;

"**Surviving Company**" means the corporate entity formed as a result of the Merger;

"**Telecure**" means Telecure Technologies Inc., a corporation incorporated under the laws of the Province of British Columbia; and

"**Telecure Shares**" means the Class A voting common shares in the capital of Telecure, as constituted on the date hereof.

**Section 1.02   Interpretation Not Affected by Headings, Etc.** The division of this Plan of Arrangement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Plan of Arrangement.

**Section 1.03   Article and Section References.** Unless the contrary intention appears, references in this Plan of Arrangement to an Article or Section by number or letter or both refer to the Article or Section respectively, bearing that designation in this Plan of Arrangement.

- 2 -

**Section 1.04   Number and Gender.** In this Plan of Arrangement, unless the contrary intention appears, words importing the singular include the plural and vice versa and words importing gender shall include all genders.

**Section 1.05   Date for Any Action.** If the date on which any action is required to be taken hereunder by any of the Parties is not a Business Day in the place where the action is required to be taken, such action shall be required to be taken on the next succeeding day which is a Business Day in such place.

**Section 1.06   Statutory References.** Unless otherwise indicated, references in this Plan of Arrangement to any statute includes all rules and regulations made pursuant to such statute, as it or they may have been or may from time to time be amended or re-enacted.

**Section 1.07   Currency.** Unless otherwise stated, all references in this Agreement to sums of money are expressed in lawful money of Canada.

**ARTICLE II**
**ARRANGEMENT**

**Section 2.01   Arrangement Agreement.**

This Plan of Arrangement is made pursuant to and subject to the provisions of, and forms part of, the Arrangement Agreement.

**Section 2.02   Binding Effect.**

As of and from the Effective Time, this Plan of Arrangement and the Arrangement will become effective and be binding on: (i) Acquireco (ii) the Company; (iii) Telecure; (iv) all registered and beneficial Company Shareholders (including Dissenting Shareholders); (v) the registrar and transfer agent of Acquireco; (vi) the registrar and transfer agent of the Company; and (vii) all other Persons at and after the Effective Time without any further act or formality required on the part of any Person.

**Section 2.03   Arrangement.**

Commencing at the Effective Time, each of the following events shall occur sequentially in the order set out below without any further authorization, act or formality, in each case, unless stated otherwise, effective as at two-minute intervals starting at the Effective Time:

(a)     Upon the terms and subject to the conditions set forth in the Arrangement Agreement and in accordance with the Florida Act and the BCBCA, at the Effective Time, Acquireco shall be merged with and into the Company, the separate existence of Acquireco shall cease and the Company shall continue as the Surviving Company in the Merger.

- 2 -

(b)     The Merger shall have the effects set forth in the Arrangement Agreement and in the applicable provisions of the Florida Act. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all property of Acquireco and the Company shall vest in the Surviving Company, all liabilities and duties of Acquireco and the Company shall become liabilities and duties of the Surviving Company, and the Surviving Company shall be a wholly-owned Subsidiary of Telecure.

(c)     Subject to the provisions of the Arrangement Agreement, articles of merger in substantially the form attached hereto as Exhibit A (the "**Articles of Merger**") shall be duly executed by the Surviving Company and, on the Effective Date, the Articles of Merger shall be filed by the Surviving Company with the Florida Department of State pursuant to all applicable provisions of the Florida Act.

(d)     The consideration for the Merger shall be comprised of, in respect of each Company Share, the Consideration Shares.

(e)     Each Company Share held by Dissenting Shareholders in respect of which Appraisal Rights have been validly exercised shall, in accordance with the applicable provisions of the Florida Act, be cancelled and converted into the right to be paid fair value for such Company Shares as set out in Section 3.01 in accordance with the applicable provisions of the Florida Act.

(f)     Each outstanding Company Share other than the Company Shares that are held by Dissenting Shareholders who have validly exercised their Appraisal Rights in accordance with Article and who are ultimately entitled to be paid the fair value for such Company Shares by the Company (the "**Consenting Shareholders**"), shall, without any further action by or on behalf of a holder of Company Shares and in accordance with the applicable provisions of the Florida Act, be cancelled and converted into the right to receive the Consideration Shares less amounts withheld and remitted in accordance with Section 4.02. In accordance with the applicable provisions of the Florida Act, the holders of such Company Shares shall cease to be the holders thereof and to have any rights as holders of such Company Shares other than the rights to be paid the Consideration per Company Share in accordance with this Plan of Arrangement.

(g)     Telecure shall issue to each Consenting Shareholder the Consideration Shares for each Company Share, in accordance with this Plan of Arrangement.

### ARTICLE III
### APPRAISAL RIGHTS

**Section 3.01   Appraisal Rights.** Under Section 607.1302 of the Florida Act, a Company Shareholder who does not wish to accept the consideration payable under the Arrangement Agreement may exercise appraisal rights and, if the Arrangement is consummated, obtain in cash the "fair value" of the Company Shares (as valued immediately prior to the consummation of the

- 2 -

Arrangement in accordance with Florida law). Such fair value excludes any appreciation or depreciation in anticipation of the Arrangement, unless such exclusion would be inequitable to the Company and its remaining Company Shareholders. For a summary of the appraisal rights process, see Exhibit B hereto.

## ARTICLE IV
## PAYMENT AND DELIVERY OF SHARE CERTIFICATES

**Section 4.01   Payment and Delivery of Share Certificates.** As soon as practicable following the Effective Time, Telecure shall cause its transfer agent to deliver to the Consenting Shareholders the certificate(s) representing, or other evidence of, the Consideration Shares that such Consenting Shareholder is entitled to receive under the Arrangement.

**Section 4.02   Withholding Rights.** The Company, Acquireco and Telecure shall be entitled to deduct and withhold from any consideration otherwise payable under this Plan of Arrangement, such amounts as the Company, Acquireco or Telecure is permitted or required to deduct and withhold with respect to such payment under the Tax Act or any provision of applicable laws and shall remit such amounts to the appropriate Governmental Entity. To the extent that the amounts are so deducted and withheld, such deducted and withheld amounts shall be treated for all purposes as having been paid to the affected holder in respect of which such deduction and withholding was made.

**Section 4.03   No Liens.** Any exchange or transfer of securities pursuant to this Plan of Arrangement shall be free and clear of any Liens or other claims of third parties of any kind.

**Section 4.04   Paramountcy.** From and after the Effective Time, subject to the applicable provisions of the Florida Act:

(a)     this Plan of Arrangement shall take precedence and priority over any and all Company Shares issued prior to the Effective Time; and

(b)     the rights and obligations of the registered holders of Company Shares and the Company, Acquireco and Telecure and any transfer agent or other depositary therefor in relation thereto, shall be solely as provided for in this Plan of Arrangement.

## ARTICLE V
## AMENDMENTS

**Section 5.01   Amendments to Plan of Arrangement.**

(a)     Telecure, Acquireco and the Company may amend, modify and/or supplement this Plan of Arrangement at any time and from time to time prior to the Effective Time; provided that, each such amendment, modification and/or supplement must: (i) be set out in writing; (ii) be approved by Telecure and the Company; (iii) be filed with

- 2 -

the Court and, if made following the completion of the Company Consent , approved by the Court; and (iv) be communicated to Company Shareholders if and as required by the Court and applicable laws.

(b)     Any amendment, modification or supplement to this Plan of Arrangement may be proposed by the Company or Telecure at any time prior to the completion of the Company Consent (provided that the Company or Telecure, as applicable, shall have consented thereto in writing) and, if the Company Consent is completed, such amendment, modification or supplement, shall become part of this Plan of Arrangement for all purposes.

(c)     Any amendment, modification or supplement to this Plan of Arrangement that is approved or directed by the Court following the completion of the Company Consent shall be effective only if it is consented to in writing by each of Telecure, Acquireco and the Company (in each case, acting reasonably); and (ii) if required by the Court, it is consented to by the holders of Company Shares, as applicable, in the manner directed by the Court.

(d)     Any amendment, modification or supplement to this Plan of Arrangement may be made following the Effective Date unilaterally by Telecure; provided that, it concerns a matter which, in the reasonable opinion of Telecure, is of an administrative nature required to better give effect to the implementation of this Plan of Arrangement.

## ARTICLE VI
## FURTHER ASSURANCES

**Section 6.01   Further Assurances.** Notwithstanding that the transactions and events set out in this Plan of Arrangement shall occur and shall be deemed to occur in the order set out in this Plan of Arrangement without any further act or formality, each of the Parties shall make, do and execute, or cause to be made, done and executed, all such further acts, deeds, agreements, transfers, assurances, instruments or documents as may reasonably be required by either of them in order to further document or evidence any of the transactions or events set out in this Plan of Arrangement.

- 2 -

**EXHIBIT A**

(Please see attached.)



FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS

Attached is a form for filing *Articles of Merger* pursuant to section 607.1105, Florida Statutes, when two or more entities merge. This form is basic and may not meet all merger needs. The advice of an attorney is recommended.

The document must be typed or printed and must be legible.

**PLEASE NOTE:** The term 'domestic' when used in this document is referring to a '**Florida**' entity.

Pursuant to section 607.0123, Florida Statutes, a delayed effective date may be specified but may not be later than the 90th day after the date on which the document is filed.

**Filing Fee**          **$35.00 for each merging and $35 for each surviving entity** (Includes a letter of acknowledgment)

**Certified Copy (optional)**   **$8.75**

Send one check in the total amount payable to the Florida Department of State.

Please include a cover letter containing your telephone number, return address and certification requirements, or complete the attached cover letter.

<table>
<tr><td><u>Mailing Address:</u></td><td><u>Street Address:</u></td></tr>
<tr><td>Amendment Section</td><td>Amendment Section</td></tr>
<tr><td>Division of Corporations</td><td>Division of Corporations</td></tr>
<tr><td>P.O. Box 6327</td><td>The Centre of Tallahassee</td></tr>
<tr><td>Tallahassee, FL 32314</td><td>2415 N. Monroe Street, Suite 810</td></tr>
<tr><td></td><td>Tallahassee, FL 32303</td></tr>
</table>

For further information, you may contact the Amendment Section at (850) 245-6050.

INHS64 (3/20)

## COVER LETTER

**TO:**   Amendment Section
          Division of Corporations

SUBJECT: **MyApps Corp.**
_____
Name of Surviving Entity


The enclosed Articles of Merger and fee are submitted for filing.

Please return all correspondence concerning this matter to following:

**Mark Lee**
_____
Contact Person

**Greenberg Traurig LLP**
_____
Firm/Company

**1201 K Street 12th Floor**
_____
Address

**Sacramento, CA 95814**
_____
City/State and Zip Code

**leema@gtlaw.com**
_____
E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

**Mark Lee**                                At ( **916** ) **868-0630**
_____        _____
Name of Contact Person                    Area Code & Daytime Telephone Number

☒ Certified copy (optional) $8.75 (**Please send an additional copy of your document if a certified copy is requested**)

| **Mailing Address:** | **Street Address:** |
| --- | --- |
| Amendment Section | Amendment Section |
| Division of Corporations | Division of Corporations |
| P.O. Box 6327 | The Centre of Tallahassee |
| Tallahassee, FL 32314 | 2415 N. Monroe Street, Suite 810 |
| | Tallahassee, FL 32303 |

**IMPORTANT NOTICE:  Pursuant to s.607.1622(8), F.S., each party to the merger must be active and current in filing its annual report through December 31 of the calendar year which this articles of merger are being submitted to the Department of State for filing.**

# ARTICLES OF MERGER

The following articles of merger are submitted in accordance with the Florida Business Corporation Act, pursuant to section 607.1105, Florida Statutes.

**FIRST**: The name and jurisdiction of the **surviving** entity:

| Name | Jurisdiction | Entity Type | Document Number (If known/ applicable) |
|------|--------------|-------------|----------------------------------------|
| MyApps Corp. | FL | Corp | |

**SECOND:** The name and jurisdiction of each **merging** eligible entity:

| Name | Jurisdiction | Entity Type | Document Number (If known/ applicable) |
|------|--------------|-------------|----------------------------------------|
| 1278859 B.C. Ltd. | British Columbia, Canada | Corp | |
| | | | |
| | | | |
| | | | |
| | | | |

**THIRD:** The merger was approved by each domestic merging corporation in accordance with s.607.1101(1)(b), F.S., and by the organic law governing the other parties to the merger.

**FOURTH:**   Please check one of the boxes that apply to surviving entity:

☑        This entity exists before the merger and is a domestic filing entity.

☐        This entity exists before the merger and is not authorized to transact business in Florida.

☐        This entity exists before the merger and is a domestic filing entity, and its Articles of Incorporation are being amended as attached.

☐        This entity is created by the merger and is a domestic corporation, and the Articles of Incorporation are attached.

☐        This entity is a domestic eligible entity and is not a domestic corporation and is being amended in connection with this merger as attached.

☐        This entity is a domestic eligible entity being created as a result of the merger. The public organic record of the survivor is attached.

☐        This entity is created by the merger and is a domestic limited liability limited partnership or a domestic limited liability partnership, its statement of qualification is attached.

**FIFTH:**   Please check one of the boxes that apply to domestic corporations:

☑        The plan of merger was approved by the shareholders and each separate voting group as required.

☐        The plan of merger did not require approval by the shareholders.

**SIXTH:**   Please check box below if applicable to foreign corporations

☑        The participation of the foreign corporation was duly authorized in accordance with the corporation's organic laws.

**SEVENTH:**  Please check box below if applicable to domestic or foreign non corporation(s).

☐        Participation of the domestic or foreign non corporation(s) was duly authorized in accordance with each of such eligible entity's organic law.

**EIGHTH:**  If other than the date of filing, the delayed effective date of the merger, which cannot be prior to nor more than 90 days after the date this document is filed by the Florida Department of State:

_____

**Note:**  If the date inserted in this block does not meet the applicable statutory filing requirements, this date will not be listed as the document's effective date on the Department of State's records.

**NINTH:**  Signature(s) for Each Party:

| Name of Entity/Organization: | Signature(s): | Typed or Printed Name of Individual |
|---|---|---|
| MyApps Corp. | | Adnan Malik |
| 1278859 B.C. Ltd. | | Eli Dusenbury |
| | | |
| | | |
| | | |
| | | |

Corporations:                                    Chairman, Vice Chairman, President or Officer
                                                 *(If no directors selected, signature of incorporator.)*
General partnerships:                            Signature of a general partner or authorized person
Florida Limited Partnerships:                    Signatures of all general partners
Non-Florida Limited Partnerships:                Signature of a general partner
Limited Liability Companies:                     Signature of an authorized person

- 2 -

## EXHIBIT B
## APPRAISAL RIGHTS

Below is a general overview of the appraisal process, which is qualified in its entirety by the full text of the relevant provisions of the Florida Business Corporation Act ("**FBCA**").

### MyApps Delivery of Notice of Appraisal Rights

Pursuant to §607.1320(3)(a), MyApps Corp. ("**MyApps**") must first send a written notice that appraisal rights are available (the "**Notice of Appraisal Rights**") to each shareholder of MyApps from whom a written consent is solicited at the time consent of such shareholder is first solicited.

MyApps must sent a Notice of Appraisal Rights to nonconsenting and nonvoting shareholders at least 10 days before the transaction becomes effective pursuant to §607.1320(3)(b).

The Notice of Appraisal Rights must include:

- A copy of §§607.1301- 607.1340 of the FBCA;
- Financial statements, including a balance sheet as of the end of the fiscal year ending not more than 16 months before the date of the notice, an income statement for that fiscal year, and a cash flow statement for that fiscal year; however, if such financial statements are not reasonably available, the corporation must provide reasonably equivalent financial information; and
- The latest available interim financial statements, including year-to-date through the end of the interim period.

### MyApps Delivery of Appraisal Notice and Form

Pursuant to §607.1322, on the date that the transaction becomes effective (or no later than 10 days thereafter), MyApps must deliver a written appraisal notice and form with the information presented below to all nonconsenting and nonvoting shareholders (the "**Appraisal Notice and Form**").

The Appraisal Notice and Form must:

- Specify the date that the transaction became effective and provide for the shareholder to state:
  - The shareholder's name and address;
  - The number, classes, and series of shares as to which the shareholder asserts appraisal rights;
  - That the shareholder did not vote for, or consent to, the transaction;
  - Whether the shareholder accepts MyApps' offer; and
  - If the offer is not accepted, the shareholder's estimated fair value of the shares and a demand for payment of the shareholder's estimated value plus accrued interest.
- State:
  - Where the Appraisal Notice and Form must be returned;

- 2 -

- Where share certificates must be deposited and the date by which those certificates must be deposited (which date may not be earlier than the date by which MyApps must receive the required form set forth in the paragraph directly below);
- A date by which MyApps must receive the returned Appraisal Notice and Form, which date may not be fewer than 40 nor more than 60 days after the date MyApps delivers the Appraisal Notice and Form (the "**Appraisal Notice Delivery Date**"), and state that the shareholder shall have waived the right to demand appraisal with respect to the shares unless the Appraisal Notice and Form is received by MyApps by such specified date;
- MyApps' estimate of the fair value of the shares;
- An offer to each shareholder who is entitled to appraisal rights to pay MyApps' estimate of fair value set forth above;
- That, if requested in writing, MyApps will provide to the shareholder so requesting, within 10 days after the Appraisal Notice Delivery Date, the number of shareholders who return the forms by the specified date and the total number of shares owned by them; and
- The date by which the notice to withdraw under §607.1323 must be received, which date must be within 20 days after the Appraisal Notice Delivery Date.
- If not previously provided, be accompanied by a copy of §§607.1301--607.1340.

### Shareholder Delivery of Notice of Intent to Demand Payment

Pursuant to §§607.1321 and 607.1322, if a shareholder desires to exercise appraisal rights, the shareholder must:

- Within 20 days after receiving the Appraisal Notice and Form, deliver to MyApps a written notice of the shareholder's intent to demand payment for the shares ("**Notice of Intent**"); and
- Not cause to be voted by written consent or otherwise any of the shareholder's shares in favor of the transaction.

All Notices of Intent must be signed in the same manner as the shares are registered on the books of MyApps. If the shareholder has not provided a Notice of Intent within 20 days of receiving the Appraisal Notice and Form, the shareholder will be deemed to have waived appraisal rights.

### Shareholder Return of Appraisal Notice and Form

As stated above, to receive payment for the shareholder's shares, MyApps must receive from the shareholder, at any time before the expiration of the Appraisal Notice Delivery Date, the following:

- The completed Appraisal Notice and Form in which the shareholder states the shareholder's estimated fair value for the shares and demands payment of the estimated value plus interest; and
- The shareholder's certificated shares, if applicable.

- 2 -

If the shareholder delivered the Appraisal Notice and Form and certificated shares to MyApps, the shareholder may still subsequently decline to exercise appraisal rights and withdraw from the appraisal process by giving written notice to MyApps within the time period specified in the Appraisal Notice and Form. Thereafter, the shareholder may not withdraw from the appraisal process without the written consent of MyApps. Upon a withdrawal, the shareholder's right to be paid the fair value of the shares will cease, and the shareholder will be bound by the terms of the transaction agreement.

### Shareholder Acceptance of MyApps Offer

Pursuant to §607.1324, if the shareholder accepts MyApps' offer in the Appraisal Notice and Form to pay MyApps' estimate of the fair value of the shares, payment for the shareholder's shares will be made within 90 days after the receipt of the Appraisal Notice and Form by MyApps or its agent. Upon payment of the agreed value, the shareholder will cease to have any interest in such shares.

### Shareholder Refusal of MyApps Offer

§§607.1326 and 607.1330 of the FBCA address what occurs if the shareholder fails to accept MyApps' offer to pay the value of the shares as estimated by MyApps and MyApps fails to comply with the shareholder's demand to pay the value of the shares as estimated by the shareholder, plus interest.

If the shareholder refuses to accept MyApps' offer to pay the value of the shares as estimated by MyApps and MyApps fails to comply with the shareholder's demand to pay the value of the shares as estimated by the shareholder, plus interest, then within 60 days after receipt of a written demand from any dissenting shareholder, MyApps shall file an action requesting that the fair value of such shares be determined by the court.

If MyApps fails to institute a proceeding within the above-prescribed period, any shareholder that has made a demand under §607.1326 may do so in the name of MyApps. A copy of the initial pleading will be served on each shareholder who has made such a demand. MyApps is required to pay each shareholder the amount found to be due within 10 days after final determination of the proceedings, which amount may, in the discretion of the court, include a fair rate of interest, which will also be determined by the court. Upon payment of the judgment, the shareholder will cease to have any interest in such shares.

§607.1331 provides that the costs of a court appraisal proceeding, including reasonable compensation for, and expenses of, appraisers appointed by the court, shall be determined by the court and assessed against MyApps, except that the court may assess costs against all or some of the shareholders demanding appraisal, in amounts the court finds equitable, to the extent that the court finds such shareholders acted arbitrarily, vexatiously or not in good faith with respect to their appraisal rights. The court also may assess the fees and expenses of counsel and experts for the respective parties, in amounts the court finds equitable, against (1) MyApps and in favor of any or all shareholders if the court finds MyApps did not substantially comply with the notification provisions set forth in §§607.1320 and 607.1322, or (2) either MyApps or the shareholder, in favor of any other party, if the court finds that the party against whom the fees

- 2 -

and expenses are assessed acted arbitrarily, vexatiously, or not in good faith with respect to the appraisal rights. If the court in an appraisal proceeding finds that the services of counsel for any shareholder were of substantial benefit to other shareholders, and that the fees for those services should not be assessed against MyApps, the court may award to such counsel reasonable fees to be paid out of the amounts awarded the shareholders who were benefited. To the extent that MyApps fails to make a required payment when a shareholder accepts MyApps' offer to pay the value of the shares as estimated by MyApps, the shareholder may sue directly for the amount owed and, to the extent successful, shall be entitled to recover from MyApps all costs and expenses of the suit, including counsel fees.

Schedule B
Telecure Resolution

## RESOLUTIONS OF THE SOLE SHAREHOLDER OF

**1278859 B.C. Ltd.**
**(the "Company")**

The undersigned, being the sole shareholder of the Company, hereby consents to the foregoing resolutions under the provisions of the *Business Corporations Act* (British Columbia) with effect as of _____, 2020.

**WHEREAS:**

A.  the Company proposes to complete a court-approved plan of arrangement (the "**Plan of Arrangement**") under Division 5 of Part 9 of the *Business Corporations Act* (British Columbia) (the "**Act**") with its sole Shareholder Telecure Technologies Inc. ("**Telecure**") and MyApps Corp. ("**MyApps**");

B.  the Company, Telecure, and MyApps entered into an arrangement agreement dated December 15, 2020 (the "**Arrangement Agreement**", and together with the Plan of Arrangement, the "**Arrangement**"); and

C.  the terms and conditions of the Arrangement are to be set out in the Plan of Arrangement, as contemplated by the Arrangement Agreement.

**NOW THEREFORE BE IT RESOLVED, AS A UNANIMOUS RESOLUTION, THAT:**

1.  The performance of the Company's obligations under the Arrangement Agreement, including but not limited to, the Arrangement, are hereby consented to and approved.

2.  The Plan of Arrangement, as may be amended, modified or supplemented in accordance with the Arrangement Agreement, is hereby authorized, approved and adopted.

3.  The directors of the Company are hereby authorized, approved, and directed to proceed with the Arrangement under the Act as set out in the Arrangement Agreement and to take such further steps and actions as may be necessary or desirable to give effect to the Arrangement or as contemplated by the Arrangement Agreement.

4.  The Company is hereby authorized to apply for a final order from the Supreme Court of British Columbia to approve the Arrangement on the terms set forth in the Arrangement Agreement and the Plan of Arrangement, as they may be amended, modified or supplemented.

5.  Any one director or officer of the Company is hereby authorized and directed to execute all documents and to do all acts necessary or desirable in connection with the transactions contemplated by the Arrangement Agreement as such director or officer may determine to be in the best interests of the Company and to file all other necessary documents and supporting materials in relation thereto.

6.    Any one director or officer of the Company is hereby authorized and directed to execute all documents and to do all acts necessary or desirable in connection with these resolutions.

IN WITNESS WHEREOF the foregoing unanimous resolutions are authorized by the undersigned shareholder as of the date first written above.

**TELECURE TECHNOLOGIES INC.**

By: _____

Name:    Harwinder Parmar
Title:    Director, President and
           Corporate Secretary

## Schedule C
## Representations and Warranties of the Company

(a) **Organization and Qualification**. The Company and each of its Subsidiaries is a corporation incorporated, validly existing under the laws of the jurisdiction of its incorporation, and has the power and capacity to own, lease and operate its assets and properties and conduct its business as now owned and conducted. The Company and each of its Subsidiaries is duly qualified, licensed or registered to carry on business in each jurisdiction in which its assets are located or it conducts business, except where the failure to be so qualified, licensed or registered would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. No steps or Proceedings have been taken by any Person, voluntary or otherwise, requiring or authorizing the dissolution or winding up of the Company and each of its Subsidiaries.

(b) **Corporate Authorization**. The Company has the corporate power and capacity to enter into and perform its obligations under this Agreement. The execution, delivery and performance by the Company of its obligations under this Agreement have been duly authorized by all necessary corporate action on the part of the Company and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement or the consummation of the Arrangement and the other transactions contemplated hereby other than: (i) approval by the Company Board of this Agreement, the Arrangement, the Merger and the other transactions contemplated by this Agreement; and (ii) the Company Consent approving this Agreement, the Arrangement, the Merger and the other transactions contemplated by this Agreement from the Company Shareholders, and, if applicable, in accordance with the Interim Order and applicable Law.

(c) **Directors' Approvals**. The Company Board has approved the entering into of this Agreement.

(d) **Execution and Binding Obligation**. This Agreement has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company enforceable against it in accordance with its terms subject only to any limitation on bankruptcy, insolvency or other Laws affecting the enforcement of creditors' rights generally and the discretion that a court may exercise in the granting of equitable remedies such as specific performance and injunction.

(e) **Governmental Authorization**. The execution, delivery and performance by the Company of its obligations under this Agreement and the consummation of the Arrangement do not require any other Authorization or other action by or in respect of, or filing with, or notification to, any Governmental Entity other than: (i) the Interim Order; (ii) the Final Order; (iii) filings with the Registrar of Companies under the BCBCA and the Florida Department of State pursuant to all applicable provisions of the Florida Act; (iv) any required actions or filings with any an applicable securities regulatory authority; (v) consents and waivers regarding the Company Shareholders from the United States tax authorities to the satisfaction of counsel to the Company; and (vi) any consents, waivers, approvals or actions or filings or notifications, the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f)  **Non-Contravention**. The execution, delivery and performance by the Company of its obligations under this Agreement and the consummation of the Arrangement do not and will not (or would not with the giving of notice, the lapse of time or the happening of any other event or condition):

    (i)  contravene, conflict with, or result in any violation or breach of the articles, by-laws or other constating documents of the Company or any of its Subsidiaries;

    (ii)  assuming compliance with the matters referred to in this subsection (f) contravene, conflict with or result in a violation or breach of any applicable Laws;

    (iii)  allow any Person to exercise any right, require any consent or notice under or other action by any Person, or constitute a default under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit to which the Company or any of its Subsidiaries is entitled (including by triggering any rights of first refusal or first offer, change in control provisions or other restrictions or limitations) under any Contract or any Authorization to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound; or

    (iv)  result in the creation or imposition of any lien upon any of the properties or assets of the Company or any of its Subsidiaries;

with such exceptions, in the case of clauses (ii) and (iii) as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)  **Third Party Consents**. Except as contemplated in this Agreement, no consent, waiver or approval from other parties to the Material Contracts is (i) required to be obtained by the Company or its Subsidiaries in connection with the execution, delivery and performance by the Company of this Agreement or the consummation of the Arrangement, or (ii) required in order to maintain the Material Contracts in full force and effect immediately upon the consummation of the Arrangement, except for such consents, the absence of which would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)  **Capitalization**.

    (i)  The authorized capital of the Company consists of 5,800,000 Class A Company Shares and of 2,600,000 Class B Company Shares. As of the date of this Agreement, there were 5,800,000 Class A Company Shares and 2,600,000 Class B Company Shares issued and outstanding.

    (ii)  As of the date of this Agreement, there were US$340,208.24 in SAFEs issued by the Company.

    (iii)  There are no issued and outstanding or authorized options, equity-based awards, warrants, calls, conversion, pre-emptive, redemption, repurchase, stock appreciation or other rights, or any other agreements, arrangements, instruments or commitments of any kind that obligate the Company or any of its Subsidiaries to, directly or indirectly, issue or sell any securities of the Company or any of its

Subsidiaries, or give any Person a right to subscribe for or acquire any securities of the Company or any of its Subsidiaries.

(iv)     Other than the Class A Company Shares, there are no securities or other instruments or obligations of the Company or any of its Subsidiaries that carry (or which is convertible into, or exchangeable for, securities having) the right to vote generally with the Company Shareholders on any matter.

(v)      All dividends or distributions on the securities of the Company or any of its Subsidiaries that have been declared or authorized have been paid in full.

(vi)     All outstanding securities of the Company or any of its Subsidiaries have been issued in material compliance with all applicable Laws.

(i)      **Shareholders and Similar Agreements**. None of the Company or any of its Subsidiaries is a party to any unanimous shareholders agreement, shareholder agreement, pooling, voting or other similar arrangement or agreement relating to the ownership or voting of any securities of the Company or any of its Subsidiaries, or pursuant to which any Person may have any right or claim in connection with any existing or past equity interest in the Company. To the knowledge of the Company or any of its Subsidiaries, there are no irrevocable proxies or voting Contracts with respect to any securities issued by the Company or any of its Subsidiaries, other than the Support Agreements.

(j)      **Subsidiaries**.

(i)      The Company is, directly or indirectly, the registered and beneficial owner of all of the outstanding shares or other equity interests of its sole Subsidiary, CARE BY CALLINGDR, LLC, free and clear of any Liens (other than Permitted Liens), and all such shares or other equity interests so owned by the Company have been duly authorized and validly issued as fully paid and non-assessable, as the case may be, in material compliance with all applicable Laws, and no such shares or other equity interests have been issued in violation of any pre-emptive or similar rights.

(ii)     Neither the Company nor its Subsidiaries, beneficially or of record, owns any equity interest of any kind in any other Person.

(k)      **Auditors**. The Company's current auditors are independent with respect to the Company within the meaning of the rules of professional conduct applicable to auditors in the United States of American and there has never been a "reportable event" within the meaning of the Public Company Accounting Oversight Board ("PCAOB") with the current auditors of the Company.

(l)      **Financial Statements**.

(i)      The Company's audited annual consolidated financial statements (including any of the notes or schedules thereto, the auditor's report thereon and the related management's discussion and analysis) for the year ended December 31, 2019 and 2018, and the Company's interim unaudited consolidated financial statements (including any of the notes or Schedules thereto) for the nine month period ended September 30, 2020, were prepared in accordance with generally accepted auditing

C-3

standards ("**GAAS**") created by The Auditing Standards Board of the American Institute of Certified Public Accountants and applicable Laws and fairly present, in all material respects, the consolidated financial position of the Company and its Subsidiaries at the respective dates thereof and the consolidated results of the Company's operations and cash flows for the periods indicated therein (except as may be expressly indicated in the notes to such financial statements). The Company does not intend to correct or restate, nor, to the knowledge of the Company, is there any basis for any correction or restatement of, any aspect of the Company's financial statements. There are no, nor are there any commitments to become party to, any off-balance sheet transaction, arrangement, obligation (including contingent obligations) or other similar relationships of the Company or any of its Subsidiaries with unconsolidated entities or other Persons.

(ii)    The financial books, records and accounts of the Company and each of its Subsidiaries: (a) have been maintained in accordance with commercially reasonable business practices in all material respects; (b) are stated in reasonable detail; (c) accurately and fairly reflect all the material transactions, acquisitions and dispositions of the Company and its Subsidiaries; and (d) accurately and fairly reflect the basis of the Company's financial statements.

(m)    **Internal Controls and Financial Reporting**. The Company has (i) designed disclosure controls and procedures to provide reasonable assurance that material information relating to the Company and its Subsidiaries is made known to the Chief Executive Officer and Chief Financial Officer of Company on a timely basis, particularly during the periods in which the annual or interim filings are being prepared; (ii) designed internal controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS and U.S. PCAOB GAAS; (iii) has evaluated the effectiveness of the Company's disclosure controls and procedures and has disclosed to Telecure its conclusions about the effectiveness of its disclosure controls and procedures; and (iv) has evaluated the effectiveness of the Company's internal control over financial reporting and has disclosed to Telecure its conclusions about the effectiveness of internal control over financial reporting and, if applicable, the necessary disclosure relating to any material weaknesses. To the knowledge of the Company, as of the date of this Agreement:

(i)    there are no material weaknesses in, the internal controls over financial reporting of the Company that could reasonably be expected to adversely affect the Company's ability to record, process, summarize and report financial information; and

(ii)    there is and has been no fraud, whether or not material, involving management or any other employees who have a significant role in the internal control over financial reporting of the Company. Since December 31, 2019, the Company has received no: (A) complaints from any source regarding accounting, internal accounting controls or auditing matters; or (B) expressions of concern from employees of the Company regarding questionable accounting or auditing matters.

(n)     **Absence of Undisclosed Liabilities**. Except as disclosed Section (n) of the Company Disclosure Letter, there are no liabilities or obligations of the Company or any of its Subsidiaries of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than liabilities or obligations: (i) disclosed in the Company's unaudited consolidated financial statements as at September 30, 2020; (ii) incurred in the ordinary course of business since September 30, 2020; (iii) incurred in connection with this Agreement; or (iv) that would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(o)     **Absence of Certain Changes or Events**. Since December 31, 2019, other than the transactions contemplated in this Agreement, the business of the Company and its Subsidiaries has been conducted only in the ordinary course of business and there has not been any event, occurrence, fact, effect or circumstance that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(p)     **Books and Records**. All accounting and financial books and records of the Company and its Subsidiaries have been maintained in accordance with sound business practices.

(q)     **Compliance with Laws**. The Company and its Subsidiaries is and has been in compliance with applicable Laws and, to the knowledge of the Company, none of the Company or any of its Subsidiaries is not under any investigation with respect to, has been charged or threatened to be charged with, or has received notice of, any violation or potential violation of any applicable Laws, except for failures to comply or violations that have not had or would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(r)     **Licences and Authorizations**. Except as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect: (i) all Authorizations which are necessary for the Company and its Subsidiaries to own its assets or conduct its business as presently owned or conducted have been obtained and are in full force and effect in accordance with their terms; (ii) the Company and its Subsidiaries has complied with all such Authorizations and are not in breach or default under any such Authorizations; (iii) the Company and its Subsidiaries has not received written, or to the knowledge of the Company, other notice, of any alleged breach of or alleged default under any such Authorization or of any intention of any Governmental Entity to revoke or not renew any such Authorizations; and (iv) no Proceedings are pending or, to the knowledge of the Company, threatened which could reasonably be expected to result in the revocation of such Authorizations.

(s)     **Material Contracts**. Except as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect: (i) each Material Contract is legal, valid and binding and in full force and effect and is enforceable by the Company or a Subsidiary, as applicable. in accordance with its terms subject only to any limitation under bankruptcy, insolvency or other Laws affecting the enforcement of creditors' rights generally and the discretion that a court may exercise in the granting of equitable remedies such as specific performance and injunction; (ii) the Company and its Subsidiaries, as applicable, has performed the obligations required to be performed by the Company or its Subsidiaries, as applicable,  under each Material Contract (iii) none of the Company is not in breach or

default under any Material Contract nor does the Company have knowledge of any condition that with the passage of time or the giving of notice or both would result in such a breach or default; and (iv) as of the date of this Agreement, none of the Company or any of its Subsidiaries does not know of, or has received any notice (whether written or oral) of, any breach, default, cancellation, termination or non-renewal under any Material Contract by any party to a Material Contract. Section (s) of the Company Disclosure Letter sets out a complete and accurate list of all Material Contracts as of the date of this Agreement. Except as prohibited, true and complete copies of the Material Contracts have been disclosed in the Data Room and no Material Contract has, since such disclosure, been modified, rescinded or terminated.

(t)     **Litigation**. There are no claims, actions, suits, arbitrations, inquiries, investigations or Proceedings pending or, to the knowledge of the Company, threatened against or relating to the Company or any of its Subsidiaries, the business of the Company or any of its Subsidiaries or affecting any of their respective current or former properties or assets by or before any Governmental Entity that, if determined adverse to the interests of the Company or its Subsidiaries would have, or be reasonably expected to have, a Material Adverse Effect or would restrain, enjoin or otherwise prohibit or delay or otherwise adversely affect the consummation of the Arrangement, nor, to the knowledge of the Company, are there any events or circumstances which could reasonably be expected to give rise to any such claim, action, suit, arbitration, inquiry, investigation or Proceeding.

(u)     **United States Securities Law Matters**.

    (i)     The Company does not have, nor is it required to have, any class of securities registered under the *U.S. Exchange Act*, nor is the Company subject to any reporting obligation (whether active or suspended) pursuant to Section 15(d) of the *U.S. Exchange Act*.

    (ii)    The Company is not, and has never been, subject to any requirement to register any class of its equity securities pursuant to Section 12(g) of the U.S. Exchange Act, and is not an investment company registered or required to be registered under the United States *Investment Company Act* of 1940.

    (iii)   The Company is in compliance, in all material respects, with all applicable securities laws and there are no current, pending or, to the knowledge of the Company, threatened Proceedings before any securities regulatory authorities or other Governmental Entity relating to any alleged noncompliance with any securities laws.

    (iv)    The Company has filed all documents required to be filed by it in accordance with securities laws with the applicable securities regulatory authorities. The Company has timely filed or furnished all filings required to be filed or furnished by the Company with any Governmental Entity. Each of the Company's filing complied as filed in all material respects with securities laws and did not, as of the date filed (or, if amended or superseded by a subsequent filing prior to the date of this Agreement, on the date of such filing), contain any Misrepresentation. The Company has not filed any confidential material change report which at the date of this Agreement remains confidential.

(v) **Related Party Transactions**. Neither the Company nor any of its Subsidiaries is not indebted to any director, officer, employee or agent of, or independent contractor to, the Company or any of its Subsidiaries or any of their respective affiliates or associates (except for amounts due in the ordinary course of business as salaries, bonuses, directors' fees or the reimbursement of ordinary course expenses). There are no Contracts (other than employment arrangements, including grants of security-based compensation arrangements) with, or advances, loans, guarantees, liabilities or other obligations to, on behalf or for the benefit of, any shareholder, officer or director of the Company or any of its Subsidiaries, or any of their respective affiliates or associates.

(w) **Money Laundering Laws**. The operations of the Company and its Subsidiaries are and have been conducted at all times in material compliance with applicable financial recordkeeping and reporting requirements of all applicable money laundering statutes of all applicable jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any applicable Governmental Entity (collectively, "**Money Laundering Laws**") and no action, suit or Proceeding by or before any regulatory authority involving the Company or any of its Subsidiaries with respect to the Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(x) **Real Property**.

   (i) The Company and its Subsidiaries do not own, nor have they ever owned, any real property.

   (ii) The Data Room contains complete and accurate copies of all Company Leases, including all amendments, modifications, supplements.

   (iii) With respect to all Company leased real property:

      (A) each Company Lease in respect thereof is in good standing, legal, valid, binding and in full force and effect and is a legal, valid, binding obligation of, and is enforceable against, each other party thereto in accordance with its terms subject to any limitation under bankruptcy, insolvency or other Law affecting the enforcement of creditors' rights generally and the discretion that a court may exercise in the granting of equitable remedies, such as specific performance and injunction;

      (B) there is no event of breach or default, or any event which, with the giving of notice, the lapse of time or both, would become an event of default, under any such Company Lease and, to the knowledge of the Company, none of the Company or any of its Subsidiaries has received or delivered any notice of any material breach of, or default under, any such Company Lease; and

      (C) to the knowledge of the Company, there is no breach of or default under, any such Company Lease by any other party thereto.

(y) **Intellectual Property**.

(i)    Except as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect: (i) the Company and its Subsidiaries, as applicable, owns or possesses, or has a licence to or otherwise has the right to use, all Intellectual Property that is material and necessary for the conduct of its business as presently conducted (collectively, the "**Intellectual Property Rights**"); (ii) all such Intellectual Property Rights that are owned by the Company and its Subsidiaries ("**Owned Intellectual Property Rights**") are valid and enforceable subject only to any limitation under bankruptcy, insolvency or other Law affecting the enforcement of creditors' rights generally and the discretion that a court may exercise in the granting of equitable remedies, such as specific performance and injunction, and to the knowledge of the Company, do not infringe in any material way upon the rights of others; (iii) to the knowledge of the Company, no third party is infringing upon or has misappropriated the Intellectual Property Rights owned or licensed by the Company or its Subsidiaries; and (iv) no person has challenged the Company's ownership of the Owned Intellectual Property Rights.

(ii)    Section (y)(ii) of the Company Disclosure Letter contains a complete and accurate list of all Intellectual Property that is registered, unregistered but material to the conduct of the business of the Company as presently conducted, or for which an application has been made, and that is owned, licensed or used by the Company for the carrying on of the business of the Company as presently conducted by it.

(iii)    The Company is exclusively entitled to possess, use (other than license rights granted in the ordinary course), transfer, license and exploit the Owned Intellectual Property Rights without the consent or permission of or payment to any Person, in any jurisdiction. The Company is not bound by, and none of the Owned Intellectual Property Rights are subject to, any Contract that in any way limits or restricts the ability of the Company to use, exploit, assert, or enforce any such Owned Intellectual Property Rights anywhere in the world.

(iv)    The Company has taken all reasonable measures, in accordance with sound industry practices, to protect and maintain the confidential information and the trade secrets of the Company, and to protect the confidential information and trade secrets of others who have provided same to the Company in confidence. Without limiting the generality of the foregoing, all developers of Intellectual Property have executed written Contracts with the Company which: (A) protect the confidentiality of the confidential information and trade secrets of the Company, (B) effect the full and irrevocable assignment without additional consideration to the Company, of all Intellectual Property conceived or reduced to practice by them for the Company, and (C) provide that such developments of Intellectual Property have waived all their moral rights in such Intellectual Property Rights in favour of the Company.

(v)    No Governmental Authority has the right to prohibit or restrict the transfer of the Owned Intellectual Property Rights.

(vi)    The Company has all rights necessary to use all copies of all software currently used by the Company (the "**Software**"). None of the Software that forms part of the Owned Intellectual Property Rights contains Open Source Software, Third-

Party Intellectual Property, or any disabling code or malicious code or is in the public domain. All Software that forms part of the Owned Intellectual Property Rights: (i) is in the possession, custody and control of the Company, along with all hardware and Software tools, documentation, and other materials necessary to exploit such Software in the ordinary course, and such Software and related tools and materials will remain so immediately after the Effective Date; (ii) has been catalogued and documented as reasonably necessary to enable competently skilled programmers and engineers to use, update and enhance such items by readily using the existing source code, engineering drawings, machine settings and documentation; and (iii) is stored in electronic form, with up-to-date appropriately catalogued versions, in at least two separate geographical locations for effective disaster recovery, (iv) is free of material defects and errors, and functions in conformity with the documentation therefor. No Software that forms part of the Owned Intellectual Property Rights has been presented or disclosed in source code form to any Person (including current and former employees, directors or officers of the Company) except under a written confidentiality agreement or employment agreement containing confidentiality obligations. There has been no material security breach relating to, no material violation of any security policy regarding, and no unauthorized access to, any of the Software that forms part of the Intellectual Property Rights. The source code for any Software forming part of the Owned Intellectual Property Rights has not been placed into escrow with third parties and there have been no releases of the source code to such Software. Except for support services provided pursuant to Contracts entered into in the ordinary course, the Company is not obligated to support or maintain any Software. The Company does not use or rely on any Person to provide outsourcing, software-as-a-service, hosting, data management or cloud computing services that are material to the Business as presently conducted by it.

(vii)   The Company has adopted, maintained and enforced commercially reasonable policies regarding use, security and integrity of the computer systems by its employees and contractors of the Company (the "**Computer Systems**"). The Computer Systems are free from disabling code and malicious code, and the Company has taken all commercially reasonable steps and implemented all procedures necessary to ensure, so far as commercially reasonably possible, that on the Effective Date such systems are free from disabling code and malicious code. The Company has in place appropriate back-up systems and disaster recovery plans, procedures, strategies and facilities necessary to ensure the continuing availability of the functionalities provided by the Computer Systems in all material respects and continued services to the Company's customers in accordance with their customer agreements, in the event of any malfunction, security incident or other form of disaster affecting the Computer Systems, and have taken commercially reasonable steps and implemented commercially reasonable procedures appropriate to safeguard the Computer Systems and prevent unauthorized access thereto. The Company acts and has acted in material compliance with all systems, plans, procedures, strategies and facilities and has taken commercially reasonable steps to test such systems, plans, procedures, strategies and facilities on a periodic basis, and such systems, plans, procedures,

strategies and facilities have been proven effective upon such testing in all material respects. The Company is the lawful owner or licensee of all Software or systems required to operate the Computer Systems.

(z)    **Employees**.

    (i)    Section (z)(i) of the Company Disclosure Letter contains a list of all Persons who are employees, independent contractors or consultants of the Company and its Subsidiaries as of the date hereof, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized.

    (ii)    All written Contracts with the directors, Company Employees and independent contractors or consultants of the Company and its Subsidiaries have been administered in accordance with their terms, in all material respects, and true, correct and complete copies of each such Contract has been provided in the Data Room.

    (iii)    All amounts due or accrued due for all salary, wages, bonuses, incentive compensation, deferred compensation, commissions, vacation with pay, sick days and benefits under Employee Plans and other similar accruals have either been paid or are accrued and accurately reflected in all material respects in the books and records of the Company and its Subsidiaries.

    (iv)    The Company and its Subsidiaries are in compliance in all material respects with applicable terms and conditions of employment and all Law respecting labour and employment, including pay equity, employment standards, labour, human rights, accessibility, privacy, workers' compensation and occupational health and safety, and there are no material Proceedings with respect to any such Law relating to the Company or any of its Subsidiaries in progress or pending or, to the knowledge of the Company, threatened.

    (v)    No Company Employee has any agreement in relation to any employee's termination, length of notice, pay in lieu of notice, severance, job security or similar provisions (other than such as results by Law from the employment of an employee without an agreement as to notice or severance) nor are there any change of control payments, golden parachutes, severance payments, retention payments, Contracts or other agreements with current or former Company Employees providing for cash or other compensation or benefits upon the consummation of, or relating to, the Arrangement or any other transaction contemplated by this Agreement, including a change of control of the Company or any of its Subsidiaries.

    (vi)    There are no material outstanding assessments, penalties, fines, Liens, charges, surcharges or other amounts due or owing pursuant to any workers' compensation Laws owing by the Company or any of its Subsidiaries, and none of the Company or any of its Subsidiaries have been assessed or reassessed in any material respect under such Laws during the past three years. No material Proceedings involving the Company or any of its Subsidiaries is currently in progress or pending, or, to the knowledge of Company, threatened pursuant to any workers' compensation Laws. There are no Proceedings currently in progress or pending, or, to the knowledge of

the Company, threatened that may materially adversely affect the accident cost experience in respect of the Company and its Subsidiaries.

(vii)   There are no material charges pending with respect to the Company or any of its Subsidiaries under applicable occupational health and safety Laws ("**OHSA**"), and there are no appeals of any Orders applicable to the Company or any of its Subsidiaries currently outstanding under OHSA. The Company and each of its Subsidiaries have complied in all material respects with the terms and conditions of any Orders issued under OHSA and have developed and implemented policies and training for Company Employees, including with respect to harassment, OHSA and accessibility for people with disabilities requirements.

(viii)  All individuals who provide services to the Company or, to the knowledge of the Company, any of its Subsidiaries, have at all times been accurately classified by the Company and its Subsidiaries with respect to such services as an employee or a non-employee for all purposes, including wages, payroll taxes and participation, and benefit accrual under each Employee Plan.

(ix)    No union has bargaining rights in respect of the Company Employees or any Person providing on-site services in respect of the business of the Company or its Subsidiaries. None of the Company or any of its Subsidiaries is a party to or bound by, either directly or indirectly, voluntarily or by operation of Law, any collective bargaining agreement. There are no outstanding or, to the knowledge of the Company, threatened, unfair labour practices, complaints or applications relating to any union, including any Proceedings that could result in the certification of a union as a bargaining agent for any Company Employees, and there have been no such Proceedings within the last five (5) years. To the knowledge of the Company, there are no threatened or apparent union organizing activities involving any Company Employees.

(x)     To the Company's knowledge, in the last five (5) years: (a) no allegations of sexual harassment or sexual misconduct have been made involving any current or former director or Company Employee or independent contractor of the Company or any of its Subsidiaries and (b) none of the Company or any of its Subsidiaries has not entered into any settlement agreements related to allegations of sexual harassment or sexual misconduct by any current or former director or Company Employee or independent contractor of the Company.

(aa)    **Employee Plans**.

(i)     The Data Room contains complete and accurate copies of all Employee Plans and, to the extent applicable, (a) each trust agreement, Contract, insurance or group annuity Contract, letter of credit or other funding Contract relating to any Employee Plan and (b) all material correspondence to or from any Governmental Entity in the last five (5) years relating to any Employee Plan.

(ii)    Only Company Employees and directors of the Company and its Subsidiaries participate in the Employee Plans, and no Persons other than the Company or its Subsidiaries is a participating employer under any Employee Plan.

(iii)    Except as required by the operation of the Plan of Arrangement, neither the execution of this Agreement nor the consummation of the Arrangement or any of the other transactions contemplated under this Agreement will increase the amount payable under, result in a default under or result in any other material obligation pursuant to any Employee Plan or individual Contract with any Company Employee.

(iv)    Each Employee Plan is and has been, in all material respects, established, registered (to the extent required), qualified (to the extent required), funded and administered in accordance with Law and in accordance with their terms. To the knowledge of the Company, no fact or circumstance exists that could adversely affect the registered or qualified status of any such Employee Plan.

(v)    No event has occurred and no condition or circumstance exists that has resulted in, or could reasonably be expected to result in, any Employee Plan being ordered, or required to be, terminated or wound up in whole or in part, having its registration under Law refused or revoked, being placed under the administration of any trustee, receiver or Governmental Entity, or the Company or any of its Subsidiaries being required to pay any Taxes, penalties, payments or levies under Law that are material in the aggregate.

(vi)    All contributions or premiums required to be made or paid by the Company or any of its Subsidiaries, as the case may be, under the terms of each Employee Plan or by Law have been duly made in accordance with the terms of such Employee Plan and in accordance with Law.

(vii)    None of the Company nor any of its Subsidiaries have any material liability or obligation for any assessment, excise or penalty Taxes with respect to any Employee Plan and, to the knowledge of the Company, no condition or circumstances exist that would give rise to any such liability or obligation.

(viii)    To the knowledge of the Company:

(A)    no Employee Plan is subject to any Proceeding initiated by any Governmental Entity, or by any other Person and

(B)    there exists no state of facts which, after notice or lapse of time or both, would reasonably be expected to give rise to any Proceeding to affect the registration or qualification of any Employee Plan required to be registered or qualified.

(bb)    **Taxes**.

(i)    The Company and each of its Subsidiaries have duly and timely filed with the appropriate Governmental Entity all material Tax Returns required by Law to be filed by them prior to the date hereof, and all such Tax Returns are complete and correct in all material respects.

(ii)    The Company and each of its Subsidiaries has paid as required by Law on a timely basis all material Taxes that are due and payable (including instalments required by

Law on account of Taxes for the current year) and all assessments and reassessments of material Taxes due and payable by them, other than Taxes that are being or have been contested in good faith and in respect of which adequate reserves have been provided in the most recently published consolidated financial statements of the Company (where required in accordance with applicable accounting standards). The Company and its Subsidiaries have provided adequate accruals in accordance with their books and records and in the most recently published consolidated financial statements of the Company for any Taxes of the Company and each of its Subsidiaries for the period covered by such financial statements that have not been paid whether or not shown as being due in any Tax Returns. Since the date of publication of the most recent consolidated financial statements of the Company, no liability in respect of material Taxes not reflected in such financial statements or otherwise provided for has been assessed, proposed to be assessed, incurred or accrued.

(iii)   The Company and each of its Subsidiaries has withheld or collected all amounts required by Law to be withheld or collected by them on account of Taxes (including Taxes and other amounts required to be withheld by them in respect of any amount paid or credited or deemed to be paid or credited by them to or for the benefit of any Person, and all amounts on account of any sales, use or transfer Taxes, including goods and services, harmonized sales, provincial and territorial Taxes, and state and local Taxes required by Law to be collected by them) and have remitted all such amounts to the appropriate Governmental Entity when required by Law to do so.

(iv)   No claims, suits, audits, assessments, reassessments, deficiencies, litigation, proposed adjustments or other matters in controversy exist or have been asserted or threatened with respect to material Taxes of the Company or any of its Subsidiaries and none of the Company nor any of its Subsidiaries is not a party to any material action or Proceeding for assessment or collection of Taxes, and no such event has been asserted or threatened against the Company nor any of its Subsidiaries or any of their respective assets.

(v)   No claim has been made by any Governmental Entity in a jurisdiction where the Company or any of its Subsidiaries do not file Tax Returns that the Company or any of its Subsidiaries is or may be subject to Tax by that jurisdiction.

(vi)   There are no Liens with respect to Taxes upon any of the assets of the Company or any of its Subsidiaries.

(vii)   The Company or any of its Subsidiaries are not bound by, is party to or has any obligation under any Tax sharing, allocation, indemnification, or similar agreement with respect to Taxes that could give rise to a payment or indemnification obligation (other than agreements among the Company and its Subsidiaries).

(viii)   There are no outstanding agreements, waivers or objections extending the statutory period or providing for any extension of time with respect to the assessment or reassessment of any material Taxes or of the payment or remittance of material Taxes by the Company or any of its Subsidiaries.

(cc)    **Anti-Terrorism Laws**. None of the Company, its Subsidiaries, or, to the knowledge of the Company, any Representative of the Company or any of its Subsidiaries, has not been and is not currently subject to any economic or financial sanctions or trade embargoes imposed, authorized, administered or enforced by any Governmental Entity (including the Government of Canada, the Office of Foreign Assets Control of the U.S. Treasury Department (including, but not limited to, the designation as a "specially designated national or blocked person" thereunder) or any other applicable sanctions authority) or other similar Laws (collectively "**Sanctions**"). The Company or any of its Subsidiaries have not received any notice alleging that the Company, any of its Subsidiaries or any representative of the Company or any of its Subsidiaries has violated any Sanctions and, to the knowledge of the Company, no condition or circumstances exist (including any ongoing Proceeding) that would form the basis for any such allegations.

(dd)    **Corrupt Practices Legislation**. None of the Company, its Subsidiaries, or, to the knowledge of the Company, any Representative of the Company, or any of its Subsidiaries, has taken, committed to take or been alleged to have taken any action that would cause the Company or any of its Subsidiaries to be in violation of the *Foreign Corrupt Practices Act* of 1977 (United States) or similar Laws (the "**Corrupt Practices Legislation**"). None of the Company or any of its Subsidiaries has received any notice alleging that the Company, any of its Subsidiaries or any representative of the Company or any of its Subsidiaries has violated any Corrupt Practices Legislation and, to the knowledge of the Company, no condition or circumstances exist (including any ongoing Proceeding) that would form the basis for any such allegations.

(ee)    **Privacy**.

(i)     The Company and its Subsidiaries has always complied with all applicable Privacy Laws;

(ii)    the Company has a written policy that governs the collection, use and disclosure of Personal Information, and the Company and its Subsidiaries are in compliance with such policy;

(iii)   there have not been, to the knowledge of the Company, any:

(A)    losses or thefts of, or security breaches relating to, Personal Information in the possession, custody or control of the Company or any of its Subsidiaries;

(B)    unauthorized access or unauthorized use of any Personal Information in the possession, custody or control of the Company or any of its Subsidiaries; and

(C)    improper disclosure of any Personal Information in the possession, custody or control of the Company or any Subsidiary or any Person acting on their behalf; and

(iv)    to the knowledge of the Company, the Company or any of its Subsidiaries is not under investigation for any violation of applicable Privacy Laws.

(v)    in the case of each of (i) through (iv) above, to the extent it would not result in a Material Adverse Effect for the Company.

(ff)    **Anti-Spam**. The Company and each of its Subsidiaries has, in all material respects, conducted its business in compliance with all applicable anti-spam legislation, including provisions relating to the sending of commercial electronic messages only with express or implied consent, within the meaning of such legislation, and with the prescribed contact information and unsubscribe mechanism, and retains records sufficient to demonstrate such compliance.

(gg)    **Insolvency**. No act or Proceeding has been taken by or against the Company or any of its Subsidiaries in connection with the dissolution, liquidation, winding up, bankruptcy or reorganization of the Company or any of its Subsidiaries or for the appointment of a trustee, receiver, manager or other administrator of the Company or any of its Subsidiaries or any of its properties or assets nor, to the knowledge of the Company, is any such act or Proceeding threatened. The Company (nor any of its Subsidiaries) has sought protection under the *United States Bankruptcy Code* (11 U.S.C. 101 et al) or similar legislation applicable to the Company or its Subsidiaries. Neither the Company nor any of its Subsidiaries nor any of their respective properties or assets are subject to any outstanding judgment, Order, writ, injunction or decree that involves or may involve, or restricts or may restrict, the right or ability of the Company or any of its Subsidiaries to conduct its business in all material respects as it has been carried on prior to the date hereof, or that would reasonably be expected to prevent or significantly impede or materially delay the completion of the Arrangement.

(hh)    **Restrictions on Business Activities**. There is no agreement, judgment, injunction, order or decree binding upon the Company or any of its Subsidiaries that has or would reasonably be expected to have the effect of prohibiting, restricting or materially impairing any business practice of the Company or its Subsidiaries or the conduct of business by the Company or any of its Subsidiaries as currently conducted other than such agreements, judgments, injunction, Orders or decrees as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

**Schedule D**
**Representations and Warranties of Telecure and Acquireco**

(a)     **Organization and Qualification**. Each of Telecure, Acquireco and each of their respective Subsidiaries is a corporation or entity incorporated or organized, as applicable, validly existing under the Laws of the jurisdiction of its incorporation, organization or formation, as applicable, and has the power and capacity to own, lease and operate its assets and properties and conduct its business as now owned and conducted. Each of Telecure, Acquireco and each of their respective Subsidiaries is duly qualified, licensed or registered to carry on business in each jurisdiction in which its assets are located or it conducts business, except where the failure to be so qualified, licensed or registered would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. No steps or Proceedings have been taken by any Person, voluntary or otherwise, requiring or authorizing the dissolution or winding up of Telecure, Acquireco or any of their Subsidiaries.

(b)     **Corporate Authorization**. Each of Telecure and Acquireco has the corporate power and capacity to enter into and perform its obligations under this Agreement. The execution, delivery and performance by each of Telecure and Acquireco of its obligations under this Agreement have been duly authorized by all necessary corporate action on the part of each of Telecure and Acquireco and no other corporate proceedings on the part of such Parties are necessary to authorize this Agreement or the consummation of the Arrangement and the other transactions contemplated hereby.

(c)     **Directors' Approvals**. Telecure Board has approved the entering into of this Agreement.

(d)     **Execution and Binding Obligation**. This Agreement has been duly executed and delivered by each of Telecure and Acquireco and constitutes a legal, valid and binding agreement of each of Telecure and Acquireco enforceable against it in accordance with its terms subject only to any limitation on bankruptcy, insolvency or other Laws affecting the enforcement of creditors' rights generally and the discretion that a court may exercise in the granting of equitable remedies such as specific performance and injunction.

(e)     **Governmental Authorization**. The execution, delivery and performance by each of Telecure and Acquireco of their obligations under this Agreement and the consummation of the Arrangement do not require any other Authorization or other action by or in respect of, or filing with, or notification to, any Governmental Entity other than: (i) the Interim Order; (ii) the Final Order; (iii) filings with the Registrar of Companies under the BCBCA; (iv) any required actions or filings with the Exchange and any applicable securities regulatory authority; and (v) any consents, waivers, approvals or actions or filings or notifications, the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f)     **Non-contravention**. The execution, delivery and performance by each of Telecure and Acquireco of its obligations under this Agreement and the consummation of the Arrangement do not and will not (or would not with the giving of notice, the lapse of time or the happening of any other event or condition):

    (i)      contravene, conflict with, or result in any violation or breach of any of the articles, by-laws or constating documents of Telecure or Acquireco;

    (ii)    assuming compliance with all matters referred to in this subsection (f), contravene, conflict with or result in a violation or breach of any Law applicable to Telecure or Acquireco; or

    (iii)   allow any Person to exercise any rights, require any consent or notice under or other action by any Person, or constitute a default under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit to which Telecure or any of its Subsidiaries is entitled (including by triggering any rights of first refusal or first offer or other restrictions or limitations) under any Contract or any Authorization to which Telecure, Acquireco, or any of their Subsidiaries is a party or by which Telecure, Acquireco, or any of its Subsidiaries is bound;

with such exceptions in the case of clauses (ii) and (iii) as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)    **Third Party Consents.** Except as contemplated in this Agreement, no consent, waiver or approval from other parties to the Material Contracts is (i) required to be obtained by Telecure, Acquireco, or their Subsidiaries in connection with the execution, delivery and performance by Telecure of this Agreement or the consummation of the Arrangement, or (ii) required in order to maintain the Material Contracts in full force and effect immediately upon the consummation of the Arrangement, except for such consents, the absence of which would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)    **Capitalization**.

    (i)      The authorized capital of Telecure consists of an unlimited number of Telecure Shares and an unlimited number of Class B Non-Voting shares. As of the date of this Agreement, there were 1,015,444.45 Telecure Shares, no Class B Non-Voting shares issued and outstanding, 25,000,000 special warrants, each ultimately exchangeable for one Telecure Share, and an aggregate of 535,644 warrants, each ultimately exercisable to acquire a Telecure Share.

    (ii)    Except as set forth in the Telecure Disclosure Letter, there are no issued and outstanding or authorized options, equity-based awards, warrants, calls, conversion, pre-emptive, redemption, repurchase, stock appreciation or other rights, or any other agreements, arrangements, instruments or commitments of any kind that obligate Telecure or any of its Subsidiaries to, directly or indirectly, issue or sell any securities of Telecure or any of its Subsidiaries, or give any Person a right to subscribe for or acquire any securities of Telecure or any of its Subsidiaries.

    (iii)   All outstanding securities of Telecure have been issued in material compliance with all applicable Laws, including Securities Laws.

(iv)     The authorized capital of Acquireco consists of an unlimited number of Acquireco Shares. As of the date of this Agreement, there is one (1) Acquireco Shares issued and outstanding.

(v)      All outstanding Acquireco Shares have been issued in material compliance with all applicable Laws, including Securities Laws.

(vi)     The Consideration Shares to be issued pursuant to the Arrangement, upon issuance, will be validly issued and outstanding as fully paid and non-assessable securities in the capital of Telecure.

(i)     **Telecure Assets**. Except as set forth in the Telecure Disclosure Letter, the assets of Telecure consist of: (i) C\$100,000 in cash; (ii) US\$100,000 promissory note receivable from MyApps Corp.; and (iii) and 1,500,000 common shares in CloudMD Software and Services (TSXV: DOC) (OTC: DOCRF).

(j)     **Business Conduct and Operations**.

(i)      Telecure does not conduct any business operations.

(ii)     Acquireco was incorporated on December 10, 2020 for the sole purpose of completing the transactions contemplated by this Agreement and has not at any time conducted any business operations.

(k)     **Subsidiaries**.

(i)      Telecure is, directly or indirectly, the registered and beneficial owner of all of the outstanding shares or other equity interests of each of its Subsidiaries (including Acquireco), as set forth in the Telecure Disclosure Letter, free and clear of any Liens (other than Permitted Liens), and all such shares or other equity interests so owned by Telecure have been duly authorized and validly issued as fully paid and non-assessable, as the case may be, in material compliance with all applicable Laws, and no such shares or other equity interests have been issued in violation of any pre-emptive or similar rights.

(ii)     Neither Telecure nor its Subsidiaries, beneficially or of record, owns any equity interest of any kind in any other Person.

(iii)    Acquireco has no Subsidiaries.

(l)     **Auditors**. Telecure's current auditors are independent with respect to Telecure within the meaning of the rules of professional conduct applicable to auditors in Canada and there has never been a "reportable event" (within the meaning of NI 51-102) with the current auditors of Telecure.

(m)    **Reporting Issuer Status and Securities Law Matters**.

(i)      Telecure is not a "reporting issuer" in any jurisdiction in Canada.

(ii)     Telecure is in compliance, in all material respects, with all applicable Securities Laws and there are no current, pending or, to the knowledge of Telecure, threatened

Proceedings before any securities regulatory authorities or other Governmental Entity relating to any alleged noncompliance with any Securities Laws.

(iii)    Telecure has filed all documents required to be filed by it in accordance with Securities Laws with the applicable securities regulatory authorities. Telecure has timely filed or furnished all filings required to be filed or furnished by Telecure with any Governmental Entity. Each of Telecure's filings complied as filed in all material respects with Securities Laws and did not, as of the date filed (or, if amended or superseded by a subsequent filing prior to the date of this Agreement, on the date of such filing), contain any Misrepresentation. Telecure has not filed any confidential material change report which at the date of this Agreement remains confidential.

(n)    **Financial Statements**.

(i)    Telecure's audited annual financial statements (including any of the notes or schedules thereto, the auditor's report thereon and the related management's discussion and analysis) for the period ended December 31, 2019 and the period from incorporation to December 31, 2018 and the unaudited financial statements (including any of the notes or Schedules thereto) for the nine month period ended September 30, 2020, were prepared in accordance with IFRS and applicable Laws and fairly present, in all material respects, the financial position of Telecure and its Subsidiaries at the respective dates thereof and the results of Telecure's operations and cash flows for the periods indicated therein (except as may be expressly indicated in the notes to such financial statements). Telecure does not intend to correct or restate, nor, to the knowledge of Telecure, is there any basis for any correction or restatement of, any aspect of Telecure's financial statements. There are no, nor are there any commitments to become party to, any off-balance sheet transaction, arrangement, obligation (including contingent obligations) or other similar relationships of Telecure or any of its Subsidiaries with unconsolidated entities or other Persons.

(ii)    The financial books, records and accounts of Telecure and each of its Subsidiaries: (a) have been maintained in accordance with commercially reasonable business practices in all material respects; (b) are stated in reasonable detail; (c) accurately and fairly reflect all the material transactions, acquisitions and dispositions of Telecure and its Subsidiaries; and (d) accurately and fairly reflect the basis of Telecure's financial statements.

(o)    **Internal Controls and Financial Reporting**. Telecure has (i) designed disclosure controls and procedures to provide reasonable assurance that material information relating to Telecure and its Subsidiaries is made known to the Chief Executive Officer and Chief Financial Officer of Telecure on a timely basis, particularly during the periods in which the annual or interim filings are being prepared; (ii) designed internal controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS; (iii) has evaluated the effectiveness of Telecure's disclosure controls and procedures; and (iv) has evaluated the effectiveness of Telecure's internal control over

financial reporting and, if applicable, the necessary disclosure relating to any material weaknesses. To the knowledge of Telecure, as of the date of this Agreement:

(i)    there are no material weaknesses in, the internal controls over financial reporting of Telecure that could reasonably be expected to adversely affect Telecure's ability to record, process, summarize and report financial information; and

(ii)    there is and has been no fraud, whether or not material, involving management or any other employees who have a significant role in the internal control over financial reporting of Telecure. Since December 31, 2019, Telecure has received no: (x) complaints from any source regarding accounting, internal accounting controls or auditing matters; or (y) expressions of concern from employees of Telecure regarding questionable accounting or auditing matters.

(p)    **Absence of Undisclosed Liabilities**. There are no liabilities or obligations of Telecure or any of its Subsidiaries of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than liabilities or obligations: (i) disclosed in Telecure's unaudited financial statements as at September 30, 2020; (ii) incurred in the ordinary course of business since September 30, 2020; (iii) incurred in connection with this Agreement; or (iv) that would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(q)    **Absence of Certain Changes or Events**. Since December 31, 2019, other than the transactions contemplated in this Agreement, the business of Telecure and its Subsidiaries has been conducted only in the ordinary course of business and there has not been any event, occurrence, fact, effect or circumstance that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(r)    **Compliance with Laws**. Telecure and each of its Subsidiaries is and has been in compliance with applicable Laws and, to the knowledge of Telecure, none of Telecure or any of its Subsidiaries is under any investigation with respect to, has been charged or threatened to be charged with, or has received notice of, any violation or potential violation of any applicable Laws, except for failures to comply or violations that have not had or would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(s)    **Licences and Authorizations**. Except as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect: (i) all Authorizations which are necessary for Telecure and its Subsidiaries to own its assets or conduct its business as presently owned or conducted have been obtained and are in full force and effect in accordance with their terms; (ii) Telecure and its Subsidiaries have complied with all such Authorizations and are not in breach or default under any such Authorizations; (iii) Telecure and its Subsidiaries have not received written, or to the knowledge of Telecure, other notice, of any alleged breach of or alleged default under any such Authorization or of any intention of any Governmental Entity to revoke or not renew any such Authorizations; and (iv) no Proceedings are pending or, to the knowledge of Telecure, threatened which could reasonably be expected to result in the revocation of such Authorizations.

(t)   **Material Contracts**. Except as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect: (i) each Material Contract is legal, valid and binding and in full force and effect and is enforceable by Telecure or a Subsidiary, as applicable, in accordance with its terms subject only to any limitation under bankruptcy, insolvency or other Laws affecting the enforcement of creditors' rights generally and the discretion that a court may exercise in the granting of equitable remedies such as specific performance and injunction; (ii) Telecure and its Subsidiaries, as applicable, have performed the obligations required to be performed by Telecure or a Subsidiary, as applicable, under each Material Contract (iii) none of Telecure or any of its Subsidiaries is in breach or default under any Material Contract nor does Telecure have knowledge of any condition that with the passage of time or the giving of notice or both would result in such a breach or default; and (iv) as of the date of this Agreement, none of Telecure or any of its Subsidiaries knows of, or has received any notice (whether written or oral) of, any breach, default, cancellation, termination or non-renewal under any Material Contract by any party to a Material Contract. The Telecure Disclosure Letter sets out a complete and accurate list of all Material Contracts as of the date of this Agreement.

(u)   **Litigation**. There are no claims, actions, suits, arbitrations, inquiries, investigations or Proceedings pending or, to the knowledge of Telecure, threatened against or relating to Telecure or any of its Subsidiaries, the business of Telecure of any of its Subsidiaries or affecting any of their respective current or former properties or assets by or before any Governmental Entity that, if determined adverse to the interests of Telecure or its Subsidiaries would have, or be reasonably expected to have, a Material Adverse Effect or would restrain, enjoin or otherwise prohibit or delay or otherwise adversely affect the consummation of the Arrangement, nor, to the knowledge of Telecure, are there any events or circumstances which could reasonably be expected to give rise to any such claim, action, suit, arbitration, inquiry, investigation or Proceeding.

(v)   **Related Party Transactions**. Except as disclosed in the Telecure Disclosure Letter, neither Telecure nor any of its Subsidiaries is indebted to any director, officer, employee or agent of, or independent contractor to, Telecure or any of its Subsidiaries or any of their respective affiliates or associates (except for amounts due in the ordinary course of business as salaries, bonuses, directors' fees or the reimbursement of ordinary course expenses). There are no Contracts (other than employment arrangements) with, or advances, loans, guarantees, liabilities or other obligations to, on behalf or for the benefit of, any shareholder, officer or director of Telecure or any of its Subsidiaries, or any of their respective affiliates or associates.

(w)   **Restrictions on Business Activities**. There is no agreement, judgment, injunction, order or decree binding upon Telecure or any of its Subsidiaries that has or would reasonably be expected to have the effect of prohibiting, restricting or materially impairing any business practice of Telecure or its Subsidiaries or the conduct of business by Telecure or any of its Subsidiaries as currently conducted other than such agreements, judgments, injunctions orders or decrees as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(x)   **Real Property**. None of Telecure, Acquireco, or their Subsidiaries currently owns or leases, nor has it at any time owned or leased, any real property.

(y)     **Insolvency**. No act or Proceeding has been taken by or against Telecure or any of its Subsidiaries in connection with the dissolution, liquidation, winding up, bankruptcy or reorganization of Telecure or any of its Subsidiaries or for the appointment of a trustee, receiver, manager or other administrator of Telecure or any of its Subsidiaries or any of its properties or assets nor, to the knowledge of Telecure, is any such act or Proceeding threatened. Telecure (nor any of its Subsidiaries) has not sought protection under the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada) or similar legislation. Neither Telecure nor any of its Subsidiaries nor any of their respective properties or assets are subject to any outstanding judgment, Order, writ, injunction or decree that involves or may involve, or restricts or may restrict, the right or ability of Telecure or any of its Subsidiaries to conduct its business in all material respects as it has been carried on prior to the date hereof, or that would reasonably be expected to prevent or significantly impede or materially delay the completion of the Arrangement.

(z)     **Money Laundering Laws**. The operations of Telecure and its Subsidiaries are and have been conducted at all times in material compliance with applicable financial recordkeeping and reporting requirements of the Money Laundering Laws and no action, suit or Proceeding by or before any regulatory authority involving Telecure or any of its Subsidiaries with respect to the Money Laundering Laws is pending or, to the knowledge of Telecure, threatened.

# EXHIBIT B

## FIRST AMENDMENT TO ARRANGEMENT AGREEMENT

**THIS AMENDMENT** is made as of February 9, 2021

AMONG:

> **TELECURE TECHNOLOGIES INC.**, a corporation incorporated under the laws of the Province of British Columbia ("**Telecure**")
>
> - and -
>
> **1278859 B.C. Ltd.**, a corporation incorporated under the laws of the Province of British Columbia ("**Acquireco**")
>
> - and -
>
> **MYAPPS CORP.**, a corporation incorporated under the laws of the State of Florida (the "**Company**")

RECITALS:

A.   Telecure, Acquireco and the Company are parties to an arrangement agreement (the "**Arrangement Agreement**") dated December 15, 2020; and

B.   Telecure, Acquireco and the Company wish to amend certain terms of the Arrangement Agreement in accordance with Section 8.01 of the Arrangement Agreement as provided in this Amendment.

**THEREFORE**, in consideration of the mutual covenants contained herein (the receipt and sufficiency of which are hereby acknowledged), the Parties agree as follows:

## ARTICLE 1
## INTERPRETATION

### 1.1   Definitions

Capitalized terms used but not defined in this Amendment have the meanings given to them in the Arrangement Agreement.

### 1.2   Interpretation not Affected by Headings

The division of this Amendment into Articles, Sections, subsections and paragraphs and the insertion of headings are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Amendment. Unless the contrary intention appears, references in this Amendment to an Article, Section, subsection or paragraph or both refer to the Article, Section, subsection or paragraph, respectively, bearing that designation in this Amendment.

### 1.3   Number and Gender

In this Amendment, unless the contrary intention appears, words importing the singular include the plural and vice versa, and words importing gender shall include all genders.

### 1.4   Governing Law

This Amendment shall be governed by and construed in accordance with the laws of the Province of British Columbia and the federal laws of Canada applicable therein.

**ARTICLE 2**
**AMENDMENTS**

### 2.1   Amendments to the Arrangement Agreement

(1)   The definition of "Outside Date" at Section 1.01 of the Arrangement Agreement is deleted in its entirety, and replaced with the following:

""**Outside Date**" means April 26, 2021."

(2)   Section 5.02(b)(v) of the Arrangement Agreement is deleted in its entirety, and replaced with the following:

"issue, grant, deliver, sell, pledge or otherwise encumber, or authorize the issuance, grant, delivery, sale, pledge or other encumbrance of, any shares or other securities, or any options, warrants or similar rights exercisable or exchangeable for or convertible into shares or other securities, of Telecure or of any Subsidiary, except (A) the Performance Warrants, (B) securities issuable pursuant to the terms of the Concurrent Financing or the Arrangement, (C) as disclosed in the Telecure Disclosure Letter, (D) restricted share rights issued pursuant to Telecure's equity incentive plan dated November 23, 2020;"

(3)   Section 5.08 of the Arrangement Agreement is deleted in its entirety, and replaced with the following:

"Following the Effective Date, two equal payments of US$75,000 are to be made to each of: (i) Adnan Malik; (ii) Muhammad Kashif Akram; and (iii) Dr. Muhammad Shaukat, with the first of such payments taking place immediately following the Effective Date and the second of such payments to occur one month following the Effective Date."

(4)   Section 6.01(j) of the Arrangement Agreement is deleted in its entirety, and replaced with the following:

"(j)   the Telecure Board shall consist of: (i) Adnan Malik; (ii) Muhammad Kashif Akram; (iii) Dr. Muhammad Shaukat; (iv) Harwinder Parmar; and (v) Josh Rosenberg."

2

## ARTICLE 3
## GENERAL PROVISIONS

**3.1   Ratification and Confirmation**

The Arrangement Agreement, as amended hereby, remains in full force and effect, and as amended hereby is hereby ratified and confirmed. Provisions of the Arrangement Agreement that have not been amended or terminated by this Amendment remain in full force and effect, unamended. All rights and liabilities that have accrued to any Party under the Arrangement Agreement up to the date of this Amendment remain unaffected by this Amendment.

**3.2   Arrangement Agreement Provisions**

The provisions of Article 8 of the Arrangement Agreement shall apply, *mutatis mutandis*, to this Amendment.

**3.3   Counterparts**

This Amendment may be executed by facsimile or other electronic signature and in counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument.

**[signature page follows]**

- 4 -

**IN WITNESS WHEREOF,** the Parties have executed this Amendment as of the date first written above.

**MYAPPS CORP.**

By: _____

    Name: Adnan Malik
    Title:  Chief Executive Officer


**TELECURE TECHNOLOGIES INC.**

By: _____

    Name: Harwinder Parmar
    Title:  President


**1278859 B.C. Ltd.**

By: _____

    Name: Eli Dusenbury
    Title:  Director

**IN WITNESS WHEREOF**, the Parties have executed this Amendment as of the date first written above.

**MYAPPS CORP.**

By: _____
       Name:  Adnan Malik
       Title:   Chief Executive Officer

**TELECURE TECHNOLOGIES INC.**

By: _____
       Name:  Harwinder Parmar
       Title:   President

**1278859 B.C. Ltd.**

By: _____
       Name:  Eli Dusenbury
       Title:   Director

*Signature Page to Amending Agreement*

# EXHIBIT C

### THIRD AMENDMENT TO ARRANGEMENT AGREEMENT

**THIS AMENDMENT** is made as of April 22, 2021

AMONG:

> **TELECURE TECHNOLOGIES INC.**, a corporation incorporated under the laws of the Province of British Columbia ("**Telecure**")
>
> - and -
>
> **1278859 B.C. Ltd.**, a corporation incorporated under the laws of the Province of British Columbia ("**Acquireco**")
>
> - and -
>
> **MYAPPS CORP.**, a corporation incorporated under the laws of the State of Florida (the "**Company**")

**RECITALS:**

A.   Telecure, Acquireco and the Company are parties to an arrangement agreement (the "**Arrangement Agreement**") dated December 15, 2020, as amended pursuant to a first amendment dated February 9, 2021 and a second amendment dated February 19, 2021; and

B.   Telecure, Acquireco and the Company wish to amend certain terms of the Arrangement Agreement in accordance with Section 8.01 of the Arrangement Agreement as provided in this Amendment.

**THEREFORE**, in consideration of the mutual covenants contained herein (the receipt and sufficiency of which are hereby acknowledged), the Parties agree as follows:

### ARTICLE 1
### INTERPRETATION

**1.1   Definitions**

Capitalized terms used but not defined in this Amendment have the meanings given to them in the Arrangement Agreement.

**1.2   Interpretation not Affected by Headings**

The division of this Amendment into Articles, Sections, subsections and paragraphs and the insertion of headings are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Amendment. Unless the contrary intention appears, references in this Amendment to an Article, Section, subsection or paragraph or both refer to the Article, Section, subsection or paragraph, respectively, bearing that designation in this Amendment.

## 1.3 Number and Gender

In this Amendment, unless the contrary intention appears, words importing the singular include the plural and vice versa, and words importing gender shall include all genders.

## 1.4 Governing Law

This Amendment shall be governed by and construed in accordance with the laws of the Province of British Columbia and the federal laws of Canada applicable therein.

**ARTICLE 2**
**AMENDMENTS**

## 2.1 Amendments to the Arrangement Agreement

(1)    The definition of "Outside Date" at Section 1.01 of the Arrangement Agreement is deleted in its entirety, and replaced with the following:

    ""**Outside Date**" means May 26, 2021."

**ARTICLE 3**
**GENERAL PROVISIONS**

## 3.1 Ratification and Confirmation

The Arrangement Agreement, as amended hereby, remains in full force and effect, and as amended hereby is hereby ratified and confirmed. Provisions of the Arrangement Agreement that have not been amended or terminated by this Amendment remain in full force and effect, unamended. All rights and liabilities that have accrued to any Party under the Arrangement Agreement up to the date of this Amendment remain unaffected by this Amendment.

## 3.2 Arrangement Agreement Provisions

The provisions of Article 8 of the Arrangement Agreement shall apply, *mutatis mutandis*, to this Amendment.

## 3.3 Counterparts

This Amendment may be executed by facsimile or other electronic signature and in counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument.

[signature page follows]

**IN WITNESS WHEREOF,** the Parties have executed this Amendment as of the date first written above.

**MYAPPS CORP.**

By: _____
E-SIGNED by Adnan Malik
on 2021-04-22 12:16:15 GMT

Name:  Adnan Malik
Title:   Chief Executive Officer


**TELECURE TECHNOLOGIES INC.**

By: _____
E-SIGNED by Harwinder Parmar
on 2021-04-22 15:51:35 GMT

Name:  Harwinder Parmar
Title:   President


**1278859 B.C. Ltd.**


By: _____

Name:  Eli Dusenbury
Title:   Director


*Signature Page to Amending Agreement*

# EXHIBIT D

## FOURTH AMENDMENT TO ARRANGEMENT AGREEMENT

THIS AMENDMENT is made as of May 25, 2021

AMONG:

TELECURE TECHNOLOGIES INC., a corporation incorporated under the laws of the Province of British Columbia ("Telecure")

- and -

1278859 B.C. Ltd., a corporation incorporated under the laws of the Province of British Columbia ("Acquireco")

- and -

MYAPPS CORP., a corporation incorporated under the laws of the State of Florida (the "Company")

RECITALS:

A.     Telecure, Acquireco and the Company are parties to an arrangement agreement (the "Arrangement Agreement") dated December 15, 2020, as amended pursuant to a first amendment dated February 9, 2021, a second amendment dated February 19, 2021 and a third amendment dated April 22, 2021; and

B.     Telecure, Acquireco and the Company wish to amend certain terms of the Arrangement Agreement in accordance with Section 8.01 of the Arrangement Agreement as provided in this Amendment.

THEREFORE, in consideration of the mutual covenants contained herein (the receipt and sufficiency of which are hereby acknowledged), the Parties agree as follows:

## ARTICLE 1
## INTERPRETATION

### 1.1     Definitions

Capitalized terms used but not defined in this Amendment have the meanings given to them in the Arrangement Agreement.

### 1.2     Interpretation not Affected by Headings

The division of this Amendment into Articles, Sections, subsections and paragraphs and the insertion of headings are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Amendment. Unless the contrary intention appears, references in this Amendment to an Article, Section, subsection or paragraph or both refer to the Article, Section, subsection or paragraph, respectively, bearing that designation in this Amendment.

### 1.3    Number and Gender

In this Amendment, unless the contrary intention appears, words importing the singular include the plural and vice versa, and words importing gender shall include all genders.

### 1.4    Governing Law

This Amendment shall be governed by and construed in accordance with the laws of the Province of British Columbia and the federal laws of Canada applicable therein.

## ARTICLE 2
## AMENDMENTS

### 2.1    Amendments to the Arrangement Agreement

(1)    The definition of "Outside Date" at Section 1.01 of the Arrangement Agreement is deleted in its entirety, and replaced with the following:

""**Outside Date**" means July 26, 2021."

## ARTICLE 3
## GENERAL PROVISIONS

### 3.1    Ratification and Confirmation

The Arrangement Agreement, as amended hereby, remains in full force and effect, and as amended hereby is hereby ratified and confirmed. Provisions of the Arrangement Agreement that have not been amended or terminated by this Amendment remain in full force and effect, unamended. All rights and liabilities that have accrued to any Party under the Arrangement Agreement up to the date of this Amendment remain unaffected by this Amendment.

### 3.2    Arrangement Agreement Provisions

The provisions of Article 8 of the Arrangement Agreement shall apply, *mutatis mutandis*, to this Amendment.

### 3.3    Counterparts

This Amendment may be executed by facsimile or other electronic signature and in counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument.

**[signature page follows]**

LEGAL*53192220.1

**IN WITNESS WHEREOF**, the Parties have executed this Amendment as of the date first written above.

MYAPPS CORP.

By: _____
E-SIGNED by Adnan Malik
on 2021-05-25 19:38:32 GMT

Name:  Adnan Malik
Title:   Chief Executive Officer

TELECURE TECHNOLOGIES INC.

By: _____
E-SIGNED by Harwinder Parmar
on 2021-05-25 19:32:09 GMT

Name:  Harwinder Parmar
Title:   President

1278859 B.C. Ltd.

By: _____
E-SIGNED by Eli Dusenbury
on 2021-05-25 19:03:20 GMT

Name:  Eli Dusenbury
Title:   Director

*Signature Page to Amending Agreement*

Filing # 141952727 E-Filed 01/13/2022 03:00:38 PM

IN THE CIRCUIT COURT OF THE
EIGHTEENTH JUDICIAL CIRCUIT IN AND
FOR SEMINOLE COUNTY, FLORIDA

Case No.: ___2022CA000089___

MYAPPS CORP.,

     Plaintiff,

vs.

TELECURE TECHNOLOGIES, INC.,

     Defendant.         /

### SUMMONS

THE STATE OF FLORIDA:

To All and Singular the Sheriffs of said State:

    **YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint in this action on Defendant

    TELECURE TECHNOLOGIES, INC.
    c/o its president, vice president, or other head; or
    c/o cashier, treasurer, secretary or general manager; or
    c/o director; or
    c/o any officer or other business agent
    801 International Parkway
    Suite 500
    Lake Mary, Florida 32746

    Defendant is hereby required to serve written defenses to the Complaint on Plaintiffs' attorneys, whose address is:

    RONALD D. EDWARDS, JR., ESQUIRE
    Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
    215 North Eola Drive
    Post Office Box 2809
    Orlando, Florida 32802
    ronald.edwards@lowndes-law.com
    lit.control@lowndes-law.com
    tracy.kennison@lowndes-law.com

within twenty (20) days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiffs' attorney or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint.

WITNESS my hand and seal of said Court on __14th__ day of ⌐January⌐, 2022.

**Grant Maloy**

CLERK OF THE CIRCUIT COURT   **And Comptroller**

/s Deborah  Conant          592622CA0000890000XX
01/14/2022 08:30:56 AM
2084a53c-cf0f-4f66-a28d-47e14436813e
As Deputy Clerk

(COURT SEAL)

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. If you require assistance please contact:**

**ADA Coordinator at Seminole Court Administration**
**301 N. Park Avenue**
**Suite N301**
**Sanford, Florida, 32771-1292**
**(407) 665-4227**

**NOTE: You must contact coordinator at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired in Seminole County, call 711.**
0029763\196104\11688138v1